**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**UNITED STATES OF AMERICA,**
**Plaintiff,**

Criminal No. 1:98CR00014-002

**v.**

Civil No. 02-429T

**RAFAEL ARIES SANTOS BATISTA,**
**Defendant.**

**MOTION TO SET ASIDE VOID JUDGMENT**
**LACK OF SUBJECT MATTER JURISDICTION**
**PURSUANT TO FEDERAL RULE CIVIL PROCEDURE**
**RULE 60(b)(4)**

The Defendant, Rafael Aries Santos Batista, (hereinafter referred to as "Batista") Pro se, in the above styled and numbered cause, under the Fifth and Sixth Amendments to the United States Constitution, the extraordinary habeas remedy, Rule 60(b)(4) of the Federal Rules of Civil Procedure respectfully moves the Court for an order setting aside the void judgment. Batista incorporates herein, and makes a part hereof, Appendix A, Statement of Uncontrovertable Fact, Appendix B, Affidavit of Rafael Aries Santos Batista, and Appendix C, Evidence from the Congressional Record, and Appendix D, Evidence that the Government Supports My Position. The void judgment in this matter must be set aside because the Court lacked subject matter jurisdiction to render it. The underlying statutes used to obtain jurisdiction violate the Presentment Clausse of the Constitution, Article I, Section 7, because a **different bill** passed the House than passed the Senate, rendering it a nullity. Furthermore, the House bill, H.R. 3190, is also unconstitutional on its face because it died sine die twice in the First Session of the 80th Congress without the Senate passing it, was not reintroduced as new legislation in the Second Session of the 80th Congress by the House, was then amended by the Senate in the Second

Session, was signed into law after Congress adjourned sine die on June 20, 1948, has no valid enactment clause, and was enrolled by fraud. Since Batista has judicially noticed the facts and law related to this motion, he is entitled to a ***directed verdict*** and dismissal of his indictment and conviction. Since Jurisdiction is a threshold issue, it may be raised at any time. In support of this motion, Batista would show the Court as follows:

**I.**

**HISTORY**

On February 18, 1998, a grand jury returned a two-count indictment against Batista. Count One charged Batista with conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. 846. Count Two charged posssession with intent to distribute cocaine, in violation of 21 U.S.C. 841(a)(1). Batista proceeded to trial by jury on the indictment. The trial began on July 14, 1998, and on July 16, 1998, the jury returned its verdict finding Batista guilty on both counts.

On December 7, 1998, the court sentenced Batista to 210 months of imprisonment.

On January 8, 2001, the First Circuit upheld Batista's conviction and sentence, *United States v. Batista*, 239 F.3d 16 (1st Cir. 2001), and certiorari was denied on October 1, 2001, *United States v. Santo (Sic) Batista*, 122 S.Ct. 117 (2001).

On September 30, 2002, Batista 28 U.S.C. 2255 motion was filed, and was denied on July 22, 2003.

**II.**

**STATEMENT OF JURISDICTION**

A district court has the authority to consider Rule 60(b)(4) motion which challenges the subject matter jurisdiction of the district court. *Gonzalez v. Crosby*, 545 U.S. 524, 125 S.Ct.

2641, 2649, L.Ed.2d 480 (2005)("Subject matter jurisdiction can be raised in Rule 60(b) motion because the absence of jurisdiction deprives federal court of power to adjudicate the rights of the parties"). See also *Cotton v. United States*, 535 U.S. 625, 630 (2002)("because jurisdiction means the court's statutory or constitutional power to adjudicate a case, defects in subject matter jurisdiction require correction regardless of whether the error was raised in district court.").

This motion to set aside void judgment is timely pursuant to Fed.R.Civ.P. Rule 60(b)(4), as there is no time limit where the court lacked / lacks jurisdiction. According to the language of Rule 60(b), a Rule 60(b)(4) motion must be "made within a reasonable time." Fed.R.Civ.P. 60 (b). However, Courts have been exceedingly lenient in defining the term 'reasonable time,' with respect to voidness challenges. In fact, it has been oft-stated that, for all intents and purposes, a motion to vacate a default judgment as void may be brought at any time. See *United States v. Boch Oldsmobile*, 909 F.2d 657, 661 (1st Cir. 1990)("a void judgment has no time limitations"); *Velez v. Vassallo*, 203 F.Supp.2d 312, 318 (S.D.N.Y. 2002)("Nearly overwhelming authority exists for the proposition that there are no time limits to a challenge to a void judgment because of its status as a nullity.")(quoting *United States v. One Toshiba Color*, 213 F.3d 147, 157 (3d Cir. 2000)).

Moreover, unlike with motions based upon other Rule 60(b) subsections, a court has no discretion with respect to motions to vacate void judgments under Rule 60(b)(4), so that if void, the court must vacate the judgment. See *Echevarria-Gonzalez v. Gonzalez-Chapel*, 849 F.2d 24, 28 (1st Cir. 1988)("If the judgment is void, the district court has no discretion but to set aside the entry of default judgment"); see also *Sea-Land Service, Inc. v. Ceramica Europa II, Inc.*, 160 F.3d 849, 852 (1st Cir. 1998); *Smalls v. Batista*, 22 F.Supp.2d 230, 231 (S.D.N.Y. 1998)("The court lacks discretion with respect to a motion made under Rule 60(b)(4). If void, the court must

vacate the judgment.").

> "If the underlying judgment is void, it is per se abuse of discretion for the district court to deny movant's motion to vacate void judgment under Federal Rule Civil Procedure 60(b)(4)." *Antonie v. Atlas Turner Inc.*, 66 F.3d 105 (6th Cir.1995).

Furthermore, this court is compelled to provide appropriate relief under the auspices of Federal Rule Civil Procedure, Rule 60(b)(4), where judgment is void.

> "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that announcing the fact and dismissing the cause." *Steel Co., v. Citizens For a Better Env.,* 523 U.S. 83, 94 (1998).

The indictment against Mr. Batista alleges violations of various federal statutes. The court obtained its jurisdiction to prosecute Mr. Batista pursuant to 18 U.S.C. Sec. 3231. Since 18 U.S.C. Sec. 3231 was never enacted into positive law, is unconstitutional on its face, and is null and void ab initio, as a matter of law, the court has no jurisdiction to prosecute Mr. Batista. Since judicially noticed facts and well-settled law establishes as a matter of law that the district court does not have jurisdiction over Mr. Batista to indict, prosecute and sentence him, the court only authority requires the court to dismiss his cause of action and order his release from custody.

## III.

## HEARING

A hearing, discovery, and subpoenas on this motion are respectfully requested.

## IV.

## THE STATUTES ARE UNCONSTITUTIONAL ON THEIR FACE

### A. Standard of Review for Unconstitutional Statutes

Penal laws are construed strictly because legislatures, not courts, define crimes and establish punishments. *Yates v. United States*, 354 U.S. 298, 304, 775 S.Ct 1064, 1 L.Ed.2d 1356 (1957), overruled on other ground, *Burks v. United States* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d

1 (1978). Article I, Section 5, Clause 4 of the Constitution requires that "Neither House, during the Session of Congress, shall, without the Consent of the other, adjourn for **more than three days,** nor to any other Place than that in which the two Houses shall be sitting." Article I, Section 7, Clause 2 requires every bill to have **passed both Houses** of Congress and be presented to the President before it can become law. Thus, **a bill *MUST!!!* pass both houses of Congress** to be valid. Article I, Secetion 7, Clause 2, U.S. Constitution; *Field v. Clark*, 143 U.S. 649, 36 L.Ed. 294, 12 S.Ct. 495 (1892); *National Bank of Oregon v. Insurance Agents*, 508 U.S. 439, 455, 124 L.Ed. 2d 402, 418 n.7 113 S.Ct. 2173 (1993).

The law is well established that to sustain a crime, the statute alleged to have been violated must have been **duly enacted** by the legislature. See *Hotch v. United States*, 212 F.2d 283, 284 (9th Cir. 1954)("a law which has not been duly enacted is **not a law,** and therefore a person who does not comply with its provisions cannot be guilty of any crime. An act repugnant to the Constitution is **void.** *Cooper v. Telfair*, 4 Dal 14, 1 L.Ed. 721 (1900); *Murbury v. Madison*, 5 U.S. 137, 2 L.Ed. 60 (1803). The Constitution ***MUST!!!*** Prevail where the inconsistency with a statute is clear. *Powell v. Pennsylvania*, 127 U.S. 678, 33 L.Ed. 253, 8 S.Ct. 992 (1888); *Brimmer v. Rebman*, 138 U.S. 78, 11 S.Ct. 213, 3 L.Ed. 862 (1891)(A statute that violates the Federal Constitution is ***VOID!!!*** regardless of the purposes of its recitals); *Cooper v. Telfair*, 4 U.S. 14, 1 L.Ed. 721 (1800). ***Longevity does not insure that a statute is constitutional.*** *Brennan v. U.S. Postal Service,* Per Marshall, J. as circuit justice, 439 U.S. 1345, 58 L.Ed. 2d 51, 98 S.Ct. 22 (1978). "The question is not how long the parties assumed a certain state of law, but whether that state of law is merely an assumption. ***The passage of time, the acquiescence of the parties, the assumptions of officials, even all taken together cannot enact a statute.*** Legislation ***ONLY!!!*** comes into existence through **bicameral** congressional

enactment and presentment to the President of the United States. *Independent Insurance Agents of America, Inc. v. Clarke*, 965 2d 1077, 1078 (D.C. Cir. 1992).[1] Normal Congressional procedures requires that any legislation that is terminated **sine die** in the first session of Congress be **reintroduced** as new legislation under a new number in the next session. See, e.g., HR 4233, which died sine die in the first session of the 79th Congress, and its reintroduction as HR 6723 in the second session of the 79th Congress. **"Adjournment sine die means *FINAL!!!* Adjournment for the session.** See Black's LAw Dictionary 1385 (6th Ed. 1990)." *Vanderbit v. Babbitt*, 113 F.3d 1061, 1068 FN (9th Cir. 1997).

Imprisonment under a void order without authority of law and one so imprisoned ***WILL!!!*** be discharged on habeas corpus. *In re Ayers*, 123 U.S. 443, 31 L.Ed. 216, 8 S.Ct. 164 (1887); *Fay v. Noia*, 372 U.S. 414, 423, 9 L.Ed. 2d 837, 83 S.Ct 822 (1963); *Ex Parte Siebold*, 100 U.S. 371, 25 L.Ed. 717 (1879). "[T]he rule, springing from the nature and limits of the jurisdictional power of the United States is ***inflexible and without exception,*** which requires the court of its **own motion,** to deny its jurisdiction, and in the exercise of its appellate power, that all other courts of the United States in all cases where such jurisdiction does not affirmatively appear on the record." *Mansfield, C & L.M. Ry. V. Swan*, 11 U.S. 379, 382, 28 L.Ed. 462, 4 S.Ct. 510 (1884). As the statutes pursuant to which Mr. Batista was indicted, convicted, and sentenced were never enacted into positive law, are unconstitutional **on their face,** and are null and void ab initio, Mr. Batista's indictment and conviction are null and void and the court has a duty to issue

---

[1] Mr. Batista requests that the court take **judicial notice** of the constitution of the United States, which establishes the requirement for legislation to be valid; see *Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803) (Courts of the United States are bound to take notice of the Constitution). Mr. Batista also request the court, herein, to take **judicial notice** of the records of the 80th Congress as referenced herein, which establishes the invalidity of the passage of Public Law 80-772.

an order for his release.

A legislature's failure to act on a pending bill or other matters needing legislative approval, before the legislative **adjourns sine die,** effectively kills that bill or matter. See, e.g., *Watkins v. Board of Trustees of Alabama State University*, 703 So. 2d 335, 122 Ed. Law Rep. 1316 (Ala. 1997). As stated in *Anderson v. Dunn*, 19 U.S. *(6 Wheaton)* 204, 5 L.Ed. 242 (1821). ". . . although the legislative power continues perpetual, the legislative body **ceases to exist** on the moment of its adjournment or periodical dissolution. . . Continuity of a session of Congress is broken **only by an adjournment sine die;** *Blanchette et al. v. United States*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed. 2d 320 (1974). Where the court does not have jurisdiction, an order or judgment is void as a matter of law. See, e.g., *Stoll v. Gottlieb*, 305 U.S. 165, 171, 83 L.Ed. 104, 59 S.Ct. 134 (1938). To establish that the statutes are unconstitutional, Mr. Batista is **only required to prove** that the enactment of the statutes did not meet ***ALL!!!*** **elements** to Constitutionally enact legislation as required by: **(1)** Article I, Section 7, Clause 2 of the Constitution[2]; **or** that the enactment of the statutes did not meet **all elements of the enactment clause statute** as required by 1 U.S.C. Sec.101[3], **or** that the enactment of the statutes did

---

[2] "Every bill which *shall* have ***passed*** **the House of Representatives *and* the Senate,** shall, before it becomes a Law, be presented to the President of the United states; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration, two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such cases the Votes of both Houses *shall* be determined by yeas and Nays, and the Names of the Person voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sunday excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, **unless the Congress by their Adjournment prevent its Return,** in which case **it *shall not*** be a Law. "U.S. Constitution, Article I, Section 7, Clause 2.

[3] "The enacting clause of all acts of Congress shall be in the following form: 'Be it

not meet **all elements** required by Article I Section 5 Clause 4, of the Constitution[4], **or** that the statutes were enacted by fraud.[5] **Nullum Crimen, Sine Lege, Nulla Poena, Sine Lege. NO LAW, NO CRIME.**

### B. The Statutes Violate the Presentment Clause, Rendering Them Nullities

The government argued the jurisdiction of the court pursuant to 18 U.S.C. Sec. 3231 (1948). The statute was part of the enactment of Public Law 80-772 (derived from H.R. 3190) in the 80th Congress of the U.S.. The court's jurisdiction, like Public Law 80-772, is a nullity because those statutes are a nullity. Public Law 80-772, was never enacted into positive law, is unconstitutional on its face, and is null and void ab initio.[6] Likewise, 18 U.S.C. Sec.3231 is also

---

enacted by **the Senate and the House of Representatives** of the United States of America **in Congress assembled.'" 1 U.S.C. Sec. 101 (July 30, 1947, ch. 388, 61 Stat. 634).**

[4] "Neither House, during the Session of Congress, shall, without the Consent of the other, **adjourn for more than three days,** nor to any other Place than that in which the two Houses shall be sitting." U.S. Constitution, Article I, Section 5, Clause 4.

[5] The acts defined herein constitute the definition of fraud, actual fraud, extrinsic fraud, fraud on the court, and intrinsic fraud. See FindLaw for Professionals Legal Dictionary, available for download at dictionary. lp.findlaw.com.

[6] The Supreme Court has repeatedly made clear that "sovereign immunity would not shield an executive officer from suit if the officer acted either 'unconstitutionally or beyond his statutory powers.'" *Dalton*, 511 U.S. at 472 (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691, n.11 (1949)(emphasis added by *Dalton* Court).
As the Court explain in Larson:

> There may be, of course, suits for specific relief against officers of the sovereign which are not suits against the sovereign. . . A second type of case is that in which the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitution. Actions for habeas corpus against a warden and injuctions against the threatened enforcement of unconstitutional statutes are familiar examples of this type. Here, too, the conduct against specific relief sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign. The only difference [from a case in which the officer lacks even a clorable claim of authority] is that in this case the power [that] has been conferred in form by the grant is lacking in substance because of its constitutional invalidity.

337 U.S. at 689-90; see also *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963); *Malone v. Bowdoin*, 369 U.S. 643, 647 (1962); *Scranton v. Wheeler*, 179 U.S. 141, 152-53 (1900).

a nullity as it is part of the fraudulent enactment of Public Law 80-772, and never enacted into positive law, are unconstitutional on their face, and are null and void ab initio, rendering Mr. Batista's indictment **null and void.** Those statutes conflict with the procedural requirements of the **presentment Clause** because the House and Senate passed different bills.

The House and senate passed different bills for Public Law 80-772 and manipulated the legislative proceedings, in violation of the Presentment Clause and the Separation of Powers Doctrine. H.R. 3190 **died sine die twice** in the first session of the 80th Congress without the Senate passing the same bill. The **dead bill** surfaced near the end of the second session of the 80th Congress, **still as a House bill.** The senate **amended the bill, then "passed" the amended bill.** The Senate did not pass the bill as a Senate bill, but as the same House bill, H.R. 3190. Since the bill passed by the House is different than the bill passed by the Senate, it violates the "single, finely wrought" Constitutional procedure for making laws. *INS v. Chadha*, 462 U.S. 919, 951 (1983), which is indivisible.[7] The bill is further unconstitutional because it violates the Separation of Powers Doctrine, does not have a valid enactment clause, and was enrolled by fraud.[8]

The Constitution vest legislative responsibility in a bicameral Congress subject to a limited check by the President. The Presentment Clause establishes **precise and detailed procedural requirements** governing the presentment by Congress and approval by the President of any "Bill". Art. I, Sec. 7, Cl. 2. That Presentment Clause, which defines the requirements to pass Constitutional legislation, carries a 230 year pedigree.

---

[7] Other than requiring that revenue bills originate in the House, the Constitution's lawmaking system is the same for a bills.

[8] It is a fundamental principle that Congress is presumed to legislate with an awareness **of existing law.**

The framers imposed no restrictions on the number or variety of provisions that a single "Bill" may contain. Congress' typical practice has been to combine numerous and disparate bills into a single bill, to be approved or returned by the President in its entirely. The effect of this ***in toto requirement*** is to compel the President to make an **all-or-nothing** choice regarding a broad and multifarious legislative package, even though he might prefer to accept some items and reject others. The ***in toto requirement*** serves to ensure that Congress retains ultimate authority to define the range of choices available to the President.[9] Furthermore, the Statutes at Large show no severability clause for Public Law 80-772.

When Congress presents the President with a bill under Article I Section 7 of the Constitution, the bill can become law in one of three ways: the President can sign it, he can let it become law without his signature; or, if the President vetoes the bill by returning it with his objections, Congress can override the veto by a two-thirds vote in each House. These requirements governs "amendment and repeal of statutes, no less than enactment of them." *INS v. Chadha*, 462 U.S. at 954.

The Framers built on the principle, long settled in England, that the Executive should not alter legislation, but be limited to approving or disapproving laws. They rejected proposals to grant the President an absolute final power to disapprove bills, and instead provided the Executive with a limited role in the legislative process.

---

[9] By the Constitution's design, the requirement that the approval or veto power of the President applies to entire bills also tempers that power. Informed by having presided at the Constitutional Convention, George Washington understood the President's unavoidable constitutional choice, to accept the bad (in the President's eyes) with the good, or reject the good with the bad. In a 1793 letter to Edmund Pendleton, Washington wrote: "You do no more than Justice when you suppose that from motives of respect to the Legislature (and I might add from my interpretation of the Constitution), I give my Signature to many Bills which my Judgment is at variance. . . From the nature of the Constitution, I must approve all of a Bill, or reject it in toto. To do the latter can only be justified upon the clear and obvious ground of propriety, . . ."

The requirement that the House and Senate, elected on different electoral principles, must agree before any new law is made or an existing one is changed or repealed, is an essential feature of the Framers' lawmaking system. The Constitution mandates the Concurrence of both Houses to the final contents of spending and tax bills as well as other legislation. There fore, the lawmaking system established by the Constitution operates on a simple principle. **Both the Senate and House have to agree to <u>every</u> legislative measure or it cannot become law.** The steps are precise. Every bill must first "have passed the House of Representatives and the Senate." "Before it becomes a Law," each bill must "be presented to the President." The President's choices are exactly stated: "If he approves he shall sign it, but if not he shall return it." The manner of return is prescribed: the bill is to be accompanied by "his Obejections," it is to go "to that House in which it shall have originated," and that House "shall enter the Objections at large on their Journal." Art. I, Sec. 7, Cl. 2. Either House may "propose" amendments to any bill, but each needs ro concur in the other's amendments before the bill may become law, **following the principles established by the Constitution.** The President may "return" a bill for "reconsideration" id. Cl. 2, but has no power to alter any bill. See U.S. Const., Art. I, Sec. 7, Cl. 1.

Not only is the "concurrence of separate and dissimilar bodies requires in every public act," *The Federalist* No. 63, p. 427 (Madison), but each House through the amending process has an equal opportunity to shape every law, subject to the concurrence of the other House. The accommodation of differences is a vital task in a representative democracy. The Constitution provides grounds rules for revisiting compromises. They require that the two Houses agree in order to change the terms of a bargain between them.

Public Law 80-772, as "passed", undermines the public's interest in faithful adherence to

the Separation of Powers. The Act violates Article I because it violates the Presentment Clause and the Separation of Powers Doctrine. The bill was passed by the House in the first session of the 80th Congress, **died sine die twice** when the Senate did not vote on it, then the Senate passed the dead bill in the Second Session of the 80th Congress **with amendments.** Therefore, the House bill "passed" in the first Session is different than the House bill "passed" by the Senate, a direct violation od Article I, Section 7, Cl. 1 of the Constitution. In "produc[ing] laws in violation of the requirement of bicameral passage," J.S. App. 27a, Public Law 80-772 undermines the genius of the Constitution's lawmaking system. It is fundamental Constitutional law. The actions of the 80th Congress regarding Public law 80-772 compromised essential responsibilities under the Constitution, and disrupted other balances struck by the Framers.

The constitutional requirements to enact legislation also keep in good repair the fabric that allows separate political branches to work in mutual respect to "integrate the dispersed powers into a workable government." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952)(Jackson, J., concurring). The different course taken by the 80th Congress damaged that fabric. The Court has repeatedly held that the separation of powers is not merely an intralmural interest of the branches of government. Abridgement of the separation of powers threatens harm to all whose "liberty and security" are its "ultimate purpose." *Metropolitan Washington Airports Authority v. Citizen for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991); see also *United States v. Munoz-Florez*, 495 U.S. 385, 395 (1900)(allocution of lawmaking authority under Art. I, Sec. 7, cl. 1 of the Constitution "safeguard[s] liberty").

The public has a further stake in faithful adherence to the separation of powers in lawmaking: "effective and accountable" government. *Loving v. United States*, 517 U.S. 748, 757 (1996). Effectiveness is promoted because Article I's requirements of representation and

bicameralism make Congress "the branch most capable of responsive and deliberative lawmaking." Public accountability is aided because the "clear assignment of power to a branch, furthermore, allows the citizen to know who may be called to answer for making, or not making, those delicate and necessary decisions essential to governance." Id. at 757-758. Public Law 80-772 fails on these counts. The separate Houses of Congress, together with the President, knowingly manipulated the Constitutional requirements of the Presentment Clause to enact legislation that is **unconstitutional on its face.** Liberty and security are threatened when the House, Senate, or President are allowed to ignore the rules created by the Framers to enact Constitutional Legislation, and together, manipulate those procedures to pass legislation that effects the American people. Accountability is diminished when, as occurs under these Acts, responsibility for the final content of legislation is blurred.

**C. Public Law 80-772 and 18 U.S.C. Sec. 3231 Are Unconstitutional**

**1. Mr. Batista Request Judicial Notice of the facts and Law**

Judicial notice dispenses with formal proof of a fact that is easily determinable from reliable sources. It is rule of convenience that saves time by eliminating the need for proof of facts about which there is no real controversy. FRE 201.

The facts from the Congressional Record, which establish the unconstitutionality of the referenced statutes on their faces, were judicially noticeable as they were not subject to reasonable dispute and were capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, i. e., the Congressional Record. FRE 201(b); *United States v. Boyd,* 289 F.3d 1254, 1258 (10th Cir. 2002); *LaSalle National Bank v. First Conn. Holding Group, LLC,* 287 F.3d 279, 290 (3d Cir. 2002); *Ritter v. Hughes Aircraft Co.,* 58 F.3d 454, 458 (9th Cir. 1995); *Lussier v. Runyon,* 50 F.3d 1103, 1113-1114 (1st Cir. 1995); *York*

*v. AT&T*, 95 F.3d 948, 958 (10th Cir. 1996); *Cantrell v. Knoxville County Development Corp.*, 60 F.3d 1177, 1180 (6th Cir. 1995).

**The facts and law which establish the unconstitutionality of the statutes are now judicially noticed on the record because the court was *REQUIRED!!!* to take judicial notice as mandatory.** See FRE 201(d) (the court **must** take judicial notice of adjudicative facts when properly requested and supplied with the necessary information).

Since the facts have now been judicially noticed, those facts have been established as a matter of law. See FRE 201 (g); 1972 Notes to FRE 201 at Par. 31. In other words, by judicially noticing the facts that establish as a matter of law that Public Law 80-772 and 18 U.S.C. Sec. 3231 (1948) were never enacted into law, are unconstitutional on their face, and null and void ab initio, it has the same effect as ***directing a verdict against Respondent*** related to the judicially noticed facts. *United States v. Boyd*, 289 F.3d 1254, 1258 (10th Cir. 2002) *Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001); *General Elec. Capital Corp. . Lease Resolution Corp.*, 128 F.3d 1074, 1083 (7th Cir. 1997).

**2. Mr. Batista Request Judicial Notice of the Law**

Mr. Batista is entitled to take judicial notice of the law of the case. The law is a fact and the court is presumed to know the law or where to find it. *United States v. Rivero*, 532 F.2d 450 (5th Cir. 1976). A matter of law may be judicially noticed as a matter of fact, that is, the court can look to law not as a rule governing the case before it, but as a social fact with evidentiary consequences. *City of Wichita v. U.S. Gypsum Co.*, 72 F.3d 1491, 1496 (10th Cir. 1996). Mr. Batista requests the court to take judicial notice of the law:

a. Penal laws are **construed strictly** becaus legislatures, not courts, define crimes and establish punishments. *Yates v. United States*, 354 U.S. 298, 304, 775 S.Ct. 1064, 1 L.Ed. 2d

1356 (1957), overruled on other grounds, *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

b. "Neither House, during the Session of Congress, shall, without the Consent of the other, **adjourn for more than three days,** nor to any other Place than that in which the two Houses shall be sitting." Article I, Section 5, Clause 4 of the Constitution.

c. Every bill must **pass both Houses** of Congress and be presented to the President before it can become law. Article I, Section 7, Clause 2, U.S. Constitution; *Field v. Clark*, 143 U.S. 649, 36 L.Ed.294, 12 S.Ct. 495 (1892); *National Bank of Oregon v. Insurance Agents*, 508 U.S. 439, 455, 124 L.Ed.2d 402, 418 n.7, 113 S.Ct. 2173 (1993).

d. To have a valid enactment clause, a statute must have Constitutionally passed both Houses of Congress and must have been enacted in Congress assembled. 1 U.S.C. Sec. 101.

e. To sustain a crime, the statute alleged to have been violated must have been **duly enacted** by the legislature. See *Hotch v. United States*, 212 F.2d 283, 284 (9th Cir. 1954)("a law which **has not been duly enacted** is **not a law,** and therefore a person who does not comply with its provisions cannot be guilty of any crime.

f. An act repugnant to the Constitution is **void.** *Cooper v. Telfair*, 4 Dal 14, 1 L.Ed. 721 (1900); *Marbury v. Madison*, 5 U.S. 137 (1803).

g. The Constitution must prevail where the inconsistency with statute is clear. *Powell v. Pennsylvania*, 127 U.S. 678, 33 L.ed. 253, 8 S.ct. 992 (1888); *Brimmer v. Rebman*, 138 U.S. 78, 11 S.Ct 213, 3 L.Ed. 862 (1891)(A statute that violates the Federal Constitution is **void** regardless of the purposes of its recitals); *Cooper v. Telfair*, 4 U.S. 14, 1 L.Ed. 721 (1800).

h. ***Longevity does not insure that a statute is constitutional.*** "The question is not how long the parties assumed a certain state of law, but whether that state of law is merely an

assumption. ***The passage of time, the acquiescence of the parties, the assumptions of officials, even all taken together cannot enact a statute.*** *Brennan v. U.S. Postal Services*, Per Marshall, J. as circuit justice, 439 U.S. 1345, 58 L.Ed. 2d 51, 98 S.Ct. 22 (1978).

i. Legislation only comes into existence through **bicameral** congressional enactment and presentment to the President of the United States. *Independent Insurance Agents of America, Inc. v. Clarke*, 965 F.2d 1077, 1078 (D.C. Cir. 1992).

j. Continuity of a session of Congress is broken **only by an adjournment sine die.** *Blanchette, el al. v. United States*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), ". . . although the legislative power continues perpetual, the legislative body **ceases to exist** on the moment of its adjournment or periodical dissolution. . . " *Anderson v. Dunn*, 19 U.S. *(6 Wheaton)* 204, 5 L.Ed. 242 (1821). A legislature's failure to act on a pending bill or other matters needing legislative approval, before the legislature **adjourns sine die,** effectively kills that bill or matter. See, e.g., *Watkins v. Board of Trustees of Alabama State University*, 703 So. 2d 335, 122 Ed. Law Rep. 1316 (Ala. 1997). **"Adjournment sine die means final adjournment for the session.** See Black's Law Dictionary 1385 (6th Ed. 1990)." *Vanderbilt v. Babbitt*, 113 F.3d 1061, 1068, FN (9th Cir. 1997). Normal Congressional procedures require that any legislation that is terminated **sine die** in the first session of Congress be **reintroduced** as **new legislation** under a new number in the next session. See, e.g., HR 4233, which died sine die in the first session of the 79th Congress, and its reintroduction as HR 6723 in the second session of the 79th Congress. An adjournment sine die results in the death of all pending legislation, (see Floyd M. Riddick, The United States Congress: Organization and Procedure 56 (1949), making passage and presentment to the President **impossible.** See U.S. Const. Art. I, Sec.1, 7; *The Pocket Veto Case*, 279 U.S. at 681 (1929)(Final adjournment of Congress "terminates the legislative existance of the

Congress").

k. Imprisonment under a void order is without authority of law and one so imprisoned will be discharged on habeas corpus. *In re Ayers*, 123 U.S. 443, 31 L.Ed. 216, 8 S.Ct. 164 (1887); *Fay v. Noia*, 372 U.S. 441, 423, 9 L.Ed.2d 837, 83 S.Ct. 822 (1963); *Ex Parte Siebold*, 100 U.S. 371, 25 L.Ed. 717 (1879).

l. "[T]he rule, springing from the nature and limits of the jurisdictional power of the United States is ***inflexible and without exception,*** which requires the court of its **own motion,** to deny its jurisdiction, and in the exercise of its appellate power, that all other courts of the United States in all cases where such jurisdiction does not affirmatively appear on the record." *Mansfield, C&L.M. Ry. V. Swan*, 111 U.S. 379, 28 L.Ed. 462, 4 S.Ct. 510 (1884).

m. "You have asked this office to analyze the legal effectiveness of a congressional subpoena issued **after a sine die adjournment of Congress.** In a **1982 opinion,** this Office concluded that a congressional subpoena issued during a session of Congress lacks present force and effect after the adjournment sine die of Congress. Continuing Effect of a Congressional Subpoena Following the Adjournment of Congress, 6 Op. O.L.C. 744 (1982). ***According to that opinion, the lapse in legal effectiveness 'results from the same factors that produce, at the same time, the death of all pending legislation not enacted. . .'*** " Memorandum for Janet Reno, Attorney General, November 12, 1996, pg. 1:

n. "Prorogation or dissolution, constitutes there what is called a session; provided some act is passed. In this case, all matters depending before them are discontinued, and at their next meeting are to be taken up de novo, if taken up at all. 1 Blackst., 186. . . .If convened by the President's proclamation, this **must** begin a new session, and of course, determine the proceeding one to have been a session." 107th Congress House rules Manual See Page 1, Modes of

Separation.

o. "The Senate and the House of Representative adjourned on June 20, 1948, under a 'conditional final adjournment' resolution, H. Con. Res. 218; 94 Cong. Rec. 9158. Pursuant to the resolution, the two Houses were to stand in adjournment until December 31, 1948, unless recalled into session earlier by specified Senate and House leaders. **In effect, the adjournment was a *sine die* adjournment, not an intrasession adjournment.** On July 26, 1948, Congress convened pursuant to a proclamation of President Truman. The President **pocket vetoed 14** bills presented to him after the adjournment of June 20, 1948." No record exists that Congress left a messenger behind to receive correspondence from the President or the return of bills. *Kennedy v. Sampson*, 511 F.2d 430, 444, Appendix, N.4 (D.C. Cir. 1974).

p. "The Senate and House of Representatives [of the 80th Congress] adjourned on June 20, 1948, under a "conditional final adjournment" resolution, H. Con. Res. 218; 94 Cong. Rec. 9158. Pursuant to the resolution, the two Houses were to stand in adjournment until December 31, 1948, unless recalled into session earlier by specified Senate and House leaders. In effect, the adjournment was a ***sine die adjournment***, not an intrasession adjournment. On July 26, 1948, Congress convened pursuant to a proclamation of President Truman. The President ***pocket vetoed 14 bills*** presented to him after the adjournment of June 20, 1948." *Kennedy v. Sampson*, 511 F.2d 430, 444, Appendix, N.5 (D.C. Cir. 1974).

q. "[T]he **determinative question** in reference to an 'adjournment is not whether it is a **final adjournment** of Congress or an **interim adjournment,** such as an adjournment of the first session, but whether it . . . prevents the President from returning the bill to the House in which it originated within the time allowed." *The Pocket Veto Case (Oskanogan v. United States)*, 279 U.S. 655, 681, 73 L.Ed. 894, 49 S.Ct. 463 (1929).

r. An enrolled bill is to be in the identical form as the engrossed bill. 1 U.S.C. Sec.106.

s. "A bill sign by the Speaker of the House of Representatives and by the President of the Senate, presented to and approved by the President of the United States, and delivered by the latter to the Secretary of the State, as an act of Congress, does not become a law of the United States if it had not in fact been passed by Congress..." *Field v. Clark*, 143 U.S. 649, 36 L.Ed. 294, 12 S.Ct. 495 (1892); *Mistretta v. United States*, 488 U.S. 361, 381, 102 L.Ed. 2d 714, 109 S.Ct. 647 (1989). Congress may not control execution of laws **except through Article I procedures.**

t. "The Constitution of the United States is the Supreme Law of the Land and binds every form whether it derives its authority from a state or from the United States." *Cook v. Moffat & Curtis*, 46 U.S. 295, 12 L.Ed. 159 (1847); *Dodge v. Woolsey*, 59 U.S. 331, 15 L.Ed. 401 (1855); *Ex Parte Siebold*, 100 U.S. 371, 25 L.Ed. 717 (1879).

u. "The words used in the Constitution are to be taken in their natural and obvious sense. *Martin Fairfax v. Hunter*, 14 U.S. 304, 4 L.Ed. 97, 1 Wheat 304, 326 (1814), and are to be given the meaning they have i common use unless there are very strong reasons to the contrary, *Tennessee v. Whitworth*, 117 U.S. 139, 147." *Patton v. United States*, 281 U.S. 276, 74 L.Ed. 854, 50 S.Ct. 253 (1930).

v. "[T]he rule, springing from the nature and limits of the jurisdictional power of the United States is **inflexible and without exception,** which requires the court on its own Petition, to deny its jurisdiction, and in the exercise of its appellate power, that all other courts of the United States in all cases where such jurisdiction does not affirmatively appear on the record." *Mansfield, C&L.M. Ry. V. Swan*, 111 U.S. 379, 382, 28 L.Ed. 462, 4 S.Ct. 510 (1884).

w. **Without jurisdiction, the power of the court is invalid.** *Hansford v. Davies*,

163 U.S. 272, 41 L.Ed. 147, 16 S.Ct. 1051 (1896); *Angel v. Bullington*, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947).

x. A charge of crime **must have clear legislative basis.** *United States v. Smull*, 236 U.S. 405, 59 L.Ed. 641, 35 S.Ct. 349 (1915).

y. "No stipulation by an executive official purporting to operate under a statute and a party affected by the official's actions can bring that statute into existence, even for purposes of judicial decision as to its construction." *Independent Insurance Agents of America, Inc. v. Clarke*, 965 F.2d 1077, 1078 (D.C. Cir. 1992). ***Nullum Crimen, Sine Lege, Nulla Poena, Sine Lege.***

z. "It is emphatically the duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. at 177 (1803).

aa. Judicial intervention is appropriate "when the failure of Congress to adhere to its own rules implicates constitutional rights." *Metzenbaum v. Federal Energy Regulatory Commission*, 673 F.2d 1282, 1287 (D.C. Cir. 1982).

bb. The requirement that a court have jurisdiction over the person **before rendering judgment** is rested in Due Process and is a basic requirement that must be satisfied before a valid judgment can be had or enforced. *Insurance Corp. v. Ireland, Ltd. v. Compagnie Des Bauxites de Guinee*, 456 U.S. 694, 702, 72 L.Ed. 2d 492, 102 S.Ct. 2099 (1982). That requirement stems from Article III of the Constitution. If the court lacked jurisdiction, the judgment is invalid.

cc. "If the law which defines the offense and prescribes its punishment is void, the court was without jurisdiction, and the prisoner must be discharged." *Ex Parte Yarborough*, 110 U.S. 651, 654, 4 S.Ct. 152, 28 L.ed. 274 (1884); *In re Ayers*, 123 U.S. 443, 31 L.Ed. 216, 8 S.Ct. 164 (1887); *Fay v. Noia*, 372 U.S. 391, 414, 223, 9 L.Ed. 2d 837, 83 S.Ct. 822 (1963); *Ex Parte*

*Siebold*, 100 U.S. 371, 2 L.Ed. 717 (1879)(an unconstitutional act is **no law** at all, and **no court has a right to imprison a citizen who has violated no law;** such restraint even if exercised under the guise and form of law, is as **subversive of the right of the citizen** as if it were exercised by a person not clothed with authority).

dd. "Where there is clearly no jurisdiction over the subject matter [,] any authority exercised is a **usurped authority** and for the exercise of such authority when the want of jurisdiction is known to the judge, no excuse is permissible." *Bradley v. Fisher*, 80 U.S. 335, 351-352, 20 L.Ed. 646 (1871).

ee. "Even a minimal amount of additional time in prison has Constitutional significance." *Glover v. United States*, 531 U.S. 198, 203, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001).

Mr. Batista has now judicially noticed the facts and law which establish as a matter of law that Public Law 80-772, and 18 U.S.C.Sec.3231 were never enacted into positive law, are unconstitutional on their face, and are null and void ab initio. Mr. Batista now requests a **directed verdict** on the facts and law and an order for dismissal of his indictment.

**3. Mr. Batista, Through Judicial Notice, Can Prove as a Matter of Law, the Following Elements of Mr. Batista's Claims**

The court should also take judicial notice of the following facts which prove Mr. Batista's claims.

a. The bill on federal crimes and criminal procedure, which later became Public Law 80-772, was first introduced in the House of Representatives as H.R. 2200 during the 79th Congress, passed the House unanimously and was referred to the Senate Committee on the Judiciary on July 16, 1946, in the Second Session of the 79th Congress, but **never** passed the Senate and died when the 79th Congress adjourned sin die. 92 Congressional Record 9122, 9067

(July 16, 1946); 93 Cong. Rec. 5049 (May 12, 1947), attached hereto as **Appendix C-1.**

b. A similar bill, entitled "Crimes and Criminal Procedue," was then reintroduced as H.R. 3190 during the First Session of the 80th Congress. The bill (with some amendments) passed the House 38-to-6 on May 12, 1947, and was referred to the Senate Committee on the Judiciary the next day, in the First Session of the 80th Congress. 93 Cong. Rec. 5048-5049 (May 12, 1947), 5121 (May 13, 1947), attached hereto as **Appendix C-2.**

c. The Senate did not take up the bill prior to the July 27, 1947 (conditional) intersession **sine die** adjournment, in accordance with S.Con.Res. 33. **61 Stat. 1029,** 93 Cong. Rec. 10439, 10522 (July 26, 1947), attached hereto as **Appendix C-3.** *Kennedy v. Sampson*, 511 F.2d 430, 444, Appendix N.4 (D.C. Cir. 1974), attached hereto as **Appendix C-4.**

d. Upon President Truman's proclamation, Congress reconvened on November 17, 1947, and the First Session of the 80th Congress **adjourned sine die** on December 19, 1947, without the Senate passing H.R. 3190. **61 Stat. 1093, 61 Stat. 1029;** *Kennedy v. Sampson*, 511 F.2d 430, 444, Appendix, n.4 (D.C. Cir. 1974), attached hereto as **Appendix C-4.**[10]

e. H.R. 3190, which died upon the **sine die** adjournment of Congress in 1947, **61 Stat. 1029, 1093, Appendix C-3 and C-4,** was **not reintroduced** in the House again at anytime in 1948 during the Second Session of the 80th Congress. 94 Cong. Rec. 568 (1948), attached herto as **Appendix C-5.**

---

[10] "The Senate and the House of Representatives adjourned on July 27, 1947 under a 'conditional final adjournment' resolution, S.Con.Res.33; 93 Cong. Rec. 10400. Pursuant to the resolution, the two Houses were to stand i adjournment until January 2, 1948, unless recalled into session earlier by specified Senate and House leaders. **In effect, the adjournment was a *sine die* adjournment, not an intrasession adjournment.** On November 17, 1947, Congress convened pursuant to proclamation of president Truman, and **adjourn *sine die*** on December 19, 1947. The President **pocket vetoed** 19 bills presented to him after the adjournment of July 27, 1947." *Kennedy v. Sampson*, 511 F.2d 430, 444, Appendix N.4.

f. Mysteriously, however, near the end of the Second Session of the 80th Congress, on June14, 1948, H.R. 3190, with Judiciary Committee amendments (Per S. Rept. No. 1620) H.R. 3190 surfaced in the Senate as if it had never died with the **sine die** adjournment in 1947 or as if it was pased one again by the House in 1948. 94 Cong. Rec. 8075 (June 14, 1948), attached hereto as **Appendix C-6.**

g. The Senate promptly "passed" the ***amended*** H.R. 3190 on June 18, 1948 and sent it back to the House, expecting that the House would adopt the amended bill. 94 Cong. Rec. 8721-8722 (June 18, 1948), attached hereto as **Appendix C-7.**

h. The House then "concurred" in the amendments that same day (June 18, 1948) but never voted on the amended bill. 94 Cong, Rec. 8864-8865 (June 18, 1948), attached hereto as **Appendix C-8.**

i. In accordance with H.Con.Res.218, the Second Session of the Congress (conditionally) adjourned on June 20, 1948, with H.R. 3190 still to be signed by the Speaker of the House and the President pro tempore of the Senate after the adjournment by H.Con.Res.219. *Kennedy v. Sampson*, 511 F.2d at 444, Appendix n.5 **(Appendix C-4)**[11]; 94 Cong. Rec. 9349 (June 19, 1948), attached hereto as **Appendix C-9.**

j. It was only after this (conditional) final adjournment of the Second Session of the 80th Congress, and as authorized by H.Con.Res.219, that the Speaker and the President pro

[11] "The Senate and the House of Representatives adjourned on June 20, 1948, under a 'conditional final adjournment' resolution, H.Con.Res.218; 94 Cong. Rec. 9158. Pursuant to the resolution, the two Houses were to stand in adjournment until December 31, 1948, unless recalled into session earlier by specified Senate and House leaders. **In effect, the adjournment was *sine die* adjournment, not an intrasession adjournment.** On July 26, 1948, Congress convened pursuant to a proclamation of President Truman. The Preident **pocket vetoed** 14 bills presented to him after the adjournment of June 20, 1948." *Kennedy v. Sampson*, 511 F.2d 430, 444, Appendix N.5.

tempore signed the enrolled H.R. 3190 and presented it to President Truman on June 23, 1948, for the President to sign the enrolled bill into law on June 25, 1948, after Congress adjourned **sine die.** 94 Cong. Rec. 9354, 9365, and 9367, attached hereto as **Appendices C-10, C-11, and C-12,** respectively; see also 94 Cong. Rec. D557 (Daily Digest), attached hereto as **Appendix C-13.**

k. At the time H.R. 3190 was signed by the Speaker of the House and the President pro tempore of the Senate, the 80th Congress was **not in open session** but it was fully (but conditionally) adjourned **sine die.** *Kennedy*, 511 F.2d at 444, Appendix, n.5, attached hereto as **Appendix C-4.**

l. The face of the engrossed bill as signed by the 80th Congress shows that the engrossed bill was passed and signed in the 80th Congress, 1947 session, by the House of Representatives. However, the enrolled bill, which actually placed Public Law 80-772 into law, was **altered** from the engrossed bill (which showed a date of enrollment in 1947 in the First Session of the 80th Congress), to **make it appear** that it passed both houses in 1948 in the Second Session of Congress, thus rendering it a **fraud and forgery.** See Congressional Records, Records of National Archives, engrossed bill, enrolled bill, Public Law 80-772, attached hereto as **Appendix C-14.**

### 4. Public Law 80-772 Is Thus Unconstitutional

To recap the steps, first the House only passed H.R. 3190 in the First Session of the 80th Congress (in 1947) and it died because the Senate did not pass it until the First Session **adjourned sine die twice. Appendix C-3, C-4.** Secondly, the House never voted on and never passed H.R. 3190 in the Second Session of the 80th Congress (in 1948) before it was taken up in

and was passed by the Senate.[12] See 94 Cong. Rec., D556-557, Congressional record, 80th Congress. Thirdly, the Senate only passed an amended bill and the House later concurred in the amendments, but the records show no House vote on the amended bill (just on the amendments). Fourthly, despite the questionable authorization of H.Con.Res.219, the (questionably) enrolled bill was sign by the Speaker of the House and the President pro tempore of the Senate **after** the 80th Congress **adjourned sine die,** and not in open session, rendering the enactment again invalid. 94 Cong. Rec. 9354, 9365, 9367; see also 94 Cong. Rec. D557 (Daily Digest); *Kennedy*, 511 F.2d at 444, n.5. And finally, the enrolled bill, which was signed by President Truman, was **altered** from the engrossed bill to **make it appear** that H.R. 3190 came through the House of Representative in the Second Session of the 80th Congress (in 1948), instead of the First Session (in 1947), rendering it a **fraud and forgery** and, therefore, invalid. **C-14.**

### 5. No Valid Enactment Clause Exist

1 U.S.C. Sec.101 specifically sets forth the reqired form of the enacting clause of all Acts of Congress: "The enacting clause of all Acts of Congress ***shall*** be in the following form: 'Be it enacted by the Senate **and** House of Representative of the United States of America in Congress assembled.'" (1 U.S.C. Sec. 101, July 30, 1947, ch 388, 61 Stat 634). However, Public Law 80-772, was not legally passed by both houses as shown herein, as H.R. 3190 **died sine die twice** in the first session of the 80th Congress and was **not re-introduced** as a new bill in the House in the Second Session of the 80th Congress, but the dead bill was amended in the Senate in the Second Session, in violation of the Presentment Clause. It was also not enacted **in Congress assembled,** as it was "sign into law" by the President Pro Tempore of the Senate and the Speaker of the

[12] Since H.R. 3190 died sine die in the First Session of the 80th Congress, it was required to be reintroduced as **new** legislation in the Second Session, which it was not.

House only *after* Congress adjourned sine die. *Kennedy*, 511 F.2d at 444, n.5; 94 Cong. Rec. 9349 (June 19, 1948); Supra. Therefore, the enactment clause for Public Law 80-772 is **invalid** on its face, and without a proper enactment clause, Public Law 80-772 itself is invalid on its face. See **Appendix A (1-m).**

### 6. Since Public Law 80-772 is Unconstitutional, 18 U.S.C. Sec.3231 is Also Unconstitutional[13]

18 U.S.C. Sec.3231 was introduced in the First Session of the 80th Congress as part of Public Law 80-772 and H.R. 3190.[14] The report of the House Committee on the Judiciary (80th Congress 1st Session) stated: "This section [3231] was formed by combining sections 546 and 547 of Title 18, U.S.C. 1940 ed. with section 588d of Title 12, U.S.C., Banks and Banking, with no change of substance." See H.R. Rep. No. 304, 80th Congress, 1st Session, 100 app. (1947).

Thus, the original proposed House revision of the new 18 USC Sec.3231 was introduced in 1947 in the First Session of the 80th Congress as part of the faulty H.R. 3190. However, it is established by judicially noticed facts herein that **H.R. 3190 died sine die twice** in the First Session of the 80th Congress when it was not passed by the Senate. The dead bill, H.R. 3190, which included the re-codificatio of 18 U.S.C. Sec.3231, was then amended in the Senate in the SEcond Session of the 80th Congress without being first **re-introduced** into the House

---

[13] Various offenses charged in Mr. Batista's indictment were also part of the unconstitutional and fraudulent enactment of Public Law 80-772, rendering them void, and his indictment and conviction defective and void.

[14] H.R. 3190, which included the codification of 18 USC Sec.3231 to replace 18 USC Sec.546, et seq. (1940) passed the House 38 to 6 on May 12, 1947, and was referred to the Senate Committee on the Judiciary the next day, in the First Session of the 80th Congress. 93 Cong. Rec. 5048-5049 (May 12, 1947), 5121 (May 13, 1947), attached hereto as **Appendix C-2.** The Senate did not take up the bill prior to the July 27, 1947 (conditional) intersession adjournment, in accordance with S.Con.Res. 33. 93 Cong. Rec. 10439, 10522 (July 26, 1947), attached hereto as **Appendix C-3.** Congress then adjourned sine die twice in the First Session of the 80th Congress in 1947, thus killing H.R. 3190 and also therefore, 18 USC Sec.3231.

(see supra, Public Law 80-772) to read as it now exist. See S.Rep. 1620, 80th Congress, 2d Session, 2430 (1948). The Senate version, as it presently exists, established the exclusivity of district court **jurisdiction over all federal crimes.**

Since the passage of 18 U.S.C. Sec.3231 is intertwined and incorporated into the passage of H.R. 3190 and Public Law 80-772 in the First Session of the 80th Congress, and since H.R. 3190 **died sine die** twice in the First Session of the 80th Congress and since Public Law 80-772 was never enacted into positive law, 18 U.S.C. Sec.3231 was never enacted into positive law, is **unconstitutional on its face,** is supported with no valid enactment clause, is enrolled by fraud, and is therefore **null and void *ab initio.*** Without a valid 18 U.S.C. Sec. 3231, the courts could only obtain their jurisdiction to prosecute Mr. Batista pursuant to 18 USC Sec. 546 and 547 (1940), and the court must revert back to that enactment based on the invalidity of 18 U.S.C. Sec.3231 to determine its jurisdiction to prosecute Mr. Batista for any alleged crimes. The plain language of 18 U.S.C. Sec. 546 states: 'The crimes and offenses **defined in this title** shall be cognizable in the district courts of the United States, as prescribed in section 41 of Title 28. (Mar. 4, 1909, ch. 321, Sec.340, 35 Stat. 1153, Mar. 3, 1911, ch. 231, Sec.291, 36 Stat. 1167).[15] 18 U.S.C. Sec.546 goes on to state in *Reference in Text* that "The words 'this title,' as used in this section refer to the Criminal Code, act Mar. 4, 1909, ch. 321, 35 Stat. 1088. The sections of said act embodied in this code are indicated by parenthetical references in the section catchlines. For full distribution of said act, see tables." Therefore, the court's limited jurisdiction to prosecute crimes begins and ends with the offenses defined in "this title".

---

[15] Mr. Batista requests the court to take judicial notice of 18 U.S.C. Sec.546 (1940). The offenses defined in that title carried different penalty provisions than the 1948 enactment.

Thus, the plain language of 18 U.S.C. Sec.546 gave the district court jurisdiction over the statutes only in **"this title"**. An analysis of those statutes shows that they contain ***different penalty provisions*** than the 1948 enactment. **Mr. Batista was not indicted pursuant to those statutes.** Mr. Batista was not given **fair warning** related to those statutes.[16] With no district court jurisdiction to prosecute crimes, the district court had no jurisdiction to indict, retain, or sentence Mr. Marmolejos, and thus his indictment is **null and void ab initio.**

**7. The Prior Statute, 18 U.S.C. Sec.546 (1940) Does Not Give the Court Jurisdiction**

A district court ***must*** obtain its jurisdiction **exclusively** from the Constitution and statutes of the United States. ***Without valid statutes, it has no jurisdiction execpt to dismiss the cause.*** 18 U.S.C. Sec.3231 is unconstitutional on its face because it is part of the unconstitutional and fraudulent enactment of H.R. 3190 and Public Law 80-772, which originated in the first session of the 80th Congress. 18 U.S.C. Sec.546, the prior 1940 enactment, defined **different crimes** and carried different penalty provisions, gave the court jurisdiction to prosecute crimes, but jurisdiction only over the crimes in "this title". Mr. Batista was not indicted based on any of the crimes in "this title", which carried different penalty provisions, was not given fair warning pursuant to 18 USC Sec.546, and therefore, his indictment is **null and vod ab initio.**

In *United States ex. Rel. Clark v. Anderson*, 502 F.2d 1080, 1081-1082 (3d Cir. 1974), the court found that at the time the offense occurred and the accused was indicted, "the state of

---

[16] **Fair warning doctrine** invokes due process rights and requires that criminal statutes at issue be sufficiently definite to notify persons of reasonable intelligence that their planned conduct is criminal. *United States v. Nevers*, 7 F.3d 59 (5th Cir. 1993). See *United States ex. Rel. Clark v. Anderson*, 502 F.2d 1080 (3d Cir. 1974)(The notice Requirements of Due Process would not permit a state, after ruling one of its criminal statutes was overly vague, to apply that statute's superseding predecessor statute in the very case which ruled the successor statue unconstitutional).

Delaware had published and was holding out the new [statute] as its only proscription of such misconduct as the indictment charged." The crime was also not a crime at common law. The court ruled the new statute unconstitutional. ***And by definition, an unconstitutional statute is one that fails to give fair notice that particular conduct is proscribed by the state.*** See *United States v. Harris*, 347 U.S. 612, 617, 98 L.Ed.989, 74 S.Ct. 808 (1954); *Connally v. General Construction Co.*, 269 U.S. 385, 391, 70 L.Ed. 332, 46 S.Ct. 126 (1926). Thus, the state's own interpretation of the new statutes and its rejection of that section as a statutory basis for Clark's prosecution caused the court to hold that the new statute did not provide constitutionally adequate notice.

The *Clark* court determined that the defendant's conviction **could be upheld only if the old statute,** the supercession of which had been legislatively declared and publicly announced, could continue to serve as notice of the criminality of defendant's conduct. In order to reach that conclusion the court decided that one would have to reason, first that the new statute on its face gave adequate notice of its own invalidity, and second, that the public, thus informed, was then put o further notice that the officially announced statutory repeal or supercession of the old statute was legally ineffective. Id.

The Court concluded that such reasoning was "too tortured and too far removed" from reality to satisfy the due process requirement that, at the time of the alleged offense, the accused shall have been on notice that his conduct was proscribed by the criminal law. THe court could not even srmont the first hurdle that the new statute could serve as notice of its own invalidity. Without that notice, no occasion was available to consider the old statute as possibly relevent.

As in the *Clark* case, and its Supreme Court precedents, to meet Due Process, Public Law 80-772 and 18 U.S.C. Sec.3231 would have had to give adequate public notice on their faces of

their own invalidity and the public would have to have been put o further notice that the officially announced statutory repeal or supercession of the old statutes was legally effective. The court can not even reach the first hurdle, much less the second one. The court obtained its jurisdiction to prosecute crimes pursuant to 18 U.S.C. Sec.3231. Without proper notice of the invalidity of the statute, Mr. Batista's indictment and conviction can not be upheld and the court has only one choice, to order dismissal of Mr. Batista's indictment with prejudice, ab initio.

According to standing precedent, this court had absolutely no jurisdiction to prosecute Mr. Batista under either 18 U.S.C. Sec.3231 or the prior enactment.

### 8. The Government Supports Mr. Batista's Argument

Throughout the period when the Department of Justice was indicting, jailing, and prosecuting Mr. Batista, they wore two faces. The first face, the one presented to the Congress of the United States and the American people, said that when Congress adjourned for more than three days, the adjournment was a **sine die adjournment,** thereby killing all pending legislation. **Appendix D.**[17] In other words, the Department of Justice, the "experts in the law", **knew** that Public Law 80-772 was never enacted into positive law, was unconstitutional on its face, and was

---

[17] See **Appendix D-1, CRS-12-13:** "'We think that where one House seeks the consent of another House and goes out on a recess for more than 3 days, you have bicameral action, which constitutes an adjournment of Congress' . . .'the Constitution implies that any adjournment by the Congress - that is, any adjournment of either house for longer than three days - gives occasion for a pocket veto.' . . . So we think that part of the rationale for the pocket veto clause was the ducking Congress problem, but there was another reason, which was to eliminate or to minimize periods of uncertainty, to focus the debate. . .to permit the legislative process to rapidly resolve and immediately address differences that arose between the Exwcutive Branch and Congress.'" **Appendix D-1, CRS-16:** ***"Thus, we believe that the Constitution implicitly defines an adjournment of Congress, which takes place whenever either House goes out for more than three days."*** (John McGinnis of the Office of legal Counsel, pocket veto hearing in 1990 before the House Judiciary Committee). **Appendix D-2,** C-Span Congressional Directory: Pocket Veto: "is when the President fails to sign a bill within the 10 days allowed by the Constitution. Congress **must be in adjournment** in order for a pocket veto to take effect." **Appendix D-3.**

void ab initio. They, therefore, **knew** that 18 U.S.C. Sec.3231 was never enacted into positive law, was unconstitutional on its face, and was vod ab initio. They therefore **knew** that Mr. Batista was not indicted pursuant to the prior criminal code, 18 USC Sec.546 (1940) and that he was not given **fair warning** related to that statute[18] and that statute had different penalty provisions.[19] They, therefore, **Knew** that without the district court having jurisdiction pursuant to 18 USC Sec.546 (1940), they were indicting a person who was **legally innocent** as a matter of law.

Any doubt as to the government's official position and their fraud is further confirmed in **Appendix D-5:** Memorandum for Janet Reno, Attorney General, November 12, 1996, pg. 1: "You have asked this office to analyze the legal effectiveness of a congressional subpoena issued ***after a sine die asdjournment of Congress.*** In a **1982 opinion,** this Office concluded that a congressional subpoena issued during a session of Congress lacks present force and effect **after** the **adjournment sine die** of Congress. *Continuing Effect of a Congressional Subpoena Following the Adjournment of Congress*, 6 Op. O.L.C. 744 (1982). ***According to that opinion, the lapse in legal effectiveness 'results from the same factors that produce, at the same time, the death of all pending legislation not enacted..."***

[18] Fair warning doctrine invokes due process rights and requires that criminal statutes at issue be sufficiently definite to notify persons of reasonable intelligence that their planned conduct is criminal. *United States v. Nevers*, 7 F.3d 59 (5th Cir. 1993). See *United States ex. Rel. Clark v. Anderson*, 502 F.2d 1080 (3d Cir. 1974)(The notice requirements of Due Process would not permit a state, after ruling one of its statutes was overly vague, to apply that statute's superseded predecessor statute in the very case which ruled the predecessor statue unconstitutional).

[19] For example, the 1940 code allowed up to 10 days good time per month, 18 U.S.C. Sec.710 (1940), and parole after serving one-third of your sentence. 18 U.S.C. Sec.714 (1940).

A question as to the government's knowledge of the fact that the 80th Congress adjourned **sine die,** thereby killing all legislation, can also be found in the 107th Congress House Rules Manual, **Appendix D-4,** which traces it roots back to *Blackstone's Commentaries*. See page 1, Modes of Separation: "Prorogation or dissolution, constitutes there what is called a session; provided some act is passed. In this case, all matters depending before them are discontinued, and **at their next meeting are to be taken up de novo,** if taken up at all. 1 Blackst., 186. . . **If convened by the President's proclamation,** this must begin a new session, and of course, determine the preceding one to have been a session." [20] See **Appendix C-4.**

In summary, the government **knew** at the time it was prosecuting Mr. Batista and since then that it was defrauding the court, acting in bad faith, in unfair dealing and in violation of the Unclean Hands Doctrine.[21] Such fraud and unclean hands voids the indictment ab initio with prejudice.

**V.**

**SUMMARY**

Mr. Batista prays that the court enter an order dismissing all counts of Mr. Batista's indictment with prejudice since the statutes used to obtain jurisdiction by the court were never enacted into positive law, are unconstitutional on their face, and are null and void ab initio, and since the government's official position supports Mr. Batista and they came to these proceedings

---

[20] See *Kennedy v. Sampson*, 511 F.2d 430, 444, Appendix, N.4: Congress adjourned on July 27, 1947, sine die then ***reconvened under a Presidental proclamation*** on November 17, 1947. See Proclamation of October 23, 1947 by President Harry S. Truman 61 Stat. 1093, **Appendix C-4.**

[21] See **Appendix D-1,** CRS Report to Congress, March 30, 2001; The Pocket Veto, Its Current Status; C-Span Congressional Glossary, **Appendix D-2,** definition of Pocket Veto; **Appendix D-3,** U.S. Senate of Adjournment Sine Die.

through fraud, unclean hands, and in violation of Mr. Batista's Due Process rights.

Dated this 14th day of February 2007.

Respectfully submitted,

Santo Rafael aria Batista

Rafael Aries Santos Batista; Pro se litigant
Reg. No. 04536-070
U.S.P. Big Sandy
P.O. Box 2068
Inez, KY 41224

**JURAT**

I, Rafael Aries Santos Batista, certify that the facts stated herein are true and correct under the penalty of perjury.

Dated this 14th day of Frebruary 2007.

Santo Rafael aria Batista

Rafael Aries Santos Batista

R. Shay 2/14/07

AUTHORIZED BY THE ACT OF
JULY 7, 1955, AS AMENDED,
TO ADMINISTER OATHS
18 U.S.C. 4004

**PROOF OF FILING**

On the 14th day of February 2007, a true and correct of the foregoing was filed pursuant to *Houston v. Lack*, 487 U.S. 266 (1988) by placing it in the institutional legal mailbox at U.S.P. Big Sandy, first class mail, postage prepaid.

**CERTIFICATE OF SERVICE**

I, Rafael Aries Santos Batista, hereby state and declare, pursuant to penalty of perjury, that on this 14th day of February, a true and correct copy of the foregoing was sent by placing it in the United States mail, postage prepaid, first class mail to the Clerk of the Court for the United States District Court for the District of Rhode Island, , One Exchange Terrace, Providence RI 02903-1720 and a copy to the Richard W. Rose, A.U.S.A., District of Rhode Island, Fleet Center, 50 Kennedy Plaza, Eighth Floor, Providence RI 02903.

Santo Rafael aria Batista
Rafael Aries Santos Batista

R. Hare, 2/14/07
AUTHORIZED BY THE ACT OF
JULY 7, 1955, AS AMENDED,
TO ADMINISTER OATHS
18 U.S.C. 4004

# APPENDIX A

# APPENDIX A

## STATEMENT OF UNCONTROVERTED FACTS

### 1. The Invalidity of Public Law 80-772 and 18 U.S.C. § 3231

a. The bill on federal crimes and criminal procedure, which later became Public Law 80-772, was first introduced in the House of Representatives as H.R. 2200 during the 79th Congress, passed the House unanimously and was referred to the Senate Committee on the Judiciary on July 16, 1946, in the Second Session of the 79th Congress, but **never** passed the Senate and died when the 79th Congress adjourned sine die. 92 Congressional Record 9122, 9067 (July 16, 1946); 93 Cong. Rec. 5049 (May 12, 1947), attached hereto as **Appendix C-1.**

b. A similar bill, entitled "Crimes and Criminal Procedure," was then reintroduced as H.R. 3190 during the First Session of the 80th Congress. The bill (with some amendments) passed the House 38-to-6 on May 12, 1947, and was referred to the Senate Committee on the Judiciary the next day, in the First Session of the 80th Congress. 93 Cong. Rec. 5048-5049 (May 12, 1947), 5121 (May 13, 1947), attached hereto as **Appendix C-2.**

c. The Senate did not take up the bill prior to the July 27, 1947 (conditional) intersession adjournment, in accordance with S.Con.Res. 33. 93 Cong. Rec. 10439, 10522 (July 26, 1947), attached hereto as **Appendix C-3.** The July 27, 1947 adjournment was a sine die adjournment, as determined by the *Kennedy v. Sampson* court, 511 F.2d 430, 444, Appendix, n. 4 (D.C. Cir. 1974), attached hereto as **Appendix C-4.**

d. Upon President Truman's **proclamation,** Congress reconvened on November 17, 1947, and the First Session of the 80th Congress **adjourned sine die** on December 19, 1947, without the Senate passing H.R. 3190. *Kennedy v. Sampson*, 511 F.2d 430, 444, Appendix, n. 4

(D.C. Cir. 1974), attached hereto as **Appendix C-4.**[6] The Statutes at Large show that adjournment as a sine die adjournment.

e. H.R. 3190, which died upon the **sine die** adjournment of Congress in 1947, was **not reintroduced** in the House again at anytime in 1948 during the Second Session of the 80th Congress. 94 Cong. Rec. 568 (1948), attached hereto as **Appendix C-6.**

f. Mysteriously, however, near the end of the Second Session of the 80th Congress, on June 14, 1948, H.R. 3190, with Judiciary Committee amendments (Per S. Rept. No. 1620) surfaced in the Senate **as if** it had never died with the **sine die** adjournment in 1947 or as if it was passed once again by the House in 1948. 94 Cong. Rec. 8075 (June 14, 1948), attached hereto as **Appendix C-6.**

g. The Senate promptly passed the amended H.R. 3190 on June 18, 1948, and sent it back to the House, expecting that the House would adopt the amended bill. 94 Cong. Rec. 8721-8722 (June 18, 1948), attached hereto as **Appendix C-7.**

h. The House then "concurred" in the amendments that same day (June 18, 1948) but never voted on the amended bill. 94 Cong. Rec. 8864-8865 (June 18, 1948), attached hereto as **Appendix C-8.**

i. In accordance with H.Con.Res.218, the Second Session of the 80th Congress (conditionally) adjourned on June 20, 1948, with H.R. 3190 still to be signed by the Speaker of the House and the President pro tempore of the Senate after the adjournment by H.Con.Res. 219.

---

[6] "The Senate and the House of Representatives adjourned on July 27, 1947 under a 'conditional final adjournment' resolution, S.Con.Res. 33; 93 Cong.Rec. 10400. Pursuant to the resolution, the two Houses were to stand in adjournment until January 2, 1948, unless recalled into session earlier by specified Senate and House leaders. **In effect, the adjournment was a *sine die* adjournment, not an intrasession adjournment.** On November 17, 1947, Congress convened pursuant to proclamation of President Truman, and **adjourned *sine die*** on December 19, 1947. The President **pocket vetoed** 19 bills presented to him after the adjournment of July 27, 1947."

*Kennedy v. Sampson*, 511 F.2d at 444, Appendix, n.5 **(Appendix C-4)**[7]; 94 Cong. Rec. 9349 (June 19, 1948) attached hereto as **Appendix C-9.**

j. It was **only after** this (conditional) final adjournment of the Second Session of the 80th Congress, and as authorized by H.Con.Res. 219, that the Speaker and the President pro tempore signed the enrolled H.R. 3190 and presented it to President Truman on June 23, 1948, for the President to sign the enrolled bill into law on June 25, 1948. 94 Cong. Rec. 9354, 9365, and 9367, attached hereto as **Appendices C-10, C-11, and C12,** respectively; see also 94 Cong. Rec. D557 (Daily Digest), attached hereto as **Appendix C-13.**

k. At the time H.R. 3190 was signed by the Speaker of the House and the President pro tempore of the Senate, the 80th **Congress was not in open session** but it was fully (but conditionally) adjourned **sine die.** *Kennedy*, 511 F.2d at 444, Appendix, n.5 (see FN 20), attached hereto as **Appendix C-4.**

l. The face of the engrossed bill as signed by the 80th Congress shows that the engrossed bill was passed and signed in the 80th Congress, 1947 session, by the House of Representatives. However, the enrolled bill, which actually placed Public Law 80-772 into law, was **altered** from the engrossed bill (which showed a date of enrollment in 1947 in the First Session of the 80th Congress), to **make it appear** that it passed both houses in 1948 in the Second Session of Congress, thus rendering it a **fraud and forgery.** (See Congressional records,

[7] "The Senate and the House of Representatives adjourned on June 20, 1948, under a 'conditional final adjournment' resolution, H. Con. Res. 218; 94 Cong. Rec. 9158. Pursuant to the resolution, the two Houses were to stand in adjournment until December 31, 1948, unless recalled into session earlier by specified Senate and House leaders. **In effect, the adjournment was a *sine die* adjournment, not an intrasession adjournment.** On July 26, 1948, Congress convened pursuant to a proclamation of President Truman. The President **pocket vetoed** 14 bills presented to him after the adjournment of June 20, 1948"

Records of National Archives, engrossed bill, enrolled bill, Public Law 80-772, attached hereto as **Appendix C-14.**

m. No valid enactment clause exist for Public Law 80-772 pursuant to 1 U.S.C. § 101[8]. H.R. 3190 **died sine die** in the first session of the 80th Congress, was **not re-introduced** as a new bill in the House in the Second Session of the 80th Congress, and, therefore, the same bill did not pass both houses of Congress. It was also not enacted **in Congress assembled**, as it was "signed into law" by the President pro tempore of the Senate and the Speaker of the House only **after** Congress adjourned. *Kennedy*, 511 F.2d at 444, Appendix, n.5 (see FN 20) **(Appendix C-4)**; 94 Cong. Rec. 9349 (June 19, 1948), attached hereto as **Appendix C-9.**

n. 18 U.S.C. § 3231 was introduced in the First Session of the 80th Congress as part of the faulty H.R. 3190 and Public Law 80-772.[9] The report of the House Committee on the Judiciary (80th Congress, 1st Session) stated: "This section [3231] was formed by combining sections 546 and 547 of Title 18, U.S.C. 1940 ed. With section 588d of Title 12, U.S.C., Banks and Banking, with no change of substance". See H.R. Rep. No. 304, 80th Congress, 1st Session, 100 app. (1947). Since H.R. 3190 and Public Law 80-772 are unconstitutional on their face, then

---

[8] "The enacting clause of **all** acts of Congress shall be in the following form: 'Be enacted by the Senate **and** House of Representatives of the United States of America **in Congress assembled.**" 1 U.S.C. § 101 (June 30, 1947, ch. 338, 61 Stat. 634).

[9] "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States. Nothing in this title shall be held to take away the jurisdiction of the courts of the several States under the laws thereof." 1 U.S.C. 101 (June 25, 1948, ch. 645, Stat. 826.) This section was formed by combining sections 546 and 547 of title 18, U.S.C., 1940 ed., with section 588d of title 12, U.S.C., Banks and Banking, with no change of substance.

18 U.S.C. Sec.3231 is unconstitutional on its face and the court never had jurisdiction to prosecute the crimes, herein.[10]

[10] Mr. Batista took judicial notice that the counts of the indictment pursuant to which Mr. Batista was charged, werre also part of the unconstitutional and fraudulent passage of Public Law 80-772 in the 80th Congress, also rendering the counts and thus the indictment a nullity.

# APPENDIX B

**APPENDIX B**

**AFFIDAVIT OF RAFAEL ARIES SANTOS BATISTA**

State of Kentucky )

County of Martin ) SS.:

Affiant, Rafael Aries Santos Batista, being duly sworn, upon his oath, deposes and says:

My name is Rafael Aries Santos Batista. I am over 18 years of age and of sound mind. I have personal knowledge of the facts alleged in my motion to dismiss my indictment and conviction for lack of subject matter jurisdiction. I hereby swear that the following statements in support of my Motion To Set Aside Void Judgment for Lack of Subject Matter Jurisdiction are true and correct.

I, Rafael Aries Santos Batista, discovered through research and investigation, including the research of others, that Public Law 80-772 and 18 U.S.C. Sec.3231 violated the Presentment Clause, Article I, Section 7, of the Constitution, were not enacted into positive law as required by the Constitution of the United States and are no law, are unconstitutional on their face, and therefore, are void ab initio. I have judicially noticed the facts from the 80th Congress on the record which, and reincorporate them herein. Therefore, I am currently imprisoned for committing no crime in violation of the Constitution of the United States.

SIGN, SWORN, and EXECUTED this 14th day of February, 2007.

Santo Rafael aria Batista
Rafael Aries Santos Batista
Reg. No. 04563-070
U.S.P. Big Sandy
P.O. Box 2068
Inez, KY 41224

**JURAT**

I, Rafael Aries Santos Batista, certify under the penalty of perjury, that the foregoing is true and correct.

Santo Rafael aria Batista

Rafael Aries Santos Batista

SUBSCRIBED AND SWORN TO
BEFORE ME this ______ day of February, 2007

______________________________, Notary Public

or

Bop Case Manager, Pursuant to 18 U.S.C. 4004

R. Haz 2/14/07

AUTHORIZED BY THE ACT OF
JULY 7, 1955, AS AMENDED,
TO ADMINISTER OATHS
18 U.S.C. 4004

# APPENDIX C

# APPENDIX C

## CONGRESSIONAL RECORDS EVIDENCE AND JUDICIALLY NOTICED FACTS RELATED TO THE INVALIDITY OF PUBLIC LAW 80-772 AND 18 U.S.C. § 3231

| | |
|---|---|
| **C-1** | 92 Cong. Rec. 9122, 9067 (July 16, 1946); 93 Cong. Rec. 5049 (May 12, 1947) |
| **C-2** | 93 Cong. Rec. 5048-5049 (May 12, 1947), 5121 (May 13, 1947) |
| **C-3** | 93 Cong. Rec. 10439, 10522 (July 26, 1947) |
| **C-4** | *Kennedy v. Sampson*, 511 F.2d 430, 444, Appendix, n. 4 and n. 5 |
| **C-5** | 94 Cong. Rec. 568 (1948) |
| **C-6** | 94 Cong. Rec. 8075 (June 14, 1948) |
| **C-7** | 94 Cong. Rec. 8721-8722 (June 18, 1948) |
| **C-8** | 94 Cong. Rec. 8864-8865 (June 18, 1948) |
| **C-9** | 94 Cong. Rec. 9349 (June 19, 1948) |
| **C-10** | 94 Cong. Rec. 9354 |
| **C-11** | 94 Cong. Rec. 9365 |
| **C-12** | 94 Cong. Rec. 9367 |
| **C-13** | 94 Cong. Rec. D557 (Daily Digest) |
| **C-14** | Congressional records, Records of National Archives related to the "passage" of Public Law 80-772 |

# APPENDIX C-1

UNITED STATES OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 79th CONGRESS

SECOND SESSION

## VOLUME 92—PART 7

JULY 2, 1946, TO JULY 18, 1946

(PAGES 8091 TO 9396)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1946

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## To all to whom these presents shall come. Greeting:

[illegible]y virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, [illegible] the seal of the National Archives of the United States, that the attached reproduction(s) is a true and co[illegible]py of documents in his custody.

| | |
|---|---|
| SIGNATURE | |
| NAME Richard Hunt | DATE 05/09/06 |
| TITLE Director<br>Center for Legislative Archives | |
| NAME AND ADDRESS OF DEPOSITORY<br>The National Archives<br>Washington, D.C. 20408 | |

*U.S. GPO: 1998-442-221/8[illegible]

NA FORM 14007A (10-86)

Southeastern Sand & Gravel Co., and Roberts Blount arising out of the construction of the afore-mentioned sewer at Anniston, Ala., under project No. Ala. 1-160 (F).

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

RALEIGH B. DIAMOND

Mr. SPRINGER. Mr. Speaker, I ask unanimous consent to return to Calendar No. 1019, the bill (H. R. 2123) for the relief of Raleigh B. Diamond, the first bill on the Private Calendar today, and I ask unanimous consent that the proceeding had on that bill be vacated and that the bill be passed over without prejudice.

The SPEAKER. Is there objection to the request of the gentleman from Indiana?

There was no objection.

FREE HIGHWAY BRIDGE ACROSS SUSQUEHANNA RIVER IN LUZERNE COUNTY, COMMONWEALTH OF PENNSYLVANIA

Mr. McCORMACK. Mr. Speaker, I ask unanimous consent for the present consideration of the bill (H. R. 5537) granting the consent of Congress to the Commonwealth of Pennsylvania to construct, maintain, and operate a free highway bridge across the Susquehanna River at a point between the borough of Plymouth, in Plymouth Township, and Hanover Township, in the county of Luzerne, and in the Commonwealth of Pennsylvania.

The Clerk read the title of the bill.

The SPEAKER. Is there objection to the request of the gentleman from Massachusetts [Mr. McCormack]?

Mr. GRAHAM. Mr. Speaker, reserving the right to object, and I do not intend to object, at the request of the gentleman from Pennsylvania [Mr. Gillette], I am authorized to withdraw his objection to the erection of this bridge. The gentleman from Pennsylvania [Mr. Gillette] introduced the original bill through a misunderstanding, but in the interest of the public and the good it will accomplish he is withdrawing all objections, and he asked that I request of you that this bill be passed unanimously.

Mr. McCORMACK. I thank the gentleman very much.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.*, That the consent of Congress is hereby granted to the Commonwealth of Pennsylvania to construct, maintain, and operate a free highway bridge, and approaches thereto, across the Susquehanna River, at a point suitable to the interests of navigation, between the borough of Plymouth, in Plymouth Township and Hanover Township, in the county of Luzerne, and in the Commonwealth of Pennsylvania, in accordance with the provisions of the act entitled "An act to regulate the construction of bridges over navigable waters," approved March 23, 1906.

Sec. 2. The right to alter, amend, or repeal this act is hereby expressly reserved.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

CRIMES AND CRIMINAL PROCEDURE

Mr. KEOGH. Mr. Speaker, I ask unanimous consent for the immediate consideration of H. R. 2200, a bill to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure."

The Clerk read the title of the bill.

The SPEAKER. Is there objection to the request of the gentleman from New York [Mr. Keogh]?

There was no objection.

Mr. KEOGH. Mr. Speaker, I ask unanimous consent that the reading of the bill be dispensed with.

The SPEAKER. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. KEOGH. Mr. Speaker, this bill, H. R. 2200, will enact into law a Federal Criminal Code which would comprise, in one place, all existing law dealing exclusively with crimes and criminal procedure. These laws are now scattered through numerous volumes of the statutes at large. The bill is a culmination of more than 2 years' work by a staff of experts under the supervision of the Committee on Revision of the Laws.

I am happy to say at the outset that the bill has the unanimous support of both the Committee on Revision of the Laws and the Committee on the Judiciary. I want to express the sincere gratitude of the Committee on Revision of the Laws to the House Committee on Judiciary and its able chairman, the gentleman from Texas [Mr. Sumners], and its subcommittee under the chairmanship of the distinguished gentleman from New York [Mr. Celler], who gave unstintingly of their time and efforts in considering the bill after it was reported by the Committee on Revision of the Laws.

A complete statement of the background of this codification is contained in House Report 152, and it is my intention to make only a brief explanation at this time.

The need for a comprehensive codification of the criminal laws has been recognized for many years by members of the bench and bar. This bill is intended to supply that need for the first time since 1909. When the Committee on Revision of the Laws undertook this task it obtained the services of the West Publishing Co., of St. Paul, Minn., and the Edward Thompson Co., of Brooklyn, N. Y., two leading law publishing firms who have been engaged in codification of Federal laws since the first United States Code was adopted in 1925. These companies in turn assembled a staff of experts and a distinguished advisory committee of leading members of the bench and bar, all of whom have worked in close cooperation with the Committee on Revision of the Laws and its counsel. Several preliminary drafts of the codification were prepared and considered in detail by the advisory committee and wide distribution was given to two such drafts. The codification received the endorsement of the then Attorney General of the United States who had designated a member of his staff to attend the advisory committee sessions. The bill has also been endorsed by the Criminal Law Section of the American Bar Association.

It has been our aim in preparing this bill to furnish a modern, simple and understandable code of the Federal criminal law, in keeping with our motto, "Making the laws understandable is as important as making the laws." To accomplish this, it was necessary to make a complete reclassification and renumbering of the existing statutes so that these laws could be found in a convenient form by the lawyer and judge and the public. Not only were we concerned with existing law but we have endeavored to provide for future legislation by our alphabetical and numerical arrangement.

In analyzing existing statutes for the purpose of consolidating them in this code, it was found that there were many inconsistencies in punishment provisions. These have been reconciled and each change in punishment has received the complete and unanimous approval of the Committee on Revision of the Laws and the Committee on the Judiciary.

The enactment of this bill now is peculiarly timely because of the recent adoption of the Federal Rules of Criminal Procedure by the Supreme Court. Our treatment of the subject matter covered by the laws has received the endorsement of the Supreme Court Advisory Committee on Rules of Criminal Procedure.

The codification has been accorded widespread distribution to members of the judiciary and United States attorneys and marshals, as well as to executive departments and agencies, to all of whom we are indebted for helpful suggestions and criticisms during the course of our work.

Simplification and improvement in existing law has been effected in this bill through the adoption of an alphabetical arrangement of crimes and through the use of a clear and uniform style and elimination of verbose, ambiguous, and archaic expressions. The consolidation of sections is also the source of great improvement. A distinctive feature is the specific repeal of the statutes incorporated in the bills which is an essential element in codification bills but which too often has been omitted from this type of bill in the past.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

GOVERNMENT CORPORATIONS AND INDEPENDENT EXECUTIVE AGENCIES APPROPRIATION, 1947

Mr. WHITTEN. Mr. Speaker, I ask unanimous consent to take from the Speaker's table the bill H. R. 6777, an act making appropriations for Government corporations and independent executive agencies for the fiscal year ending June 30, 1947, and for other purposes, and concur in the amendment of the Senate to the amendment of the House to the amendment of the Senate numbered 4.

The Clerk read the title of the bill.

Case 1:02-cv-00429-T Document 21-4 Filed 03/02/2007 Page 7 of 63



The result has been one disaster after another, resulting in the loss of many lives. This should be stopped. The Safety Board should be restored in the law, and safety should be returned to air transport.

With that in mind, Mr. President, I am sending forward a resolution which I ask to have referred to the Committee on Commerce, authorizing the Committee on Commerce to make a thorough investigation of the entire subject and to submit a report, with the view of bringing about legislation.

There being no objection, the resolution (S. Res. 304) was received and referred to the Committee on Commerce, as follows:

*Resolved*, That the Committee on Commerce, or any duly authorized subcommittee thereof, is authorized and directed to make a full and complete study and investigation of the present-day fire hazards and other defects of modern air-line equipment, and of possible action to improve safety in air transportation.

The committee shall report to the Senate at the earliest practicable date not later than January 3, 1947, the results of its study and investigation, together with such recommendations as it may deem advisable.

For the purposes of this resolution the committee, or any duly authorized subcommittee thereof, is authorized to hold such hearings, to sit and act at such times and places during the sessions, recesses, and adjourned periods of the Seventy-ninth Congress, to employ such experts, and such clerical, stenographic, and other assistants, to require by subpena or otherwise the attendance of such witnesses and the production of such correspondence, books, papers, and documents, to administer such oaths, to take such testimony, and to make such expenditures, as it deems advisable. The cost of stenographic services to report such hearings shall not be in excess of 25 cents per hundred words. The expenses of the committee, which shall not exceed $5,000, shall be paid from the contingent fund of the Senate upon vouchers approved by the chairman.

MESSAGE FROM THE HOUSE

A message from the House of Representatives, by Mr. Maurer, one of its reading clerks, announced that the House had disagreed to the amendment of the Senate to the Joint Resolution (H. J. Res. 371) extending the effective period of the Emergency Price Control Act of 1942, as amended, and the Stabilization Act of 1942, as amended; agreed to the conference asked by the Senate on the disagreeing votes of the two Houses thereon, and that Mr. SPENCE, Mr. BROWN of Georgia, Mr. PATMAN, Mr. BARRY, Mr. WOLCOTT, Mr. CRAWFORD, and Mr. GAMBLE were appointed managers on the part of the House at the conference.

The message also announced that the House had agreed to the amendment of the Senate to the amendment of the House to the amendment of the Senate numbered 4 to the bill (H. R. 6777) making appropriations for Government corporations and independent executive agencies for the fiscal year ending June 30, 1947, and for other purposes.

The message further announced that the House had passed the following bills in which it requested the concurrence of the Senate:

H. R. 2200. An act to revise, codify, and enact into positive law title 18 of the United States Code, entitled "Crimes and Criminal Procedure"; and

H. R. 6515. An act to amend the act entitled "An act authorizing the Nebraska-Iowa Bridge Corp., a Delaware corporation, its successors and assigns, to construct, maintain, and operate a bridge across the Missouri River between Washington County, Nebr., and Harrison County, Iowa," approved March 6, 1928.

HOUSE BILLS AND JOINT RESOLUTION REFERRED

The following bills and joint resolution were severally read twice by their titles and referred, as indicated:

H. R. 2377. An act to authorize the coinage of 50-cent pieces in commemoration of the one hundredth anniversary of the admission of Iowa into the Union as a State; and

H. R. 6528. An act to authorize the coinage of 50-cent pieces to commemorate the life and perpetuate the ideals and teachings of Booker T. Washington; to the Committee on Banking and Currency.

H. R. 3523. An act to provide for lump-sum payment of compensation for accumulated annual leave and current accrued annual leave to certain officers and employees, and authorizing the appropriation of funds for that purpose;

H. R. 4718. An act to amend the Civil Service Retirement Act of May 29, 1930, as amended, to provide annuities for certain officers and employees who have rendered at least 25 years of service;

H. R. 5590. An act to provide for the uniform administration of efficiency ratings; and

H. J. Res. 380. Joint resolution to exempt officers and employees of the Bureau of Internal Revenue from the provisions of section 14 (a) of the Federal Employees Pay Act of 1946, relating to personnel ceilings; to the Committee on Civil Service.

H. R. 5144. An act to establish a national air museum, and for other purposes; to the Committee on the Library.

H. R. 6918. An act to provide emergency relief for the victims of the seismic waves which struck the Territory of Hawaii, and for other purposes; to the Committee on Territories and Insular Affairs.

H. R. 6932. An act to provide for further research into basic laws and principles relating to agriculture and to improve and facilitate the marketing and distribution of agricultural products; to the Committee on Agriculture and Forestry.

H. R. 2200. An act to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure"; to the Committee on the Judiciary.

THIRD DEFICIENCY APPROPRIATIONS

The Senate resumed consideration of the bill (H. R. 6885) making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1946, and for prior fiscal years, to provide supplemental appropriations for the fiscal year ending June 30, 1946, to provide appropriations for the fiscal year ending June 30, 1947, and for other purposes.

Mr. BARKLEY. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The Chief Clerk called the roll, and the following Senators answered to their names:

| | | | | | |
|---|---|---|---|---|---|
| Aiken | Brewster | Capper | Downey | Langer | Robertson |
| Andrews | Bridges | Carville | Eastland | Lucas | Russell |
| Austin | Brooks | Chavez | Ferguson | McCarran | Shipstead |
| Ball | Bushfield | Connally | Fulbright | McClellan | Smith |
| Barkley | Byrd | Cordon | George | McKellar | Stanfill |
| Bilbo | Capehart | Donnell | Gerry | McMahon | Stewart |
| | | | Gossett | Magnuson | Swift |
| | | | Green | Mead | Taft |
| | | | Guffey | Millikin | Taylor |
| | | | Gurney | Mitchell | Thomas, Okla. |
| | | | Hart | Moore | Thomas, Utah |
| | | | Hawkes | Morse | Tobey |
| | | | Hayden | Murdock | Tunnell |
| | | | Hill | Murray | Vandenberg |
| | | | Hoey | Myers | Wagner |
| | | | Huffman | O'Daniel | Walsh |
| | | | Johnson, Colo. | Overton | Wherry |
| | | | Johnston, S. C. | Pepper | White |
| | | | Kilgore | Radcliffe | Wiley |
| | | | Knowland | Reed | Wilson |
| | | | La Follette | Revercomb | Young |

The PRESIDING OFFICER. Eighty-one Senators having answered to their names, a quorum is present.

Mr. McKELLAR. Mr. President, I ask unanimous consent that the formal reading of the bill be dispensed with, that it be read for amendment, and that the committee amendments be first considered.

The PRESIDING OFFICER. Without objection, it is so ordered.

The clerk will proceed to state the amendments of the Committee on Appropriations.

The first amendment of the Committee on Appropriations was under the heading "Title I—General Appropriations Legislative," on page 2, after line 4, to insert:

SENATE

OFFICE OF THE SECRETARY

For a clerk in the Office of the Secretary at the rate of $3,380 per annum, in lieu of an assistant in the Secretary's Office provided by Senate Resolution 181, agreed to December 13, 1939, fiscal year 1947, $3,380, and the Legislative Branch Appropriation Act for the fiscal year 1947 hereby is amended accordingly.

The amendment was agreed to.

The next amendment was, on page 2, after line 12, to insert:

For an amount necessary to increase the salary of one clerk under the Office of the Secretary from $2,400 to $2,700, fiscal year 1947, $300, and the Legislative Branch Appropriation Act for the fiscal year 1947 hereby is amended accordingly.

The amendment was agreed to.

The next amendment was, on page 2, after line 17, to insert:

For an amount necessary to increase the salary of the assistant to the press door from $1,900 to $2,000, fiscal year 1947, $100, and the Legislative Branch Appropriation Act for the fiscal year 1947 hereby is amended accordingly.

Mr. JOHNSTON of South Carolina. Mr. President, I have an amendment to offer on page 2.

The PRESIDING OFFICER. Is it a separate amendment or is it an amendment to the committee amendment?

Mr. JOHNSTON of South Carolina. It is an amendment to the committee amendment.

The PRESIDING OFFICER. Very well; the amendment will be stated.

The LEGISLATIVE CLERK. At the proper place, under the subhead "Senate," it is proposed to insert the following: "Public Law 479, the Legislative Branch Appropriation Act, 1947," is hereby amended by striking out, under the heading "Senate," subhead "Office of the Secretary," the

UNITED STATES OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 80th CONGRESS

FIRST SESSION

## VOLUME 93—PART 4

APRIL 30, 1947, TO MAY 20, 1947
(PAGES 4251 TO 5560)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1947

relating to crimes and criminal procedure.

A bill similar to this passed the House unanimously in the closing days of the Seventy-ninth Congress but was not acted upon in the other body. I believe that I should make a brief statement explaining the method of drafting the bill and its scope.

The work on this revision was commenced under the supervision of the former Committee on Revision of the Laws in 1944. That committee engaged the services of the West Publishing Co. and the Edward Thompson Co., two law-publishing companies that have assisted in the preparation of the original United States Code and every supplement and new edition of that code. These companies have worked continuously and closely with the Committee on Revision of the Laws and, since the beginning of this Congress, with the Committee on the Judiciary, and counsel for the committees. In turn, the companies supplemented their regular editorial staffs by engaging the services of a reviser who was long familiar with the operation and administration of these laws. In addition they assembled an outstanding group of men as an advisory committee who labored unselfishly toward achieving the best revision of the criminal laws. A number of these men—members of the bench and bar of the country—appeared before the Committee on the Judiciary and testified that in their opinion this bill is eminently worthy of favorable action by the Congress. The Department of Justice also designated a representative of the Criminal Division to cooperate in the preparation of this revision.

Several preliminary drafts of the revision were studied most carefully, word for word and line for line, by these various groups, culminating in the bill now up for consideration.

At the last Congress the Committee on the Revision of the Laws, through its chairman, appeared before a subcommittee of the Judiciary Committee and, in a number of sessions, pointed out and explained every change in substantive law made by the bill which had been reported by that committee. After full discussion the Committee on the Judiciary unanimously endorsed the then pending bill, which is similar to the bill before us today, and that bill was passed unanimously by the House on July 16, 1946, in the closing days of the session. The bill had received the endorsement of the Department of Justice and the Section on Criminal Law of the American Bar Association. I believe that I am not engaging in overstatement when I say that no bill of this magnitude ever came to the House with such a background of careful and painstaking preparation and critical appraisal by so many leaders in this branch of the law.

So much for the method of preparation—and I want to express our appreciation to the learned members of the bench and bar who contributed so much of their talent and time toward this work.

Now as to the scope of the bill.



This bill is a restatement of the Federal laws relating to crimes and criminal procedure in effect on April 15, 1947. Most of these laws are now set forth in title 18 of the United States Code and are based upon the 1909 Criminal Code—which was the last revision of criminal laws enacted by the Congress—and subsequent laws on the subject. Of course, title 18 of the United States Code is only prima facie evidence of the law which is contained in numerous volumes of the Statutes at Large. Upon the enactment of this bill it will no longer be necessary to have recourse to those numerous volumes. All the law will be set out in one place and amendments in the future will be facilitated because of the orderly arrangement of the laws within one title.

Just a year ago with the adoption of the Federal Rules of Criminal Procedure many statutes became obsolete or superseded, but, of course, were not specifically repealed. These together with other obsolete, superseded, redundant, and repetitious statutes are repealed by this bill, and the effect of the rules is clearly set forth in the revision.

The law is restated in simple, clear, and concise language. Many sections of existing statutes are consolidated to facilitate finding the law. The advantages of codes are too well known to require any lengthy exposition on my part at this time.

You will find no radical changes in the philosophy of our criminal law in this bill. There is no attempt made here to coddle criminals and wrongdoers. Nor is this bill a subject of partisanship. Its predecessor which passed the House unanimously in the Seventy-ninth Congress had been reported unanimously by the Committee on the Revision of the Laws and had received the unanimous endorsement of the Committee on the Judiciary. This bill has also been reported unanimously by the Committee on the Judiciary.

Favorable action by the House today will constitute a big step toward an orderly and systematic code of laws and will prove a boon to the bench and bar and the public generally.

Mr. COLE of New York. Mr. Speaker, I rise in opposition to the amendment only for the purpose of suggesting that to some extent the gentleman's amendment is in violation of the understanding on which these bills were submitted to the House for passage today. It was understood that they were simply codifications of existing law and undertook to make no changes in existing law.

I understand that probably the gentleman's amendment has considerable merit, and I see several members of the Committee on the Judiciary on the floor. I certainly am not in a position and have no desire to raise any criticism of procedure or objection to it, but it does seem to be a violation of the understanding under which these bills were submitted.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield.

Mr. ROBSION. I pointed out when I made my statement with reference to the first five bills that we considered, that they were purely a codification. But there are some changes in this bill (H. R. 3198), I mean, for instance, when we were considering this bill the Philippine Islands were a part of the United States. We had many laws applicable to the Philippine Islands when she was a part of the United States that are no longer in force because the Philippines are no longer a part of the United States. Those laws we cut out.

We also found going through criminal law with the Department of Justice, the bar association, and the representatives of the Federal courts that Congress has passed many acts almost identical. In some of them the penalty was fixed at 5 years and in others, fixed at 6 months. We thought it wise to clarify and harmonize these.

Mr. COLE of New York. Mr. Speaker, so long as these distinguished gentlemen of the Judiciary Committee are satisfied with this procedure and with this bill, I shall not use the time of the House further.

Mr. MICHENER. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield to the gentleman from Michigan.

Mr. MICHENER. Mr. Speaker, I hold in my hand a copy of the committee report which I wish the Members would look at carefully. Where there is any indication of change every one of these questions is fully explained in the report. If we start to amend now we are liable to get into trouble. I favor the bill suggested by the gentleman from Pennsylvania but I hope it will not be interjected here because it will upset the procedure which must be followed if we ever hope to accomplish this purpose.

Mr. COLE of New York. Is the amendment offered by the gentleman from Pennsylvania in the report accompanying this bill to which he has referred?

Mr. MICHENER. No; it is not.

The SPEAKER. The question is on the amendment offered by the gentleman from Pennsylvania [Mr. WALTER].

The question was taken; and the Speaker being in doubt, the House divided, and there were—ayes 38, noes 6.

So the amendment was agreed to.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## EXTENSION OF REMARKS

Mr. STEVENSON asked and was given permission to extend his remarks in the Appendix of the RECORD and include a report to his constituents.

## REVISION OF TITLE 28, UNITED STATES CODE

The Clerk called the bill (H. R. 3214) to revise, codify, and enact into law title 28 of the United States Code entitled "Judicial Code and Judiciary."

The SPEAKER. Is there objection to the present consideration of the bill?

Mr. CURTIS. Mr. Speaker, reserving the right to object, this bill H. R. 3214 deals with the judiciary and judicial procedure and I wish to call attention merely to one part of it. That is the part

# APPENDIX C-2

UNITED STATES OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 80th CONGRESS

FIRST SESSION

## VOLUME 93—PART 4

APRIL 30, 1947, TO MAY 20, 1947

(PAGES 4251 TO 5560)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1947

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

### all to whom these presents shall come. Greeting:

virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, e seal of the National Archives of the United States, that the attached reproduction(s) is a true and py of documents in his custody.

| SIGNATURE | |
|---|---|
| NAME Richard Hunt | DATE 05/09/06 |
| TITLE Director Center for Legislative Archives | |
| NAME AND ADDRESS OF DEPOSITORY The National Archives Washington, D.C. 20408 | |

*U.S. GPO: 1998 1/89075

NA FORM 14007A (10-86)

Case 1:02-cv-00429-? Document 21-4 Filed 03/02/2007 Page 13 of 63

amount each year for the development of farm-to-market roads. The Commissioner of Public Roads, Mr. Thomas H. MacDonald, spoke in favor of the bill. General Fleming, Commissioner of Public Works, favored the bill. No one appeared in opposition to the bill. It was reported unanimously by the Public Works Committee. Three identical bills have been introduced in the other body by three different Senators. The President recommended the passage of such measure in his message to the Congress on January 3 of this year. This bill will not require a single dollar of appropriations from the Federal Treasury.

Mr. CASE of South Dakota. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield.

Mr. CASE of South Dakota. Does the extension apply to the farm-to-market roads as well as to the primary system?

Mr. CUNNINGHAM. It certainly does, as well as the development of the highways in the urban areas.

Mr. CASE of South Dakota. The bill is very much in order for two reasons. One is that the time when the Japanese war expired, creating the resolution which the gentleman has referred to before, came along in the fall, which gave the States a short year the first year.

Mr. CUNNINGHAM. Yes. No States started building highways prior to October of 1945. They lost 4 months to start with. Then, there was a lack of material and shortage of labor and high prices, which caused the program to be held up. The whole program will be retarded and the States will lose some of this appropriation and there will be tremendous waste if this bill is not enacted. Possibly 12 months' grace period is not sufficient, but if it is not sufficient we can bring up another bill later.

Mr. CASE of South Dakota. If I remember correctly prior to this authorization the old Federal-aid authorization gave the States 2 years in which to act.

Mr. CUNNINGHAM. I think the gentleman is right.

Mr. H. CARL ANDERSEN. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield.

Mr. H. CARL ANDERSEN. I wish to state at this time that in my opinion this is very necessary legislation. As a previous member of the Committee on Roads, I would like to compliment the gentleman for bringing this bill up at this time.

Mr. CUNNINGHAM. I thank the gentleman.

Mr. DONDERO. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield to the chairman of the committee.

Mr. DONDERO. I think the gentleman has already covered the ground, but is it not a fact that because of the conditions enumerated by the gentleman, many of the States have been unable to comply with the provisions of this act, which makes this bill mandatory in order to protect the States?

Mr. CUNNINGHAM. That is absolutely true. In addition, there would be tremendous waste, because the highway program would be stopped, and highways partly completed would be left in status quo until the Congress took some additional action.

Mr. COLE of New York. Mr. Speaker, I withdraw my reservation of objection.

Mr. ANGELL. Mr. Speaker, reserving the right to object, as one of the members of this committee, I had an opportunity to study this bill very carefully. The people in my particular area in the Northwest are very, very much in sympathy with this bill. I think what the chairman has said and what the gentleman from Iowa [Mr. CUNNINGHAM] has said is absolutely true, that this bill is essential for our road-building program.

The SPEAKER. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That paragraph (d) of section 4 of the Federal-Aid Highway Act of 1944, Public Law 521, Seventy-eighth Congress, approved December 20, 1944, is hereby amended by striking out the term "one year" where it appears in said paragraph and inserting in lieu thereof the term "two years."

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## TO CODIFY TITLE 18 OF THE UNITED STATES CODE, CRIMES AND CRIMINAL PROCEDURE

The Clerk called the bill (H. R. 3190) to revise, codify, and enact into positive law, title 18 of the United States Code entitled "Crimes and Criminal Procedure."

The SPEAKER. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill the second time.

Mr. WALTER. Mr. Speaker, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. WALTER: On page 434, line 11, after the word "of", strike out "three" and insert "five."

Mr. WALTER. Mr. Speaker, the amendment you have just heard reported would have the effect, if adopted, of increasing the membership of the parole board from three to five.

At the last session of the Congress one of the subcommittees of the Committee on the Judiciary, in studying the legislation which we hoped might have the effect of cutting down the criminal rate in this country, found a perfectly appalling situation in the parole board. That board of three members actually interviews upward of 10,000 prisoners each year. That is, personal interviews. In addition to that, they have to review the cases acted on after personal interviews.

There are 21 criminal institutions in the United States that must be visited by this Board at regular intervals. So they have a perfectly impossible job with the result that men are paroled according to formula who should be compelled to serve their full sentence. I am not thinking about those men who are eligible for parole and in whose cases no action can be taken because the Board has not the time to reach their cases; that is bad enough, but, significantly enough, over 50 percent of the criminals in the Federal institutions are repeaters. It seems to me that the least we can do is to make it possible or probable for a Board intelligently to pass on applications for parole in order to determine whether or not men should be released from their incarceration.

Mr. CARROLL. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. CARROLL. Would the gentleman's amendment change existing law?

Mr. WALTER. It does not change existing law at all.

Mr. COLE of New York. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. COLE of New York. If it does not change existing law, and this bill is designed to codify existing law, what is the necessity of offering the amendment?

Mr. WALTER. It changes existing law in that it changes the number of members on the Board. It does not, however, in any way affect the purpose of the law establishing the parole system; it merely changes the number of members of the Board. This is not different from what has been done by this committee in this very bill. The period of sentence has been changed in order to make different crimes fit the sentences that have been fixed by Congress from time to time. That is done throughout this entire title 28.

Mr. GRAHAM. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. GRAHAM. As I understand the gentleman's amendment it increases the number of members from three to five.

Mr. WALTER. That is right.

Mr. GRAHAM. But it does not increase the rate of compensation of the members.

Mr. WALTER. That is right, exactly.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. ROBSION. I may say this to the gentleman, this matter came up before our Judiciary Committee and former Senator George Wharton Pepper, who is tremendously interested in this subject, and others felt they had to have additional authorization to increase the number from three to five. Otherwise we are not amending the law. I think there is no objection to it. We have a bill which can be called up to do this thing.

Mr. WALTER. The gentleman is correct, but we are this far. I do not think there is any doubt but that the Judiciary Committee would unanimously approve a separate bill, but we have gotten this far with this legislation and it certainly seems to me the situation is so critical that we ought to act as quickly as we possibly can. That is the reason I have offered this amendment at this time.

The SPEAKER. The time of the gentleman from Pennsylvania has expired.

Mr. ROBSION. Mr. Speaker, this bill differs from the five codification bills which have preceded it on this calendar in that it constitutes a revision, as well as a codification, of the Federal laws

relating to crimes and criminal procedure.

A bill similar to this passed the House unanimously in the closing days of the Seventy-ninth Congress but was not acted upon in the other body. I believe that I should make a brief statement explaining the method of drafting the bill and its scope.

The work on this revision was commenced under the supervision of the former Committee on Revision of the Laws in 1944. That committee engaged the services of the West Publishing Co. and the Edward Thompson Co., two law-publishing companies that have assisted in the preparation of the original United States Code and every supplement and new edition of that code. These companies have worked continuously and closely with the Committee on Revision of the Laws and, since the beginning of this Congress, with the Committee on the Judiciary, and counsel for the committees. In turn, the companies supplemented their regular editorial staffs by engaging the services of a reviser who was long familiar with the operation and administration of these laws. In addition they assembled an outstanding group of men as an advisory committee who labored unselfishly toward achieving the best revision of the criminal laws. A number of these men—members of the bench and bar of the country—appeared before the Committee on the Judiciary and testified that in their opinion this bill is eminently worthy of favorable action by the Congress. The Department of Justice also designated a representative of the Criminal Division to cooperate in the preparation of this revision.

Several preliminary drafts of the revision were studied most carefully, word for word and line for line, by these various groups, culminating in the bill now up for consideration.

At the last Congress the Committee on the Revision of the Laws, through its chairman, appeared before a subcommittee of the Judiciary Committee and, in a number of sessions, pointed out and explained every change in substantive law made by the bill which had been reported by that committee. After full discussion the Committee on the Judiciary unanimously endorsed the then pending bill, which is similar to the bill before us today, and that bill was passed unanimously by the House on July 16, 1946, in the closing days of the session. The bill had received the endorsement of the Department of Justice and the Section on Criminal Law of the American Bar Association. I believe that I am not engaging in overstatement when I say that no bill of this magnitude ever came to the House with such a background of careful and painstaking preparation and critical appraisal by so many leaders in this branch of the law.

So much for the method of preparation—and I want to express our appreciation to the learned members of the bench and bar who contributed so much of their talent and time toward this work.

Now as to the scope of the bill.



This bill is a restatement of the Federal laws relating to crimes and criminal procedure in effect on April 15, 1947. Most of these laws are now set forth in title 18 of the United States Code and are based upon the 1909 Criminal Code—which was the last revision of criminal laws enacted by the Congress—and subsequent laws on the subject. Of course, title 18 of the United States Code is only prima facie evidence of the law which is contained in numerous volumes of the Statutes at Large. Upon the enactment of this bill it will no longer be necessary to have recourse to those numerous volumes. All the law will be set out in one place and amendments in the future will be facilitated because of the orderly arrangement of the laws within one title.

Just a year ago with the adoption of the Federal Rules of Criminal Procedure many statutes became obsolete or superseded, but, of course, were not specifically repealed. These together with other obsolete, superseded, redundant, and repetitious statutes are repealed by this bill, and the effect of the rules is clearly set forth in the revision.

The law is restated in simple, clear, and concise language. Many sections of existing statutes are consolidated to facilitate finding the law. The advantages of codes are too well known to require any lengthy exposition on my part at this time.

You will find no radical changes in the philosophy of our criminal law in this bill. There is no attempt made here to coddle criminals and wrongdoers. Nor is this bill a subject of partisanship. Its predecessor which passed the House unanimously in the Seventy-ninth Congress had been reported unanimously by the Committee on the Revision of the Laws and had received the unanimous endorsement of the Committee on the Judiciary. This bill has also been reported unanimously by the Committee on the Judiciary.

Favorable action by the House today will constitute a big step toward an orderly and systematic code of laws and will prove a boon to the bench and bar and the public generally.

Mr. COLE of New York. Mr. Speaker, I rise in opposition to the amendment only for the purpose of suggesting that to some extent the gentleman's amendment is in violation of the understanding on which these bills were submitted to the House for passage today. It was understood that they were simply codifications of existing law and undertook to make no changes in existing law.

I understand that probably the gentleman's amendment has considerable merit, and I see several members of the Committee on the Judiciary on the floor. I certainly am not in a position and have no desire to raise any criticism of procedure or objection to it, but it does seem to be a violation of the understanding under which these bills were submitted.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield.

Mr. ROBSION. I pointed out when I made my statement with reference to the first five bills that we considered, that they were purely a codification. But there are some changes in this bill (H. R. 3198). I mean, for instance, when we were considering this bill the Philippine Islands were a part of the United States. We had many laws applicable to the Philippine Islands when she was a part of the United States that are no longer in force because the Philippines are no longer a part of the United States. Those laws we cut out.

We also found going through criminal law with the Department of Justice, the bar association, and the representatives of the Federal courts that Congress has passed many acts almost identical. In some of them the penalty was fixed at 5 years and in others, fixed at 6 months. We thought it wise to clarify and harmonize these.

Mr. COLE of New York. Mr. Speaker, so long as these distinguished gentlemen of the Judiciary Committee are satisfied with this procedure and with this bill, I shall not use the time of the House further.

Mr. MICHENER. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield to the gentleman from Michigan.

Mr. MICHENER. Mr. Speaker, I hold in my hand a copy of the committee report which I wish the Members would look at carefully. Where there is any indication of change every one of these questions is fully explained in the report. If we start to amend now we are liable to get into trouble. I favor the bill suggested by the gentleman from Pennsylvania but I hope it will not be interjected here because it will upset the procedure which must be followed if we ever hope to accomplish this purpose.

Mr. COLE of New York. Is the amendment offered by the gentleman from Pennsylvania in the report accompanying this bill to which he has referred?

Mr. MICHENER. No; it is not.

The SPEAKER. The question is on the amendment offered by the gentleman from Pennsylvania [Mr. WALTER].

The question was taken; and the Speaker being in doubt, the House divided, and there were—ayes 38, noes 6.

So the amendment was agreed to.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

EXTENSION OF REMARKS

Mr. STEVENSON asked and was given permission to extend his remarks in the Appendix of the RECORD and include a report to his constituents.

REVISION OF TITLE 28, UNITED STATES CODE

The Clerk called the bill (H. R. 3214) to revise, codify, and enact into law title 28 of the United States Code entitled "Judicial Code and Judiciary."

The SPEAKER. Is there objection to the present consideration of the bill?

Mr. CURTIS. Mr. Speaker, reserving the right to object, this bill H. R. 3214 deals with the judiciary and judicial procedure and I wish to call attention merely to one part of it. That is the part

those employees who have not left the Federal Government, and who do not do so by the time this pending legislation is enacted. The violation of a covenant does not become either moral or ethical simply because it is done by legislation.

The major purpose of the bill S. 637 is to liberalize retirement benefits. It is incompatible with that purpose to break a covenant already made with employees now working, and take away from them retirement rights which they now have. It would be far more logical to provide for the commencement of retirement benefits at the age of 60, irrespective of whether a person is voluntarily or involuntarily separated from Government service.

I have prepared two proposed amendments to the bill S. 637, which have been printed.

The first of these two amendments would do what I have just proposed: It would substitute the age of 60 years, throughout the bill, as the age at which retirement benefits are to begin. It would also cover the case of an employee who is forced to retire voluntarily at an earlier age than the retirement age, by permitting him to begin drawing a reduced annuity at the age of 55, or thereafter, computed on an actuarial basis.

I think this amendment is entirely equitable, and I should be glad to see it adopted. However, I do not intend to press it. Speaking frankly, I have been told that the offering of any amendments to this bill would result in defeating the bill, and I should not wish to be responsible for such an eventuation.

The second amendment which I sent to the desk, and which has been printed, was not intended to be offered unless the first amendment should have been defeated. Since I have decided not to press the first amendment, neither shall I press the second.

This second amendment treats only with the discrimination and equity between voluntary and involuntary retirement; and its sole effect would be to provide that an employee who has served the number of years entitling him to receive retirement benefits can begin to receive those benefits at the age of 62, regardless of whether his retirement is voluntary or involuntary.

Employees who left their jobs with old-line Government agencies, during the time when OPA and other war agency staffs were being recruited, and took positions with the newer agencies at salary increases ranging from one-third to 40 or even 50 percent above the salaries they were previously receiving, and who now face involuntary separation from the service as the wartime agencies are liquidated, are actually getting a special bonus when their agency ceases to exist, by being allowed the full deferred annuity at the age of 62, while those who stayed on the job in the old-line agencies are told they cannot receive a deferred annuity until they reach the age of 65. The migrant workers got higher salaries all during the war years, and they will get higher retirement benefits because of those higher salaries.

Both voluntary and involuntary separation, except for cause, should receive the same treatment in the Government's retirement system. No logical argument to the contrary can be offered, and no such argument was offered at the hearings on the bill S. 637.

I have made this statement to the Senate because I had already sent forward these two amendments, and they had been printed at my request; and I felt the Senate was entitled to an explanation of why I had prepared these amendments and what they were designed to accomplish. I felt, also, that the Senate was entitled to notice that I have decided not to press these amendments.

## HOUSE BILLS REFERRED

The following bills were severally read twice by their titles, and referred, as indicated:

H. R. 84. An act to amend the Nationality Act of 1940, as amended;

H. R. 1467. An act to amend the act entitled "An act to punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States, and for other purposes," of June 15, 1917, as amended, and the Alien Registration Act, 1940, to increase the penalties for violation of such acts;

H. R. 1565. An act to codify and enact into positive law, title 1 of the United States Code, entitled "General Provisions";

H. R. 1566. An act to codify and enact into positive law, title 4 of the United States Code, entitled "Flag and Seal, Seat of Government, and the States";

H. R. 1567. An act to codify and enact into positive law, title 6 of the United States Code, entitled "Official and Penal Bonds";

H. R. 2083. An act to codify and enact into positive law, title 17 of the United States Code, entitled "Copyrights";

H. R. 2084. An act to codify and enact into positive law, title 9 of the United States Code, entitled "Arbitration";

H. R. 2237. An act to correct an error in section 342 (b) (8) of the Nationality Act of 1940, as amended; and

H. R. 3190. An act to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure"; to the Committee on the Judiciary.

H. R. 239. An act to further perfect the consolidation of the Lighthouse Service with the Coast Guard;

H. R. 2054. An act to amend the act of April 14, 1930, to provide increased retired pay for certain members of the former Life Saving Service;

H. R. 2331. An act to amend section 20a of the Interstate Commerce Act; and

H. R. 2654. An act to authorize the Secretary of the Treasury to grant to the mayor and City Council of Baltimore, State of Maryland, a permanent easement for the purpose of installing, maintaining, and servicing a subterranean water main in, on, and across the land of the United States Coast Guard station called Lazaretto depot, Baltimore, Md.; to the Committee on Interstate and Foreign Commerce.

H. R. 1179. An act to aid in defraying the expenses of the Seventeenth Triennial Convention of the World's Woman's Christian Temperance Union to be held in this country in June 1947; to the Committee on Foreign Relations.

H. R. 1203. An act to provide compensation to persons performing the duties of postmasters at post offices of the fourth class during annual and sick leave of the postmasters; to the Committee on Civil Service.

H. R. 1237. An act to regulate the marketing of economic poisons and devices, and for other purposes; to the Committee on Agriculture and Forestry.

H. R. 1362. An act to permit certain naval personnel to count all active service rendered under temporary appointment as warrant or commissioned officers in the United States Navy and the United States Naval Reserve, or in the United States Marine Corps and the United States Marine Corps Reserve, for purposes of promotion to commissioned warrant officer in the United States Navy or the United States Marine Corps, respectively; and

H. R. 1371. An act to authorize the Secretary of the Navy to appoint, for supply duty only, officers of the line of the Marine Corps, and for other purposes; to the Committee on Armed Services.

H. R. 1412. An act to grant to the Arthur Alexander Post, No. 68, the American Legion, of Belzoni, Miss., all of the reversionary interest reserved to the United States in lands conveyed to said post pursuant to act of Congress approved June 29, 1938;

H. R. 1874. An act to amend the act entitled "An act to provide that the United States shall aid the States in the construction of rural post roads, and for other purposes," approved July 11, 1916, as amended and supplemented, and for other purposes; and

H. R. 3029. An act to provide for the acquisition of a site and for preparation of plans and specifications for a courthouse to accommodate the United States Court of Appeals for the District of Columbia and the District Court of the United States for the District of Columbia; to the Committee on Public Works.

H. R. 2181. An act relating to institutional on-farm training for veterans; and

H. R. 2368. An act to amend paragraph 8 of part VII, Veterans Regulation No. 1 (a), as amended, to authorize an appropriation of \$3,000,000 as a revolving fund in lieu of \$1,500,000 now authorized, and for other purposes; to the Committee on Labor and Public Welfare.

H. R. 2353. An act to authorize the patenting of certain public lands to the State of Montana or to the Board of County Commissioners of Hill County, Mont., for public-park purposes; and

H. R. 2573. An act to authorize the Director of the United States Geological Survey to produce and sell copies of aerial or other photographs and mosaics, and photographic or photostatic reproductions of records, on a reimbursement of appropriations basis; to the Committee on Public Lands.

## LABOR LEGISLATION—ADDRESS BY SENATOR BALL

[Mr. BALL asked and obtained leave to have printed in the RECORD a radio address on the subject of labor legislation delivered by him on May 12, 1947, which appears in the Appendix.]

## THE PLACE OF THE UNITED STATES IN INTERNATIONAL AFFAIRS—ADDRESS BY SENATOR HATCH

[Mr. HOEY asked and obtained leave to have printed in the RECORD an address on the place of the United States in international relations, delivered by Senator HATCH, at the University of North Carolina, May 8, 1947, under the auspices of the International Relations Club of the University, which appears in the Appendix.]

## PROHIBITION OF ALCOHOLIC-BEVERAGE ADVERTISEMENTS—STATEMENT OF DR. CLINTON N. HOWARD

[Mr. CAPPER asked and obtained leave to have printed in the RECORD a statement relative to Senate bill 265, prohibiting the transportation in interstate commerce of advertisements of alcoholic beverages, made by Dr. Clinton N. Howard before the Committee on Interstate and Foreign Commerce on May 13, 1947, which appears in the Appendix.]

## UNIVERSAL MILITARY TRAINING—EDITORIAL FROM THE CHICAGO HERALD-AMERICAN

[Mr. BREWSTER asked and obtained leave to have printed in the RECORD an editorial entitled "For the Sake of Peace and Safety," published in the Chicago Herald-American of May 5, 1947, which appears in the Appendix.]

## IS CONGRESS ANTILABOR?—EDITORIAL FROM MAGAZINE AMERICA

[Mr. MYERS asked and obtained leave to have printed in the RECORD an editorial entitled "Is Congress Antilabor?" from the magazine America, for April 19, 1947, which appears in the Appendix.]

## THE STATE DEPARTMENT'S BROADCAST TO RUSSIA—ARTICLE FROM THE NEW YORK HERALD TRIBUNE

[Mr. LODGE asked and obtained leave to have printed in the RECORD an article entitled "The Henry Wallace Affair," by John Crosby, published in the New York Herald Tribune of May 9, 1947, which appears in the Appendix.]

# APPENDIX C-3

UNITED STATES OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 80th CONGRESS

FIRST SESSION

VOLUME 93—PART 8

JULY 21, 1947, TO NOVEMBER 17, 1947
(PAGES 9463 TO 10644)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1947

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## [illegible]o all to whom these presents shall come. Greeting:

[illegible] virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, [illegible] seal of the National Archives of the United States, that the attached reproduction(s) is a true and co[illegible] of documents in his custody.

SIGNATURE
[signature]

| NAME | DATE |
|---|---|
| Richard Hunt | 05/09/06 |

TITLE Director
Center for Legislative Archives

NAME AND ADDRESS OF DEPOSITORY

The National Archives
Washington, D.C. 20408

*U.S. GPO: 1998-442-221/8907

NA FORM 14007A (10-86)

The cost of stenographic services in reporting such hearings shall not be in excess of 25 cents per one hundred words. Subpenas shall be issued under the signature of the chairman or vice chairman of the committee and shall be served by any person designated by them.

Reimbursement of members for certain expenses.

SEC. 6. The members of the committee shall be reimbursed for travel, subsistence, and other necessary expenses incurred by them in the performance of the duties vested in the committee, other than expenses in connection with meetings of the committee held in the District of Columbia during such times as the Congress is in session.

Payment of expenses of committee.

SEC. 7. The expenses of the committee, which shall not exceed $100,000, shall be paid one-half from the contingent fund of the Senate and one-half from the contingent fund of the House of Representatives upon vouchers signed by the chairman. Disbursements to pay such expenses shall be made by the Secretary of the Senate out of the contingent fund of the Senate, such contingent fund to be reimbursed from the contingent fund of the House of Representatives in the amount of one-half of disbursements so made.

Passed July 26, 1947.

---

## ADJOURNMENT

July 26, 1947
[S. Con. Res. 33]

*Resolved by the Senate (the House of Representatives concurring)*, That when the two Houses adjourn on Sunday, July 27, 1947, they shall stand adjourned until 12 o'clock meridian on Friday, January 2, 1948, or until 12 o'clock meridian on the third day after their respective Members are notified to reassemble in accordance with section 2 of this resolution, whichever event first occurs.

Reassembly of Congress.

SEC. 2. The President pro tempore of the Senate, the Speaker of the House of Representatives, the Majority Leader of the Senate and the Majority Leader of the House of Representatives, all acting jointly, shall notify the Members of the Senate and the House, respectively, to reassemble whenever in their opinion the public interest shall warrant it.

Agreed to July 26, 1947.

---

## JOINT MEETING

November 17, 1947
[H. Con. Res. 118]

Communication from the President.

*Resolved by the House of Representatives (the Senate concurring)*, That the two Houses of Congress assemble in the Hall of the House of Representatives on Monday, November 17, 1947, at 1:30 o'clock in the afternoon, for the purpose of receiving such communications as the President of the United States shall be pleased to make to them.

Passed November 17, 1947.

---

## ADJOURNMENT SINE DIE

December 19, 1947
[H. Con. Res. 127]

*Resolved by the House of Representatives (the Senate concurring)*, That, notwithstanding the provisions of S. Con. Res. 33, Eightieth Congress, the two Houses of Congress shall adjourn on Friday, December 19, 1947, and that when they adjourn on said day, they stand adjourned sine die.

Passed December 19, 1947.

BUREAU OF MINES

The legislative clerk read the nomination of James Boyd, of Colorado, to be Director of the Bureau of Mines.

Mr. TAFT. Mr. President, I ask that the nomination be passed over.

The PRESIDING OFFICER. Without objection, the nomination will be passed over.

Mr. REVERCOMB. Mr. President, I join in the request that the nomination of James Boyd to be Director of the Bureau of Mines be passed over. I do that not for any personal reason whatsoever, but solely on the ground of doubt as to whether this nominee is fitted for the position and whether he has had the training and experience to fill the position.

The position of Director of Mines is becoming an increasingly important one. More and more he is a director of safety in the mines of this country.

At this session we passed a law with respect to continuing mine inspection in the Bureau of Mines. That law did not contain all that I wanted it to contain, but it indicates that there is a continued interest by the Federal Bureau of Mines in mine inspection. There are approximately 820,000 miners in the Nation, and of that number approximately 400,000 are engaged in coal mining. The preservation of safety has become one of the foremost duties of the Bureau of Mines. I find that Mr. Boyd is absolutely devoid of any experience in the coal-mining industry.

I want to read two questions which he very frankly and fairly answered when he was before the committee. This question was asked by the Senator from Montana [Mr. MURRAY]:

Senator MURRAY. Mr. Boyd, what study have you given to the coal-mining industry?

Mr. BOYD. Senator, I have never worked in the coal-mining industry directly. I have, as a member of the faculty of the Colorado School of Mines, been instrumental in training men who have gone into the coal-mining industry. I have been on inspection trips myself to various coal mines in the West. As I have said, we had direction of coal operations in Europe, and I know something of the operations there. I have never myself been engaged in the coal-mining industry.

And then this question was asked by the Senator from Montana:

Senator MURRAY. You admit that you are not familiar with the conditions in the coal mines in the country, especially here in the eastern section of the country.

Mr. BOYD. Senator, I admit that I have never been employed in coal mines. I have studied the situation for many years, and I know the basic problems in the coal-mining industry.

Mr. President, in view of the fact that more than half of the miners in this country are engaged in the mining of coal, and in view of the fact that the safety of those miners has become the primary duty and interest of the Federal Bureau of Mines, I feel that it is entirely fair to raise the question of the training and competency of Mr. Boyd to fill this position; and I join in the request that the nomination go over.

The PRESIDING OFFICER. The nomination will be passed over.

The clerk will state the next nomination on the calendar.

NATIONAL LABOR RELATIONS BOARD

The legislative clerk proceeded to read the nominations of two members and the general counsel of the National Labor Relations Board.

Mr. TAFT. Mr. President, I ask that the Labor Relations Board nominations go over.

The PRESIDING OFFICER. Without objection, it is so ordered.

UNITED STATES PUBLIC HEALTH SERVICE

The legislative clerk proceeded to read sundry nominations in the United States Public Health Service.

Mr. TAFT. Mr. President, I ask that the nominations in the Public Health Service be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the nominations are confirmed en bloc.

THE ARMY

The legislative clerk proceeded to read sundry nominations in the Army.

Mr. TAFT. Mr. President, I ask that the nominations in the Army be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the nominations are confirmed en bloc.

Mr. TAFT. The Senator from South Dakota [Mr. GURNEY] has additional nominations.

Mr. GURNEY. Mr. President, I submit the nominations of 120 captains, 307 first lieutenants, 123 lieutenant colonels, and also certain nominations in the Navy, and ask that they be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the nominations are confirmed en bloc.

POSTMASTERS

The legislative clerk proceeded to read sundry nominations of postmasters.

Mr. TAFT. Mr. President, I ask that the postmaster nominations be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the postmaster nominations are confirmed en bloc.

Mr. TAFT. I ask that the President be notified of the confirmations in all of these instances.

The PRESIDING OFFICER. Without objection, the President will be notified forthwith.

CONDITIONAL ADJOURNMENT JANUARY 2, 1948

Mr. TAFT. Mr. President, in accordance with the terms of Senate Concurrent Resolution 33, adopted earlier today, I move that the Senate do now adjourn.

The motion was agreed to; and (at 3 o'clock and 50 minutes a. m., Sunday, July 27, 1947) the Senate adjourned, the adjournment being, under the provision of Senate Concurrent Resolution 33, to January 2, 1948, at 12 o'clock meridian.

NOMINATIONS

Executive nominations received by the Senate July 26 (legislative day of July 16), 1947:

SECRETARY OF DEFENSE

James V. Forrestal, of New York, to be Secretary of Defense.

COLLECTOR OF INTERNAL REVENUE

John T. Jarecki, of Chicago, Ill., to be collector of internal revenue for the first district of Illinois, in place of Nigel D. Campbell, resigned.

---

CONFIRMATIONS

Executive nominations confirmed by the Senate July 26 (legislative day of July 16), 1947:

SECRETARY OF DEFENSE

James V. Forrestal, to be Secretary of Defense.

DEPARTMENT OF JUSTICE

Philip B. Perlman, to be Solicitor General of the United States.

DIPLOMATIC AND FOREIGN SERVICE

TO BE ENVOY EXTRAORDINARY AND MINISTER PLENIPOTENTIARY OF THE UNITED STATES OF AMERICA TO RUMANIA

Rudolf E. Schoenfeld

TO BE FOREIGN SERVICE OFFICERS OF CLASS 6, VICE CONSULS OF CAREER, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

John A. Bovey, Jr.
James R. Ruchti
Ernest E. Ramsaur, Jr.
Ralph S. Saul
Miss Louise Schaffner
Robert M. Winfree
Richard W. Sterling
Robert W. Zimmermann

TO BE FOREIGN SERVICE OFFICERS OF CLASS 2, CONSULS, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Charles F. Baldwin
John Lammey Stewart
Ben H. Thibodeaux

TO BE FOREIGN SERVICE OFFICERS OF CLASS 3, CONSULS, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Ralph B. Curren
Oscar E. Heskin
Jerome T. Gaspard
Philip W. Ireland

TO BE FOREIGN SERVICE OFFICERS OF CLASS 4, CONSULS, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Turner C. Cameron, Jr.
Eric Kocher
William Henry Lawrence
Harry Conover
Robert C. Creel
Frank G. Siscoe
Ridgway B. Knight

TO BE A FOREIGN SERVICE OFFICER OF CLASS 5, A VICE CONSUL OF CAREER, AND SECRETARY IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

James R. Gustin.

TO BE FOREIGN SERVICE OFFICERS OF CLASS 6, VICE CONSULS OF CAREER, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Robert A. Aylward
Francis N. Magliozzi
Howard L. Boorman
Parke D. Massey, Jr.
William D. Brewer
Everett K. Melby
Edward West Burgess
Alfred E. Moon
Stephen A. Comiskey
Curtis W. Prendergast
William B. Dunn
Herbert F. Propps
Seymour M. Finger
Lowell G. Richardson
Walter P. Houk
Jordan T. Rogers
Vernon V. Hukee
Howard René Stephenson
Joseph E. Jacques
Robert L. James
Kenneth P. T. Sullivan
Edward J. Krache, Jr.
Edward J. Trost
Edward T. Long
Wayland B. Waters

Case 1:02-cv-00429 Document 21-4 Filed 03/02/2007 Page 21 of 63

of those which duplicate or conflict with each other or with activities carried on by the Government of Puerto Rico. He shall report through the Secretary of the Interior to the President and to Congress concerning the administration of all Federal civilian functions and activities in Puerto Rico, specifying the recommendations made by him to the Federal agencies and the results of such recommendations. He shall advise the Secretary of the Interior, who shall advise the Bureau of the Budget and the Congress with respect to all appropriation estimates submitted by any civilian department or agency of the Federal Government to be expended in or for the benefit of Puerto Rico. He shall confer with the Governor of Puerto Rico with respect to the correlation of activities of Federal and insular agencies and all plans and programs and other matters of mutual interest.

"'(3) The President of the United States may, from time to time, after hearing, promulgate Executive orders expressly excepting Puerto Rico from the application of any Federal law, not expressly declared by Congress to be applicable to Puerto Rico, which as contemplated by section 9 of this act is inapplicable by reason of local conditions. The Coordinator of Federal Agencies may, from time to time, make recommendations to the President for such purpose. Any such recommendation shall show the concurrence or dissent of the Governor of Puerto Rico.

"'(4) The Coordinator of Federal Agencies, in the name of the President of the United States, shall have authority to request from the Governor of Puerto Rico, and the Governor shall furnish to him all such reports pertaining to the affairs, conditions, and government of Puerto Rico as the Coordinator of Federal Agencies shall from time to time request for transmission to the President through the Secretary of the Interior.

"'(5) The President of the United States shall prescribe such rules and regulations as may be necessary to carry out the provisions of this section.'

"SEC. 7. Section 2 of said Organic Act (48 U. S. C., sec. 737) is amended by adding at the end thereof the following new paragraph:

"'The rights, privileges, and immunities of citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a State of the Union and subject to the provisions of paragraph 1 of section 2 of article IV of the Constitution of the United States.'"

The SPEAKER. Is there objection to the request of the gentleman from Michigan?

There was no objection.

The Senate amendments were concurred in.

A motion to reconsider was laid on the table.

RECESS

The SPEAKER. The Chair declares the House in recess at this time subject to the call of the Chair.

Accordingly (at 12 o'clock and 10 minutes a. m.), the House stood in recess, subject to the call of the Chair.

AFTER RECESS

The recess having expired, the House was called to order by the Speaker at 12 o'clock and 31 minutes a. m.

FURTHER MESSAGE FROM SENATE

A further message from the Senate, by Mr. Carrell, one of its clerks, announced that the Senate agrees to the amendment of the House to a concurrent resolution of the Senate of the following title:

S. Con. Res. 33. Concurrent resolution providing for the adjournment of the two Houses of Congress until January 2, 1948.

SENATE ENROLLED BILLS AND JOINT RESOLUTIONS SIGNED

The SPEAKER announced his signature to enrolled bills and joint resolutions of the Senate of the following titles:

S. 609. An act conferring jurisdiction upon the United States District Court for the Western District of Arkansas to hear, determine, and render judgment upon any claims arising out of the deaths of Norman Ray Pedron and Carl Franklin Morris;

S. 758. An act to promote the national security by providing for a Secretary of Defense; for a National Military Establishment; for a Department of the Army, a Department of the Navy, and a Department of the Air Force; and for the coordination of the activities of the National Military Establishment with other departments of the Government concerned with the national security;

S. 794. An act to authorize the sale of a small tract of land on the Cherokee Indian Reservation, N. C.;

S. 892. An act for the payment of claims of one Fidelity Trust Co., of Baltimore, Md., and others, covered by findings of fact made by the United States Court of Claims, dated June 5, 1944, and contained in Senate Document No. 229, Seventy-eighth Congress, second session;

S. 907. An act to provide for the orderly transaction of the public business in the event of the death, resignation, or separation from office of regional disbursing officers of the Treasury Department;

S. 1070. An act to provide for the cancellation of the capital stock of the Federal Deposit Insurance Corporation and the refund of moneys received for such stock, and for other purposes;

S. 1181. An act for the relief of Robert F. Parks;

S. 1350. An act to authorize relief of accountable officers of the Government, and for other purposes;

S. 1361. An act to amend the United States Housing Act of 1937 so as to permit loans, capital grants, or annual contributions for low-rent housing and slum-clearance projects where construction costs exceed present cost limitations upon condition that local housing agencies pay the difference between cost limitations and the actual construction costs;

S. 1463. An act to amend section 12 of the Immigration Act of 1917;

S. 1480. An act authorizing the conveyance to the State of Delaware of a portion of Pea Patch Island;

S. 1494. An act to amend section 14 of the Veterans' Preference Act of June 27, 1944;

S. 1505. An act authorizing the Secretary of Agriculture to convey certain lands in Boise, Idaho, to the Boise Chamber of Commerce;

S. 1582. An act relating to the sale of Paxon Field, Duval County, Fla.;

S. 1590. An act to amend the District of Columbia rent-control law so as to provide that schools and universities may recover possession of housing accommodations in certain cases;

S. 1633. An act to authorize the attendance of the Marine Band at the National Convention of the American Legion to be held in New York, N. Y., August 28 to 31, 1947, and the National Convention of the Veterans of Foreign Wars of the United States to be held in Cleveland, Ohio, September 4 to 9, 1947;

S. 1661. An act to provide additional inducements to physicians, surgeons, and dentists to make a career of the United States military, naval, and public-health services, and for other purposes;

S. J. Res. 112. Joint resolution to establish a commission to formulate plans for the erection, in Grant Park, Chicago, Ill., of a Marine Corps memorial.

S. J. Res. 130. Joint resolution relating to safety in bitumious-coal and lignite mines of the United States;

S. J. Res. 138. Joint resolution to provide for return of Italian property in the United States, and for other purposes; and

S. J. Res. 148. Joint resolution to authorize the temporary continuation of regulation of consumer credit.

ADJOURNMENT

Mr. HALLECK. Mr. Speaker, I move that the House do now adjourn.

The motion was agreed to; accordingly (at 12 o'clock and 32 minutes a. m.), pursuant to Senate Concurrent Resolution 33, the House adjourned until Friday, January 2, 1948, at 12 o'clock noon.

---

EXECUTIVE COMMUNICATIONS, ETC.

Under clause 2 of rule XXIV, executive communications were taken from the Speaker's table and referred as follows:

993. A letter from the Attorney General, transmitting request for withdrawal of the case of Juan Hernandez Ayala from those 139 cases involving suspension of deportation referred to in letter of June 15, 1947; to the Committee on the Judiciary.

994. A letter from the Clerk, House of Representatives, transmitting the motion to dismiss of the contestee in the contested election case of Lawrence Michael against Howard W. Smith for a seat in the House of Representatives from the Eighth Congressional District of the State of Virginia (H. Doc. No. 418); to the Committee on House Administration and ordered to be printed.

995. A letter from the Executive Secretary, Air Coordinating Committee, transmitting a draft of a proposed bill to encourage the development of a safe United States flag international air transportation system properly adapted to the present and future needs of foreign commerce of the United States, of the postal service, and of the national defense, and to meet certain of the obligations incumbent upon the United States by virtue of its membership in the International Civil Aviation Organization, by providing for the transfer, establishment, operation, administration, and maintenance of airport and airway property located outside the continental United States, for the training of foreign nationals in aviation activities, and for other purposes; to the Committee on Interstate and Foreign Commerce.

996. A letter from the Acting Secretary of Commerce, transmitting a draft of a proposed bill to provide basic authority for the performance of certain functions and activities of the Department of Commerce, and for other purposes; to the Committee on Interstate and Foreign Commerce.

997. A letter from the Acting Secretary of Commerce, transmitting a draft of a proposed bill to provide basic authority for certain functions and activities of the Weather Bureau, and for other purposes; to the Committee on Interstate and Foreign Commerce.

998. A letter from the Secretary of the Interior, transmitting interim report on the status of investigations of potential water resource developments in the Colorado River Basin in Arizona, California, Colorado, Nevada, New Mexico, Utah, and Wyoming (H. Doc. No. 419); to the Committee on Public Lands and ordered to be printed, with illustrations.

# APPENDIX C-4

NOW, THEREFORE, I, HARRY S. TRUMAN, President of the United States of America, by this proclamation designate Saturday, October 11, 1947, as General Pulaski's Memorial Day; I invite the people of the United States to observe the day in civic ceremonies; and I direct the appropriate officials of the Government to have the American flag flown from all Government buildings on that day. Designation of Oct. 11, 1947, as General Pulaski's Memorial Day.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the Seal of the United States of America to be affixed.

DONE at the City of Washington this 8th day of October in the year of our Lord nineteen hundred and forty-seven, and of the independence of the United States of America the one hundred and seventy-second.

[SEAL]

HARRY S TRUMAN

By the President:
ROBERT A LOVETT
*Acting Secretary of State*

---

CONVENING THE CONGRESS

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

October 23, 1947 [No. 2751]

A PROCLAMATION

WHEREAS the public interest requires that the Congress of the United States should be convened at twelve o'clock, noon, on Monday, the Seventeenth day of November, 1947, to receive such communication as may be made by the Executive;

NOW, THEREFORE, I, Harry S. Truman, President of the United States of America, do hereby proclaim and declare that an extraordinary occasion requires the Congress of the United States to convene at the Capitol in the City of Washington on Monday, the Seventeenth day of November, 1947, at twelve o'clock, noon, of which all persons who shall at that time be entitled to act as members thereof are hereby required to take notice. Convening of Congress Nov. 17, 1947.

IN WITNESS WHEREOF, I have hereunto set my hand and caused to be affixed the great seal of the United States.

DONE at the City of Washington this twenty-third day of October, in the year of our Lord nineteen hundred and forty-seven, and of the Independence of the United States of America the one hundred and seventy-second.

[SEAL]

HARRY S TRUMAN

By the President:
ROBERT A LOVETT
*Acting Secretary of State.*

---

AMENDMENT OF REGULATIONS RELATING TO MIGRATORY BIRDS AND GAME MAMMALS

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

October 28, 1947 [No. 2752]

A PROCLAMATION

WHEREAS the Secretary of the Interior has adopted and has submitted to me for approval the following amendment of the regulations approved by Proclamation No. 2739 of July 31, 1947, as amended by Proclamation No. 2747 of September 27, 1947, relating to migratory birds and game mammals included in the terms of the Convention *Ante*, pp. 1076, 1088.

The cost of stenographic services in reporting such hearings shall not be in excess of 25 cents per one hundred words. Subpenas shall be issued under the signature of the chairman or vice chairman of the committee and shall be served by any person designated by them.

Reimbursement of members for certain expenses.

SEC. 6. The members of the committee shall be reimbursed for travel, subsistence, and other necessary expenses incurred by them in the performance of the duties vested in the committee, other than expenses in connection with meetings of the committee held in the District of Columbia during such times as the Congress is in session.

Payment of expenses of committee.

SEC. 7. The expenses of the committee, which shall not exceed $100,000, shall be paid one-half from the contingent fund of the Senate and one-half from the contingent fund of the House of Representatives upon vouchers signed by the chairman. Disbursements to pay such expenses shall be made by the Secretary of the Senate out of the contingent fund of the Senate, such contingent fund to be reimbursed from the contingent fund of the House of Representatives in the amount of one-half of disbursements so made.

Passed July 26, 1947.

---

ADJOURNMENT

July 26, 1947
[S. Con. Res. 33]

*Resolved by the Senate (the House of Representatives concurring)*, That when the two Houses adjourn on Sunday, July 27, 1947, they shall stand adjourned until 12 o'clock meridian on Friday, January 2, 1948, or until 12 o'clock meridian on the third day after their respective Members are notified to reassemble in accordance with section 2 of this resolution, whichever event first occurs.

Reassembly of Congress.

SEC. 2. The President pro tempore of the Senate, the Speaker of the House of Representatives, the Majority Leader of the Senate and the Majority Leader of the House of Representatives, all acting jointly, shall notify the Members of the Senate and the House, respectively, to reassemble whenever in their opinion the public interest shall warrant it.

Agreed to July 26, 1947.

---

JOINT MEETING

November 17, 1947
[H. Con. Res. 118]

Communication from the President.

*Resolved by the House of Representatives (the Senate concurring)*, That the two Houses of Congress assemble in the Hall of the House of Representatives on Monday, November 17, 1947, at 1:30 o'clock in the afternoon, for the purpose of receiving such communications as the President of the United States shall be pleased to make to them.

Passed November 17, 1947.

---

ADJOURNMENT SINE DIE

December 19, 1947
[H. Con. Res. 127]

*Resolved by the House of Representatives (the Senate concurring)*, That, notwithstanding the provisions of S. Con. Res. 33, Eightieth Congress, the two Houses of Congress shall adjourn on Friday, December 19, 1947, and that when they adjourn on said day, they stand adjourned sine die.

Passed December 19, 1947.

ident Behncke before committees considering the bill which became the Civil Aeronautics Act of 1938. A reading of Mr. Behncke's testimony, however, discloses that he consistently focused on the minimum wage and maximum hour provisions of section 13 of the Air Mail Act of 1934, which became sections 401(*l*)(1) and (2) of the 1938 statute, and which are sections 401(k)(1) and (2) of the present Act. He insisted that the new legislation must give the pilots the protections of these provisions. As the petitioners say in their brief (p. 22) "the new law contained everything Behncke wanted". What the petitioners fail to make clear is that what "Behncke wanted" and said he wanted was the minimum wage and maximum hour protection now embodied in sections 401(k)(1) and (2). His testimony supported this thesis, not the proposition that section 401(k)(4) must apply to every air carrier. In short, the legislative history upon which the petitioners place such great weight will not bear it.

The petitioners assert that "In construing other provisions of the Act, the Board has interpreted the term 'certificate holder' to include exempt operators, and there is no basis for distinguishing those situations from the present case." (Br. p. 31) On this point the petitioners cite Mail Transportation by Noncertificated Carriers, 18 C.A.B. 201 (1953); Surface-Mail-By-Air Exemptions, 20 C.A.B. 658 (1955), aff'd sub nom. American Airlines, Inc. v. CAB, 97 U.S.App. D.C. 324, 231 F.2d 483 (1956). These mail pay cases however do not sustain the petitioners' claim. Section 406(a) of the Civil Aeronautics Act empowered the Board to fix fair and reasonable rates of compensation for the transport of mail by aircraft by each "holder of a certificate", and section 406(b) specified certain unique standards and factors to be taken into consideration in fixing such rates. The mail pay cases held that to the extent necessary to enable certain air carriers to participate in a one-year experiment being conducted by the Postmaster General the Board, under section 416(b), could exempt carriers from the requirement of certification and fix fair and reasonable rates for their services under ordinary public utility rate-making standards.[12] The Board said "[w]ere we to grant exemptions to the applicants herein, their authority to transport mail would be only permissive and could by no stretch of the imagination constitute them 'holders' of mail certificates or entitle them to all the compensatory benefits of certificate holders" including the right to receive subsidies and to require the Postmaster General to tender mail to them for transportation. 18 C.A.B. at 206, 202. Thus the Board did not hold that an exempt operator was the equivalent of a certificate holder.

In summary, we hold that the Board was correct in its conclusion that section 401(k)(4) "itself contains a built-in limitation upon its applicability."

The order of the Board is

Affirmed.

Edward M. KENNEDY

v.

Arthur F. SAMPSON, Acting Administrator, General Services Administration, et al., Appellants (two cases).

Nos. 73-2121 and 73-2122.

United States Court of Appeals, District of Columbia Circuit.

Argued May 31, 1974.

Decided Aug. 14, 1974.

Action by United States senator for declaratory judgment that bill became validly enacted law without signature of President and for order in nature of

12. Two of the five members of the Board dissented.

mandamus or permanent injunction requiring acting Administrator of General Services Administration and Chief of White House Records to publish the bill as a validly enacted law. The United States District Court for the District of Columbia, Joseph C. Waddy, J., 364 F. Supp. 1075, entered judgment for plaintiff and defendants appealed. The Court of Appeals, Tamm, Circuit Judge, held that the senator had standing to bring suit for declaratory judgment that act became law without President's signature at expiration of ten-day period following its presentation to him and that purported pocket veto was not effective, and that where bill was passed by both Houses of Congress was presented to President on December 14, on December 22 the House adjourned until December 29 and the Senate, in which bill originated, adjourned until December 28, and the Senate authorized Secretary of Senate to receive messages from President during adjournment, the recess did not prevent return of the bill by the President and the President's failure to take action with respect to bill did not result in a pocket veto, but instead the bill became law.

Affirmed.

Fahy, Senior Circuit Judge, filed concurring opinion in which Bazelon, Chief Judge, joined.

1. Declaratory Judgment ⇐304

United States senator had standing to bring suit for declaratory judgment that act became law without President's signature at expiration of ten-day period following its presentation to him and that the purported pocket veto was not effective, on basis that conduct by officials of executive branch amounted to illegal nullification of senator's exercise of his power. U.S.C.A.Const. art. 1, § 7, cl. 2.

2. Constitutional Law ⇐58, 77

When either branch of government perceives an intrusion upon its legislative power by the other, the constitutional provision allocating to executive and legislative branches their respective roles in law-making process is appropriately invoked.

3. Federal Civil Procedure ⇐103

Individual legislator has standing to protect effectiveness of his vote on legislation with or without concurrence of other members of the majority which voted for the legislation.

4. Constitutional Law ⇐42(2)

Prerequisite to standing for constitutional purposes is that a party be among the injured, not that he be the most grievously or the most directly injured.

5. Statutes ⇐35

Generally, Congress may override presidential disapproval of proposed legislation.

6. Statutes ⇐34

Pocket veto power is one component of constitutional mechanism designed to enforce respect on part of each of law-making branches of government for legislative authority of the other and where possible the pocket veto clause should be construed in manner which preserves President's opportunity to consider bills presented to him and Congress' opportunity to consider his objection to bills and, on such consideration, to pass them over his veto and, since pocket veto always has effect of frustrating Congress' right to reconsider veto bill, preferred construction of the clause is that return of bill was not "prevented" by an adjournment. U.S.C.A.Const. art. 1, § 7, cl. 2.

7. Statutes ⇐34

Where bill passed by both Houses of Congress was presented to President on December 14, on December 22 the House adjourned until December 29 and Senate, in which bill originated, adjourned until December 28, and Senate, before adjourning, authorized Secretary of Senate to receive messages from President, the recess did not prevent return of the bill by the President and the President's failure to take action with respect

to bill did not result in a pocket veto, but the bill became law, during recess at expiration of ten-day period following its presentation to him. U.S.C.A.Const. art. 1, § 7, cl. 2.

James C. Hair, Jr., Atty., Dept. of Justice, with whom Irving Jaffe, Acting Asst. Atty. Gen., Earl J. Silbert, U. S. Atty. and Robert E. Kopp, Atty., Dept. of Justice, were on the brief for appellants. Morton Hollander, Atty., Dept. of Justice, also entered an appearance for appellants.

Edward M. Kennedy, appellee, pro se.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and TAMM, Circuit Judge.

TAMM, Circuit Judge.

Appellee, a United States Senator, filed suit against the Administrator of the General Services Administration and the Chief of White House Records seeking a declaration that the Family Practice of Medicine Act (hereinafter, S. 3418)[1] became law on December 25, 1970, and an order requiring the appellants to publish the Act as a validly enacted law.[2] S. 3418 was passed by overwhelming majorities in both the House and Senate in the Fall of 1970.[3] Appellee was among those Senators who voted in favor of the bill which was presented to the President on December 14, 1970.[4] On December 22 both Houses of Congress adjourned for the Christmas holidays, the Senate until December 28 and the House until December 29.[5] Before adjourning, the Senate authorized the Secretary of the Senate to receive messages from the President during the adjournment.[6] On December 24, the President issued a memorandum of disapproval announcing that he would withhold his signature from S. 3418.[7] The President took no further action with respect to the bill. Appellants maintain that this series of events resulted in a "pocket veto" under article I, section 7 of the United States Constitution. Appellee, relying upon the same provision, contends that the bill became law without the President's signature at the expiration of the ten-day period following its presentation to him.

Upon cross motions for summary judgment, the district court granted judgment in favor of appellee. The order of the district court declares that S. 3418 became a law of the United States on December 25, 1970 and that "defendants are under a ministerial, nondiscretionary duty to publish said law . . . ."[8] Although the district court has retained jurisdiction for the purpose of adjudicating appellee's request for injunctive relief in the nature of a mandamus, further action has been postponed pending this appeal.[9]

Two questions are presented for review: (1) does appellee have standing to maintain this suit; and (2) did S.

1. S. 3418, 91st Cong., 2d Sess. (1970).

2. Appellee contends that appellant Jones is required to deliver and appellant Sampson to publish in slip form and in Statutes at Large all newly enacted laws of the United States. Kennedy v. Sampson, C.A. No. 1583–72, Complaint, ¶¶ 4, 5 (D.D.C., filed Aug. 9, 1972), *citing* 1 U.S.C. §§ 106a, 112, 113 (1970). This question was not decided by the district court.

3. Passed in the Senate September 14, 1970 by a vote of 64–1, 116 Cong.Rec. 31508 (1970); in the House of Representatives on December 1, 1970 by a vote of 346–2, *id.* at 39379. The Senate-House Conference Report, H.R. Rep.No.91–1668, 91st Cong., 2d Sess., was agreed to by the House on December 8, 116 Cong.Rec. 40289–92 (1970), and by the Senate on December 10, *id.* at 40867.

4. 116 Cong.Rec. 41289 (1970).

5. S.Con.Res. 87, 91st Cong., 2d Sess., *id.* at 43250.

6. 116 Cong.Rec. 43221 (1970).

7. 6 Presidential Documents 1726–27 (December 28, 1970).

8. Kennedy v. Sampson, 364 F.Supp. 1075, 1087 (D.D.C.1973).

9. Pursuant to Rule 54(b), Fed.R.Civ.P. the district court found that there was no just reason for delay and directed entry of a final order granting appellee's request for declaratory relief. Kennedy v. Sampson, *supra* note 2, Order dated September 24, 1973.

3418 become a law? We conclude that both questions must be answered in the affirmative.

I.

[1] The requirement of standing derives from the limitation upon judicial power expressed in the "case" or "controversy" formula of article III of the Constitution. The concept was recently treated by the Supreme Court in Sierra Club v. Morton, 405 U.S. 727, 731–732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972):

> Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue. Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a "personal stake in the outcome of the controversy," Baker v. Carr, 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663] as to ensure that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." Flast v. Cohen, 392 U.S. 83, 101 [88 S.Ct. 1942, 1953, 20 L.Ed.2d 947].

Although he has not been authorized to prosecute this suit on behalf of the Senate or the Congress, appellee offers several alternative theories of standing.[10] We agree with the district court that appellee has standing to maintain this suit in his capacity as an individual United States Senator who voted in favor of S. 3418. This conclusion follows from any of the traditional methods of evaluating the standing of a party to sue.

One approach to the question is to inquire whether a "logical nexus" exists between the status asserted by a litigant and the claim sought to be adjudicated. Flast v. Cohen, 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Examination of appellee's complaint reveals that such a nexus is present in this case. While the complaint is literally addressed to the ministerial duties of certain officials, the legal issue turns on the validity of executive action which purports to have disapproved an Act of Congress by means of a constitutional procedure which does not permit Congress to override the disapproval. If appellants' arguments are accepted, then appellee's vote in favor of the bill in question has been nullified and appellee has no right to demand or participate in a vote to override the President's veto. Conversely, if appellee's interpretation of the veto clause is correct, then the bill became law without the President's signature. In short, disposition of the substantive issue will determine the effectiveness *vel non* of appellee's actions as a legislator with respect to the legislation in question. This demonstrates a relationship between appellee and his claim which is not only "logical" but real, a relationship which assures that the issues have been litigated with the vigor and thoroughness necessary to assist the court in rendering an informed judgment.

[2] A somewhat different analysis of standing has been employed with respect to parties who challenge administrative action. In Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) the Supreme Court framed the standing issue as follows: (1) does the plaintiff allege that the challenged action has caused him "injury in fact, economic or otherwise;". (2) is the interest sought to be protected "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 152–153, 90 S.Ct. at 830. Appellee's pleading satisfies both inquiries. The

10. Appellee claims standing in his capacity as a citizen, as a taxpayer, and as a member of the United States Senate. The district court agreed with the latter contention and did not reach the alternative arguments. Kennedy v. Sampson, *supra*, 364 F.Supp. at 1077–1079.

complaint alleges an injury to him in his capacity as a United States Senator:

> The acts of the defendants have injured the plaintiff as a United States Senator by denying him the effectiveness of his vote as a member of the United States Senate. The plaintiff . . . was among 64 Senators voting in favor of S. 3418 . . . .[11]

Appellee's asserted interest plainly falls among those contemplated by the constitutional provision upon which he relies. That provision, article I, section 7, is one of several in the Constitution which implement the "separation of powers" doctrine. Taken together, these provisions define the prerogatives of each governmental branch in a manner which prevents overreaching by any one of them. The provision under discussion allocates to the executive and legislative branches their respective roles in the law-making process. When either branch perceives an intrusion upon its legislative power by the other, this clause is appropriately invoked. The gist of appellee's complaint is that such an intrusion has occurred as a result of the President's misinterpretation of this clause and that a consequence of this intrusion is the nullification of appellee's vote in favor of the bill in question; hence, the complaint alleges injury to an interest of appellee as a member of the legislative branch of the government, an interest among those protected by article I, section 7. Appellants insist that only the interests of the Congress or one of its Houses as a body are protected by this provision. This contention is treated below in the discussion of the *Coleman* decision.

Our conclusion with respect to appellee's standing finds support in Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), which held, *inter alia*, that twenty state senators who had voted against ratification of a constitutional amendment had standing to challenge the legality of a tie-breaking vote in favor of ratification which was cast by the Lieutenant Governor, the presiding officer of the Senate of Kansas. The Court concluded that the interest of the legislators in protecting the effectiveness of their votes conferred standing to maintain the suit:

> Here, the plaintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification. We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes.

*Id.* at 438, 59 S.Ct. at 975. Appellants correctly point out that the votes of the twenty plaintiffs in *Coleman* had peculiar legal significance *as a bloc, i. e.:* these votes were sufficient to prevent ratification absent the challenged vote of the Lieutenant Governor. Appellants read *Coleman* as holding that the plaintiff legislators had standing only as a group for the purpose of protecting the collective effectiveness of their votes. In a like vein, appellants contend that appellee's vote in favor of S. 3418 has no legal significance independent of the other votes in favor of the bill. Any injury to him occasioned by the President's action, it is argued, is "derivative" in nature.[12] In appellants' view, only the Senate or the Congress has sustained the "direct" injury necessary to confer standing (assuming that the veto of S. 3418 was invalid).[13]

11. Kennedy v. Sampson, *supra* note 2, Complaint, ¶ 15.

12. Appellants' Br. at 24–27; Appellants' Reply Br. at 2–3.

13. Appellants' Reply Br. at 2. Appellants suggest that the Senate might have standing because it was "improperly deprived of the initial opportunity to override the veto . . . ." *Id.* Appellee makes a similar argument in favor of his own individual standing. Appellee's Br. at 18. Both parties misconceive the issue. The only possible effects of the President's action with respect to S. 3418 are that the bill became law, in which case there is no need to override, or it

[3] The *Coleman* opinion neither confirms nor rejects appellants' interpretation. It does not express reliance upon the fact that all nay-voters had joined as plaintiffs in the action, nor does it contain any hint as to whether one of the plaintiffs might have maintained the suit alone. Although references to the parties and their votes are, quite naturally, in the plural form, the opinion does not disclose whether the Court was considering them collectively or severally. In light of the purpose of the standing requirement, however, we think the better reasoned view of both *Coleman* and the present case is that an individual legislator has standing to protect the effectiveness of his vote with or without the concurrence of other members of the majority.

The policy underlying the doctrine of standing is identified in the following passage from Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962):

> Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions? This is the gist of the question of standing.

Another discussion describes the purpose of the standing doctrine as follows:

> Under such circumstances, we feel confident that the questions will be framed with the necessary specificity, that the issues will be contested with the necessary adverseness and that the litigation will be pursued with the necessary vigor to assure that the constitutional challenge will be made in a form traditionally thought to be capable of judicial resolution.

Flast v. Cohen, *supra*, 392 U.S. at 106, 88 S.Ct. at 1955. Appellee's interest in the present controversy provides the same assurance that he is an appropriate advocate.

[4] Appellants' argument to the contrary is based upon a distinction which is more formal than substantive. While conceding that Congress as a whole (or even one of its Houses) has standing to challenge the President's purported use of the pocket veto,[14] appellants insist that an individual member of Congress does not, even if he voted for the bill in controversy. The interest of the Congress in preserving its role in the lawmaking process is said to be "direct" while that of appellee is labelled "indirect or derivative."[15] Appellants base this distinction upon the self-evident proposition that appellee is not the Congress:

> As an individual senator appellee can at best be said to have sustained only indirect injury as the result of the pocket veto, *for his vote for S. 3418 is in no sense the legal or political equivalent of the passage of the bill by the Congress.* . . .[16]

The italicized observation is undoubtedly correct but it does not help appellants' argument. The prerequisite to standing is that a party be "among the injured," in the words of *Sierra Club*, not that he be the *most* grievously or *most* directly injured. We think that appellee is "among the injured" in this case.

The subject matter at stake in this litigation is legislative power. The court is presented with conflicting views of the pocket veto power, one which is expansive, and another which is restrictive. Over the long term, appellants' broad view of the pocket veto power threatens a diminution of congressional influence in the legislative process.[17] It

did not become law because Congress prevented its return, in which case there is no right to override. *See* Hearings on the Constitutionality of the President's "Pocket Veto" Power Before the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary, 92nd Cong., 1st Sess. 4-5 (1971).

14. Appellants' Reply Br. at 2.

15. *Id.* at 2-3.

16. *Id.* (emphasis added).

17. Appellants dispute the contention that a broad construction of the pocket veto clause can affect the legislative balance of power.

seems to this court axiomatic that, to the extent that Congress' role in the government is thus diminished, so too must be the individual roles of each of its members. Put another way, the influence of any one legislator upon the political process is in great measure dependent upon the stature of the governmental branch of which he is a member.

In a sense, therefore, the contention that appellee's interest in the pocket veto controversy is "derivative" is correct. It is derivative, but it is nonetheless substantial. When asserted in the context of a particular dispute about specific legislation, such an interest may be sufficient to confer standing. Appellee's stake in this litigation is a quantum of his official influence upon the legislative process. To be sure, that influence can never be "the legal or political equivalent of the passage" of a bill, for only Congress as a body has that authority. Nevertheless, the office of United States Senator does confer a participation in the power of the Congress which is exercised by a Senator when he votes for or against proposed legislation. In the present case, appellee has alleged that conduct by officials of the executive branch amounted to an illegal nullification not only of Congress' exercise of its power, but also of appellee's exercise of his power. In the language of the *Coleman* opinion, appellee's object in this lawsuit is to vindicate the effectiveness of his vote. No more essential interest could be asserted by a legislator. We are satisfied, therefore, that the purposes of the standing doctrine are fully served in this litigation.

II.

Article I, section 7, paragraph 2 of the United States Constitution prescribes the manner in which laws of the United States are enacted:

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approves he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been

Two defenses are suggested whereby Congress can maintain legislative supremacy: (1) if disapproval is anticipated, Congress may delay the presentation of a bill until after the recess in order to preserve its right to override; (2) Congress may reenact a pocket-vetoed bill and present it to the President a second time. Appellants' Br. at 44-45. While both of these procedures might be effective, they would not change the fact that the pocket veto power will have been used as an obstacle—however temporary—to the implementation of the will of Congress. Moreover, such delays may for practical purposes become permanent. As appellee points out in his brief at 54:

> It is no answer to say that if Congress wishes, it can simply pass a pocket-vetoed bill again and present it to the President at a time when the pocket veto cannot be used. At best, the legislative route is arduous and time-consuming, involving numerous subcommittee, full committee, and other proceedings in both the Senate and the House. At worst, if delay has dimmed the constellation of public and private interests that facilitated the original passage of the bill, if the unique alchemy that enabled the legislative process to function successfully the previous time around has disappeared, the result may be that the bill cannot be passed at all.

It is significant, too, that the utilization of a broadly construed pocket veto power is likely to grow with the increasing frequency of brief, intrasession adjournments. *See infra* note 40 and accompanying text.

presented to him, the Same shall be a Law, in like Manner as if he had signed it, *unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.* (Emphasis added.)

At issue in this case is whether the Christmas adjournment of 1970 was one which "prevented" the return of S. 3418 by the President. If so, then the President's failure to approve the bill within ten days of its presentation to him constituted a pocket veto. If the adjournment did not prevent the return of S. 3418, then the bill became law without the President's signature. Our study of the constitutional text itself, its history and previous judicial interpretations of it convinces us that an intrasession adjournment of Congress does not prevent the President from returning a bill which he disapproves so long as appropriate arrangements are made for the receipt of presidential messages during the adjournment. Since the adjournment in question falls into this category, we affirm the district court's declaration that S. 3418 became law on December 25, 1970.

[5, 6] Our analysis begins with the premise that the pocket veto power is an exception to the general rule that Congress may override presidential disapproval of proposed legislation. Rejection of an absolute presidential veto is explicit both in the proceedings of the Constitutional Convention[18] and in contemporaneous commentary. Alexander Hamilton, himself an advocate of the absolute veto during the Convention,[19] later took pains to distinguish the presidential veto power from that of the King of England:

> The President of the United States is to have power to return a bill, which shall have passed the two branches of the Legislature, for re-consideration; but the bill so returned is to become a law, if upon that re-consideration it be approved by two thirds of both houses. The King of Great Britain, on his part, has an absolute negative upon the acts of the two houses of Parliament. The disuse of that power for a considerable time past, does not affect the reality of its existence; and is to be ascribed wholly to the crown's having found the means of substituting influence to authority, or the art of gaining a majority in one or the other of the two houses, to the necessity of exerting a prerogative which could seldom be exerted without hazarding some degree of national agitation. The qualified negative of the President differs widely from this absolute negative of the British sovereign . . . .

The Federalist No. 69, at 463–64 (J. Cooke ed. 1961) (A. Hamilton). Since it operates as an "absolute negative", the pocket veto power is a departure from the central scheme of the Constitution. As such, it must be limited by the specific purpose it is intended to serve, a purpose explained in the following passage from Story's *Commentaries*:

> But the President might effectually defeat the wholesome restraint [*i. e.* congressional override], thus intended, upon his qualified negative, if he might silently decline to act after a bill was presented to him for approval or rejection. The Constitution, therefore, has wisely provided, that, "if any bill shall not be returned by the President within ten days (Sundays excepted) after it shall have been presented to him, it shall be a law, in like manner as if he had signed it." But if this clause stood alone, Congress might, in like manner, defeat the due exercise of his qualified negative by a termination of the session,

18. 1 M. Farrand, The Records of the Federal Convention of 1787, at 104, 106 (Rev. ed. 1937) [hereinafter cited as M. Farrand]; 2 M. Farrand at 71, 200, 301, 582, 585 (the last page recording the opinion of one delegate that even a provision requiring a three-fourths vote to override "puts too much in the power of the President").

19. 1 M. Farrand at 192, 300. *See also* 3 M. Farrand at 624, 627.

which would render it impossible for the President to return the bill. It is therefore added, "unless the Congress, by their adjournment, prevent its return, in which case it shall not be a law."[20]

The pocket veto power is one component of a constitutional mechanism designed to enforce respect on the part of each of the law-making branches of the government for the legislative authority of the other. This understanding of the purpose of the clause has led the Supreme Court to adopt a rule of construction which governs in this case:

> The constitutional provisions [*i. e.*, article I, section 7, paragraph 2] have two fundamental purposes; (1) that the President shall have suitable opportunity to consider the bills presented to him, and (2) that the Congress shall have suitable opportunity to consider his objections to bills and on such consideration to pass them over his veto provided there are the requisite votes. Edwards v. United States, 286 U.S. 482, 486 [52 S.Ct. 627, 628, 76 L.Ed. 1239]. We should not adopt a construction which would frustrate either of these purposes.

Wright v. United States, 302 U.S. 583, 596, 58 S.Ct. 395, 400, 82 L.Ed. 439 (1938). Where possible, then, the pocket veto clause should be construed in a manner which preserves both purposes. Since a pocket veto always has the effect of frustrating Congress' right to reconsider a vetoed bill,[21] the preferred construction of the clause is that return of a bill was not "prevented" by an adjournment. Only two decisions of the Supreme Court have addressed the question of whether an adjournment prevented the return of a bill. Appellant relies upon the first of these and seeks to distinguish the later decision from the present case.

The decision relied upon by appellant is The Pocket Veto Case, 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929), which held that the intersession adjournment of the 69th Congress prevented the return of a bill which had been presented to the President eight days (excluding Sunday) before the adjournment of the first session. The opinion states two reasons for the holding: (1) the word "House" in the return veto clause means "House in session" and does not permit return of a bill to an officer or agent of the originating House during an adjournment; (2) return of a bill during an intersession adjournment would result in a long delay in the final disposition of the bill attended by public uncertainty as to its status. *Id.* at 682–684, 49 S.Ct. 463.[22] A significant exception to this holding was established in the Supreme Court's only other pocket veto decision, Wright v. United States, *supra*, 302 U.S. at 589–590, 58 S.Ct. 395.[23] Addressing the first part of the *Pocket Veto Case* rationale, the Court held that the return of a bill may, in certain instances, be accomplished by delivery to an appropriate agent of the originating House:

> Nor was there any practical difficulty in making the return of the bill

20. 1 J. Story, Commentaries on the Constitution of the United States § 891 (5th ed. 1905) (footnotes omitted).

21. Where a pocket veto is appropriate there is, by definition, no congressional right to override. *See supra*, note 13.

22. The Court also cited "the practical construction that has been given to [the clause] by the Presidents through a long course of years, in which Congress has acquiesced." 279 U.S. at 688–689, 49 S.Ct. at 469. A similar argument was made in this case and is treated below.

23. In that case, a bill was return-vetoed by the President during a brief recess of the Senate, the originating House. The petitioner, who relied upon the bill as the jurisdictional basis for his unsuccessful claim in the Court of Claims, argued that no valid return had been effected. It was apparently his simultaneous contention that no pocket veto was possible because "Congress" as a whole had not adjourned within the meaning of the phrase "unless the Congress by their Adjournment prevent its return." *See* 302 U.S. at 597, 58 S.Ct. 395. *See also* Comment, The Veto of S. 3418: More Congressional Power in the President's Pocket?, 22 Catholic L. Rev., 385, 391 (1973).

> during the recess. The organization of the Senate continued and was intact. The Secretary of the Senate was functioning and was able to receive, and did receive, the bill. Under the constitutional provision [article I, section 5, paragraph 4] the Senate was required to reconvene in not more than three days and thus would be able to act with reasonable promptitude upon the President's objections. There is no greater difficulty in returning a bill to one of the two Houses when it is in recess during the session of Congress than in presenting a bill to the President by sending it to the White House in his temporary absence. Such a presentation is familiar practice. The bill is sent by a messenger and is received by the President. It is returned by a messenger, and why may it not be received by the accredited agent as the legislative body? To say that the President cannot return a bill when the House in which it originated is in recess during the session of Congress, and thus afford an opportunity for the passing of the bill over the President's objections, is to ignore the plainest practical considerations and by implying a requirement of an artificial formality to erect a barrier to the exercise of a constitutional right.

*Id.* at 589–590, 58 S.Ct. at 398. The Court then discussed the dangers it had foreseen at the time of its earlier decision:

> However real these dangers may be when Congress has adjourned and the members of its Houses have dispersed at the end of a session—the situation with which the Court was dealing—they appear to be illusory when there is a mere temporary recess. Each House for its convenience, and during its session and the session of Congress, may take, and frequently does take, a brief recess limited, as we have seen, in the absence of the consent of the other House, to a period of three days. In such case there is no withholding of the bill from appropriate legislative record for weeks or perhaps months, no keeping of the bill in a state of suspended animation with no certain knowledge on the part of the public whether it was seasonably delivered, no causing of any undue delay in its reconsideration. When there is nothing but such a temporary recess the organization of the House and its appropriate officers continue to function without interruption, the bill is properly safeguarded for a very limited time, and is promptly reported and may be reconsidered immediately after the short recess is over. The prospect that in such a case the public may not be promptly and properly informed of the return of the bill with the President's objections, or that the bill will not be properly safeguarded or duly recorded upon the journal of the House, or that it will not be subject to reasonably prompt action by the House, is, we think, wholly chimerical. If we regard the manifest realities of the situation, we cannot fail to see that a brief recess by one House, such as is permitted by the Constitution without the consent of the other House, during the session of Congress, does not constitute such an interruption of the session of the House as to give rise to the dangers which, as the Court apprehended, might develop after the Congress has adjourned.

*Id.* at 595–596, 58 S.Ct. at 400. Appellants emphasize two factual distinctions between *Wright* and the present case: (1) *Wright* involved an adjournment of only three days, a shorter period that the five-day adjournment at issue in this case; (2) only the Senate had adjourned in the former case whereas both Houses were in recess at the time S. 3418 was disapproved. These distinctions fail to overcome the logic and reasoning of the *Wright* decision.

The five-day recess in this case was only two days longer than that considered in *Wright*. Moreover, the most significant portion of the recess, that which extended beyond the ten-day period for return of a bill, was only one day

longer than that which occurred in *Wright*,[24] and was actually within the maximum delay explicitly approved in *Wright*.[25] As in the former case, the Senate continued in existence during the Christmas recess of 1970 and the Secretary of the Senate was available to receive messages from the President during the adjournment.[26] There was no danger that the bill could not be reconsidered "with reasonable promptitude" should it be returned by the President during the adjournment.[27] For these reasons, the mere fact that the Senate was not in session to physically receive the President's objections does not require the conclusion that the Congress had, by its adjournment, prevented the return of S. 3418.

The fact that the House of Representatives had not adjourned in the *Wright* case is also a distinction without a difference.[28] Assuming that the conclusion of the foregoing paragraph is correct, it is difficult to see how the presence or absence of the non-originating House at the time of the return could affect our decision. To hold that a return veto is possible while the originating House alone is in brief recess but not when both Houses are in recess would embrace ritual at the expense of logic.[29]

As the foregoing discussion demonstrates, the present case falls within the exception—or, at least, within a logical extension of the exception—to the *Pocket Veto Case* established in *Wright*. Even if *Wright* were not applicable, however, appellants' reliance upon the *Pocket Veto Case* would be misplaced. The modern practice of Congress with respect to intrasession adjournments creates neither of the hazards—long delay and public uncertainty—perceived in the *Pocket Veto Case*.

24. The Senate's 1970 Christmas recess extended from Tuesday, December 22 to Monday, December 28—a period of five days (excluding Sunday). *See supra* note 5. The *Wright* case involved an adjournment by the Senate of less than three days from Monday, May 4, 1936 until Thursday, May 7, 1936. 302 U.S. at 585, 58 S.Ct. 395. The last day for return of S. 3418 was December 25, 1970, two days (excluding Sunday) before the end of the Senate recess. In *Wright*, the tenth day fell on May 6, 1936, the day before the Senate's return. 302 U.S. at 592, 58 S.Ct. 395.

25. Even a narrow construction of *Wright* permits return of a bill during a recess of the originating House which began at the end of the ninth day of the President's ten-day period for consideration. In such a case, Congress' reconsideration of the bill would be delayed at least two days. *See* Kennedy v. Sampson, *supra*, 364 F.Supp. at 1086.

26. Unlike the *Wright* case, the Secretary of the Senate was expressly authorized to receive messages from the President during the 1970 Christmas adjournment. *See supra* note 6.

27. The *Wright* opinion emphasizes that a brief recess does not occasion long delay of Congress' reconsideration of a bill returned during the recess—a problem envisioned in the case of the months-long intersession adjournment considered in the *Pocket Veto Case*. As demonstrated above, the Christmas recess of 1970 comes within the reasoning of *Wright* on this point. We do not thereby intimate, however, that prompt reconsideration of a returned bill is constitutionally required in order to override a return veto. The Constitution itself sets no time limit upon Congress' right to override a presidential veto. By the same token, as we indicate in our alternative discussion, *infra*, the mere duration of an intrasession adjournment will not "prevent" the return of a bill absent some constitutional evil such as the danger of public uncertainty perceived in the *Pocket Veto Case*.

28. The House of Representatives was in recess from December 22, 1970 until December 29, 1970, the day after the Senate's return. *See supra* note 5.

29. *See* Note, The Presidential Veto Power: A Shallow Pocket, 70 Mich.L.Rev. 148, 161–62 (1971). The *Wright* opinion does state at the outset that the return of the disapproved bill was not prevented because "Congress" (*i. e.* both Houses) had not adjourned. This clearly was not the basis for its decision, however, since the Court expressly reserved the question of whether a more extended one-House adjournment might "prevent" the return of a vetoed bill. 302 U.S. at 598, 58 S.Ct. 395. The Court relied, rather, upon the reasoning which we have outlined above; the brevity of the recess and the availability of efficient methods for delivery of the President's veto message.

First of all, intrasession adjournments are much shorter than the intersession adjournment considered in the *Pocket Veto Case*. At the time of that decision, intersession adjournments of five or six months were still common.[30] By contrast, only four intrasession adjournments in the history of the Congress have exceeded sixty days in duration. Of these, only two occurred in this century—a sixty-seven day recess in 1943 and a sixty-four day recess in 1950.[31] Aside from these four, there have been one hundred twenty-nine intrasession adjournments of more than three days as of June, 1974: two of them for periods of fifty to sixty days; seven for periods of thirty to forty days; and two for periods of twenty to thirty days. The remaining one hundred eighteen were for periods of less than twenty days.[32] Until 1932, practically every one of these adjournments was a Christmas holiday recess.[33] In 1933 the twentieth amendment took effect, setting January 3rd as the customary date for commencement of each session of Congress. As a consequence, the pattern of intrasession recesses was altered somewhat over the ensuing years. In the last decade, however, a consistent pattern of intrasession adjournments has again developed. Typically, there are several recesses of approximately five days for various holidays and a summer recess (or recesses) lasting about one month.[34]

Plainly, intrasession adjournments of Congress have virtually never occasioned interruptions of the magnitude considered in the *Pocket Veto Case*.[35] More importantly, return of a bill during an intrasession adjournment, whatever its length, can no longer cause the public uncertainty envisioned in the *Pocket Veto Case*. Modern methods of communication make it possible for the return of a disapproved bill to an appropriate officer of the originating House to be accomplished as a matter of public record accessible to every citizen. The status of such a bill would be clear; it has failed to receive presidential approval but may yet become law if Congress, upon resumption of its deliberations, passes the bill again by a two-thirds majority. This state of affairs generates no more public uncertainty than does the return of a disapproved bill while Congress is in actual session.[36] The only possible uncertainty about this situation arises from the absence of a definitive ruling as to whether an intrasession adjournment "prevents" the return of a vetoed bill.[37] Hopefully, our present opinion eliminates that ambiguity.

Appellants' briefs directs our attention to the "consistent executive practice" regarding pocket vetoes during intrasession adjournments. The court has considered this argument and finds it unpersuasive. As appellants admit, consistent practice cannot create or destroy an executive power. Appellants' Br. at 37–38.

In addition, the precedents cited by appellants are not strong. Of only thirty-eight intrasession pocket vetoes in the nation's history, thirty (or 78%) have occurred since the inauguration of President Franklin Roosevelt.[38] None occurred prior to 1867.[39] The intrasession pocket veto is, therefore, a relatively

30. The intersession adjournments of the 68th, 69th and 70th Congresses lasted six months, five months, and six months respectively. 1974 Congressional Directory 396. These Congresses covered the period from December, 1923 to March, 1929. The *Pocket Veto Case* was decided in 1929.

31. The other two adjournments occurred in 1867 (94 days and 128 days). *See* Appendix herein.

32. *See* Appendix.

33. *Id.* The exceptions are numbered 9, 12 13, 61 and 70 in Appendix.

34. *See* items 88–133 in Appendix.

35. The only intrasession adjournments approaching this occurred in 1867. *See supra* note 31.

36. The length of an intrasession adjournment *per se* does not prevent the return of a disapproved bill for reconsideration. The Constitution sets no time limit on the right of Congress to override a presidential veto.

37. *Hearings, supra* note 13 at 14, 15.

38. *See* Appendix.

39. *Id.*

modern phenomenon. Moreover, it is a phenomenon which has gained new significance in recent years as brief, intrasession recesses have become more frequent.[40] The present case arises from the shortest intrasession recess ever relied upon by any President as having prevented the return of a disapproved bill.[41] It is also significant that, in the single case which presented the issue of whether an intrasession adjournment precluded a return veto, the Supreme Court ruled that it had not. Wright v. United States, *supra*. In our view, therefore, the question raised in this case is still very much an open one, prior executive practice notwithstanding.

[7] In summary, we hold that the Christmas recess of 1970 did not prevent the return of S. 3418—a conclusion which may be reached by either of two routes. First, the present case is governed by the logic, if not the precise holding, of the *Wright* decision. Second, the case is an appropriate one for disposition of the question of whether any intrasession adjournment, as that practice is presently understood, can prevent the return of a bill by the President where appropriate arrangements have been made for receipt of presidential messages during the adjournment—a question which must be answered in the negative.

Affirmed.

## APPENDIX

### INTRASESSION ADJOURNMENTS OF MORE THAN THREE DAYS BY CONGRESS (1789–June, 1974), INDICATING THE NUMBER OF POCKET VETOES DURING EACH ADJOURNMENT [1]

| Congress/ Session | | Dates of Adjournment [2] | Length of Adjournment (Days) | Number of Pocket Vetoes |
|---|---|---|---|---|
| 6/2 | 1. | Dec. 24, 1800–Dec. 30, 1800 | 6 | 0 |
| 15/1 | 2. | Dec. 25, 1817–Dec. 29, 1817 | 4 | 0 |
| 20/2 | 3. | Dec. 25, 1828–Dec. 29, 1828 | 4 | 0 |
| 35/1 | 4. | Dec. 24, 1857–Jan. 4, 1858 | 11 | 0 |
| 35/2 | 5. | Dec. 24, 1858–Jan. 4, 1859 | 11 | 0 |
| 37/3 | 6. | Dec. 24, 1862–Jan. 5, 1863 | 12 | 0 |
| 38/1 | 7. | Dec. 24, 1863–Jan. 5, 1864 | 12 | 0 |
| 38/2 | 8. | Dec. 23, 1864–Jan. 5, 1865 | 13 | 0 |
| 39/1 | 9. | Dec. 7, 1865–Dec. 11, 1865 | 4 | 0 |
| | 10. | Dec. 22, 1865–Jan. 5, 1866 | 14 | 0 |
| 39/2 | 11. | Dec. 21, 1866–Jan. 3, 1867 | 13 | 0 |
| 40/1 | 12. | March 31, 1867–July 1, 1867 | 92 | 1 |
| | 13. | July 21, 1867–Nov. 21, 1867 | 123 | 1 |
| 40/2 | 14. | Dec. 21, 1867–Jan. 6, 1868 [3] | 16 | 2 |

40. *Id.*

41. *Id.*

1. Source: 1974 Congressional Directory 392; Presidential Vetoes, Record of Bills Vetoed and Action Taken Thereon by the Senate and House of Representatives, 1789–1968 (Compiled by Senate Library, 1969); Calendar, 93rd Cong. (June 24, 1974).

2. The date of the beginning of each adjournment is the first day on which neither House was in session; the date of the end of each adjournment is the day on which one or both Houses resumed the session.

3. There were additional adjournments in this session, from July 27, 1868, to September 21, to October 16, and to November 10. No business was transacted subsequent to July

APPENDIX—Continued

| Congress/ Session | | Dates of Adjournment | Length of Adjournment (Days) | Number of Pocket Vetoes |
|---|---|---|---|---|
| 40/3 | 15. | Dec. 22, 1868–Jan. 5, 1869 | 14 | 0 |
| 41/2 | 16. | Dec. 23, 1869–Jan. 10, 1870 | 18 | 0 |
| 41/3 | 17. | Dec. 23, 1870–Jan. 4, 1871 | 12 | 0 |
| 42/2 | 18. | Dec. 22, 1871–Jan. 8, 1872 | 17 | 0 |
| 42/3 | 19. | Dec. 21, 1872–Jan. 6, 1873 | 16 | 0 |
| 43/1 | 20. | Dec. 20, 1873–Jan. 5, 1874 | 16 | 0 |
| 43/2 | 21. | Dec. 24, 1874–Jan. 5, 1875 | 12 | 0 |
| 44/1 | 22. | Dec. 21, 1875–Jan. 5, 1876 | 15 | 0 |
| 45/2 | 23. | Dec. 16, 1877–Jan. 10, 1878 | 25 | 0 |
| 45/3 | 24. | Dec. 21, 1878–Jan. 7, 1879 | 17 | 0 |
| 46/2 | 25. | Dec. 20, 1879–Jan. 6, 1880 | 17 | 0 |
| 46/3 | 26. | Dec. 23, 1880–Jan. 5, 1881 | 13 | 0 |
| 47/1 | 27. | Dec. 22, 1881–Jan. 5, 1882 | 14 | 0 |
| 48/1 | 28. | Dec. 25, 1883–Jan. 7, 1884 | 13 | 0 |
| 48/2 | 29. | Dec. 25, 1884–Jan. 5, 1885 | 11 | 0 |
| 49/1 | 30. | Dec. 22, 1885–Jan. 5, 1886 | 14 | 0 |
| 49/2 | 31. | Dec. 23, 1886–Jan. 4, 1887 | 12 | 0 |
| 50/1 | 32. | Dec. 23, 1887–Jan. 4, 1888 | 12 | 0 |
| 50/2 | 33. | Dec. 22, 1888–Jan. 2, 1889 | 11 | 0 |
| 51/1 | 34. | Dec. 22, 1889–Jan. 6, 1890 | 15 | 0 |
| 52/1 | 35. | Dec. 24, 1891–Jan. 5, 1892 | 12 | 0 |
| 52/2 | 36. | Dec. 23, 1892–Jan. 4, 1893 | 12 | 1 |
| 53/2 | 37. | Dec. 22, 1893–Jan. 3, 1894 | 12 | 0 |
| 53/3 | 38. | Dec. 23, 1894–Jan. 3, 1895 | 11 | 0 |
| 54/2 | 39. | Dec. 23, 1896–Jan. 5, 1897 | 13 | 2 |
| 55/2 | 40. | Dec. 19, 1897–Jan. 5, 1898 | 17 | 0 |
| 55/3 | 41. | Dec. 22, 1898–Jan. 4, 1899 | 13 | 0 |
| 56/1 | 42. | Dec. 21, 1899–Jan. 3, 1900 | 13 | 0 |
| 56/2 | 43. | Dec. 22, 1900–Jan. 3, 1901 | 12 | 0 |
| 57/1 | 44. | Dec. 20, 1901–Jan. 6, 1902 | 17 | 0 |
| 57/2 | 45. | Dec. 21, 1902–Jan. 5, 1903 | 15 | 0 |
| 58/2 | 46. | Dec. 20, 1903–Jan. 4, 1904 | 15 | 0 |
| 58/3 | 47. | Dec. 22, 1904–Jan. 5, 1905 | 14 | 0 |
| 59/1 | 48. | Dec. 22, 1905–Jan. 4, 1906 | 13 | 0 |
| 59/2 | 49. | Dec. 21, 1906–Jan. 3, 1907 | 13 | 0 |
| 60/1 | 50. | Dec. 22, 1907–Jan. 6, 1908 | 15 | 0 |
| 60/2 | 51. | Dec. 20, 1908–Jan. 4, 1909 | 15 | 0 |
| 61/2 | 52. | Dec. 22, 1909–Jan. 4, 1910 | 13 | 0 |
| 61/3 | 53. | Dec. 22, 1910–Jan. 5, 1911 | 14 | 0 |
| 62/2 | 54. | Dec. 22, 1911–Jan. 3, 1912 | 12 | 0 |
| 62/3 | 55. | Dec. 20, 1912–Jan. 2, 1913 | 13 | 0 |
| 63/2 | 56. | Dec. 24, 1913–Jan. 12, 1914 | 19 | 0 |
| 63/3 | 57. | Dec. 24, 1914–Dec. 29, 1914 | 5 | 0 |
| 64/1 | 58. | Dec. 18, 1915–Jan. 4, 1916 | 17 | 0 |

27, 1868, and the session adjourned *sine die* on November 10. In effect, the adjournment on July 27 was a *sine die* adjournment.

President Andrew Johnson pocket vetoed two bills presented to him after the adjournment of July 27, 1868.

APPENDIX—Continued

| Congress/ Session | | Dates of Adjournment | Length of Adjournment (Days) | Number of Pocket Vetoes |
|---|---|---|---|---|
| 64/2 | 59. | Dec. 23, 1916–Jan. 2, 1917 | 10 | 0 |
| 65/2 | 60. | Dec. 19, 1917–Jan. 3, 1918 | 15 | 0 |
| 66/1 | 61. | July 2, 1919–July 8, 1919 | 6 | 0 |
| 66/2 | 62. | Dec. 21, 1919–Jan. 5, 1920 | 15 | 0 |
| 67/2 | 63. | Dec. 23, 1921–Jan. 3, 1922 | 11 | 0 |
| 68/1 | 64. | Dec. 21, 1923–Jan. 3, 1924 | 13 | 0 |
| 68/2 | 65. | Dec. 21, 1924–Dec. 29, 1924 | 8 | 0 |
| 69/1 | 66. | Dec. 23, 1925–Jan. 4, 1926 | 12 | 0 |
| 69/2 | 67. | Dec. 23, 1926–Jan. 3, 1927 | 11 | 0 |
| 70/1 | 68. | Dec. 22, 1927–Jan. 4, 1928 | 13 | 0 |
| 70/2 | 69. | Dec. 23, 1928–Jan. 3, 1929 | 11 | 1 |
| 71/1 | 70. | June 20, 1929–Aug. 19, 1929 | 60 | 0 |
| 71/2 | 71. | Dec. 22, 1929–Jan. 6, 1930 | 15 | 0 |
| 71/3 | 72. | Dec. 21, 1930–Jan. 5, 1931 | 15 | 0 |
| 72/1 | 73. | Dec. 23, 1931–Jan. 4, 1932 | 12 | 0 |
| 74/2 | 74. | June 9, 1936–June 15, 1936 | 6 | 0 |
| 76/3 | 75. | July 12, 1940–July 22, 1940 | 10 | 0 |
| 78/1 | 76. | July 9, 1943–Sept. 14, 1943 | 67 | 3 |
| 78/2 | 77. | Apr. 2, 1944–Apr. 12, 1944 | 10 | 1 |
| | 78. | June 24, 1944–Aug. 1, 1944 | 38 | 5 |
| | 79. | Sept. 22, 1944–Nov. 14, 1944 | 53 | 1 |
| 79/1 | 80. | Aug. 2, 1945–Sept. 5, 1945 | 34 | 0 |
| 80/1 [4] | | | | |
| 80/2 [5] | | | | |
| 81/2 | 81. | Sept. 24, 1950–Nov. 27, 1950 | 64 | 6 |
| 83/2 [6] | | | | |
| 84/1 | 82. | Apr. 5, 1955–Apr. 13, 1955 | 8 | 0 |
| 84/2 | 83. | Mar. 30, 1956–Apr. 9, 1956 | 10 | 1 |
| 85/1 | 84. | Apr. 19, 1957–Apr. 29, 1957 | 10 | 0 |
| 85/2 | 85. | Apr. 4, 1958–Apr. 14, 1958 | 10 | 0 |
| 86/1 | 86. | Mar. 27, 1959–Apr. 7, 1959 | 11 | 0 |

4. The Senate and the House of Representatives adjourned on July 27, 1947 under a "conditional final adjournment" resolution, S.Con. Res. 33; 93 Cong.Rec. 10400. Pursuant to the resolution, the two Houses were to stand in adjournment until January 2, 1948, unless recalled into session earlier by specified Senate and House leaders. In effect, the adjournment was a *sine die* adjournment, not an intrasession adjournment. On November 17, 1947, Congress convened pursuant to proclamation of President Truman, and adjourned *sine die* on December 19, 1947. The President pocket vetoed 19 bills presented to him after the adjournment of July 27, 1947.

5. The Senate and the House of Representatives adjourned on June 20, 1948, under a "conditional final adjournment" resolution, H.Con.Res. 218; 94 Cong.Rec. 9158. Pursuant to the resolution, the two Houses were to stand in adjournment until December 31, 1948, unless recalled into session earlier by specified Senate and House leaders. In effect, the adjournment was a *sine die* adjournment, not an intrasession adjournment. On July 26, 1948, Congress convened pursuant to a proclamation of President Truman. The President pocket vetoed 14 bills presented to him after the adjournment of June 20, 1948.

6. The House adjourned *sine die* on August 20, 1954. Thereafter President Eisenhower pocket vetoed twenty-five bills. Although the Senate remained in session until December 2, 1954, these were not intrasession pocket vetoes since the House had already finally adjourned.

APPENDIX—Continued

| Congress/ Session | | Dates of Adjournment | Length of Adjournment (Days) | Number of Pocket Vetoes |
|---|---|---|---|---|
| 86/2 | 87. | July 4, 1960–Aug. 8, 1960 | 35 | 6 |
| 88/2 | 88. | July 11, 1964–July 20, 1964 | 9 | 0 |
| | 89. | Aug. 22, 1964–Aug. 31, 1964 | 9 | 1 |
| 89/2 | 90. | Apr. 8, 1966–Apr. 18, 1966 | 5 | 0 |
| | 91. | July 1, 1966–July 11, 1966 | 10 | 0 |
| 90/1 | 92. | Mar. 24, 1967–Apr. 3, 1967 | 10 | 0 |
| | 93. | June 30, 1967–July 10, 1967 | 10 | 0 |
| | 94. | Sept. 1, 1967–Sept. 11, 1967 | 10 | 0 |
| | 95. | Nov. 23, 1967–Nov. 27, 1967 | 4 | 0 |
| 90/2 | 96. | Apr. 12, 1968–Apr. 17, 1968 | 5 | 0 |
| | 97. | May 30, 1968–June 3, 1968 | 4 | 0 |
| | 98. | July 4, 1968–July 8, 1968 | 4 | 0 |
| | 99. | Aug. 3, 1968–Sept. 4, 1968 | 32 | 1 |
| 91/1 | 100. | Feb. 8, 1969–Feb. 17, 1969 | 9 | 0 |
| | 101. | Apr. 4, 1969–Apr. 14, 1969 | 10 | 0 |
| | 102. | July 3, 1969–July 7, 1969 | 4 | 0 |
| | 103. | Aug. 14, 1969–Sept. 3, 1969 | 20 | 0 |
| | 104. | Nov. 27, 1969–Dec. 1, 1969 | 4 | 0 |
| 91/2 | 105. | Feb. 11, 1970–Feb. 16, 1970 | 5 | 0 |
| | 106. | Mar. 27, 1970–Mar. 31, 1970 | 4 | 0 |
| | 107. | Sept. 3, 1970–Sept. 8, 1970 | 5 | 0 |
| | 108. | Oct. 15, 1970–Nov. 16, 1970 | 32 | 1 |
| | 109. | Nov. 26, 1970–Nov. 30, 1970 | 4 | 0 |
| | 110. | Dec. 23, 1970–Dec. 28, 1970 | 5 | 2 |
| 92/1 | 111. | Feb. 21, 1971–Feb. 26, 1971 | 5 | 0 |
| | 112. | Apr. 8, 1971–Apr. 14, 1971 | 6 | 0 |
| | 113. | May 28, 1971–June 1, 1971 | 4 | 0 |
| | 114. | July 2, 1971–July 6, 1971 | 4 | 0 |
| | 115. | Aug. 7, 1971–Sept. 8, 1971 | 32 | 1 |
| | 116. | Oct. 22, 1971–Oct. 26, 1971 | 4 | 0 |
| | 117. | Nov. 25, 1971–Nov. 29, 1971 | 4 | 0 |
| 92/2 | 118. | Feb. 10, 1972–Feb. 14, 1972 | 4 | 0 |
| | 119. | Mar. 31, 1972–Apr. 4, 1972 | 4 | 0 |
| | 120. | May 26, 1972–May 30, 1972 | 4 | 0 |
| | 121. | July 1, 1972–July 17, 1972 | 16 | 0 |
| | 122. | Aug. 19, 1972–Sept. 5, 1972 | 17 | 1 |
| 93/1 | 123. | Feb. 9, 1973–Feb. 15, 1973 | 6 | 0 |
| | 124. | Apr. 20, 1973–Apr. 30, 1973 | 10 | 0 |
| | 125. | May 25, 1973–May 29, 1973 | 4 | 0 |
| | 126. | July 1, 1973–July 9, 1973 | 8 | 0 |
| | 127. | Aug. 4, 1973–Sept. 5, 1973 | 32 | 0 |
| | 128. | Oct. 19, 1973–Oct. 23, 1973 | 4 | 0 |
| | 129. | Nov. 22, 1973–Nov. 26, 1973 | 4 | 0 |
| 93/2 | 130. | Feb. 9, 1974–Feb. 13, 1974 | 4 | 0 |
| | 131. | Mar. 14, 1974–Mar. 19, 1974 | 5 | 0 |
| | 132. | Apr. 12, 1974–Apr. 22, 1974 | 10 | 0 |
| | 133. | May 24, 1974–May 28, 1974 | 4 | 0 |
| | | | | 33 |

FAHY, Senior Circuit Judge, with whom BAZELON, Chief Judge, joins.

I concur in the opinion of Judge Tamm for the court, adding only a few notes.

Appellants contend in this court only that Senator Kennedy lacks standing to obtain the adjudication he seeks, and that the proposed legislation never became law because of a valid pocket veto. The opinion of Judge Tamm meets these contentions. The position asserted in the District Court that the President was an indispensable party has not been renewed in this court; nor is any issue of jurisdiction or justiciability now raised, aside from the problem of standing as it might bear upon jurisdiction or justiciability.

I do not think the standing of Senator Kennedy is quite the same as the 20 Senators of the State of Kansas, the plaintiffs in Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). Ratification by Kansas of the Child Labor Amendment depended upon the validity of the vote of the Lieutenant Governor which the Senators challenged. If his vote should not have been counted the Senate was equally divided, 20–20, and ratification by Kansas would have failed. In the present case, Senator Kennedy's vote did not control passage of S. 3418. Nevertheless, his interest is substantial. As a United States Senator he represents a sovereign State whose people have a deep interest in the Act and look to their Senators to protect that interest; and he, as Senator, it seems to me, has a legal right not only to seek judicial protection of those interests, believed by him to be threatened by an invalid veto, but also, in the circumstances, to protect his own interest as a national legislator in the bill for which he voted. These interests I think do not depend for their protection upon affirmative approval by the Senate itself of efforts to obtain judicial relief. Moreover, as Judge Tamm points out, the Senator's stake in the outcome of the controversy meets the adversary test of standing under Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and subsequent decisions of the Court.

The aliveness of the controversy also seems clear. Whether the Act is to continue in its present form of course is for Congress to decide, but it has not been abandoned. Although its uncertain status necessarily affected congressional appropriations, the Second Supplemental Appropriations Act, 1973, 87 Stat. 106, includes a $100,000 appropriation to carry out the purposes of the Family Practice of Medicine Act, S. 3418, to remain available until expended. S.Rep. No. 160, 93d Cong., 1st Sess. 48–49 (1973).

# APPENDIX C-5

UNITED STATES OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 80th CONGRESS

SECOND SESSION

VOLUME 94—PART 1

JANUARY 6, 1948, TO FEBRUARY 19, 1948

(PAGES 1 TO 1434)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1948

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## To all to whom these presents shall come. Greeting:

[illegible]y virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, [illegible]he seal of the National Archives of the United States, that the attached reproduction(s) is a true and [illegible]py of documents in his custody.

SIGNATURE

NAME: Richard Hunt

DATE: 05/09/06

TITLE: Director
Center for Legislative Archives

NAME AND ADDRESS OF DEPOSITORY

The National Archives
Washington, D.C. 20408

*U.S. GPO: 1996-442-2[illegible]5

NA FORM 14007A (10-86)

Case 1:02-cv-00429-T Document 21-4 Filed 03/02/2007 Page 45 of 63

desires to do so in support of the amendment, as I would like to speak in opposition to it.

Mr. GEARHART. Mr. Chairman, I offer a substitute for the committee amendment.

Mr. HINSHAW. If there is not going to be any support for this amendment, I would like to rise in opposition to it.

Mr. BECKWORTH. Mr. Chairman, I am in favor of the amendment and do expect to advocate its passage, but if the gentleman desires to speak, he certainly has the right to rise in oposition to it.

Mr. HINSHAW. Mr. Chairman, I rise in opposition to the amendment.

Mr. GEARHART. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. GEARHART. As a point of information, Mr. Chairman, I am offering a substitute amendment to the committee amendment. Do I not have the right to offer it at this time?

The CHAIRMAN. The Chair must first recognize the gentleman from California [Mr. HINSHAW].

Mr. HINSHAW. Mr. Chairman, I rise in opposition to the committee amendment. This amendment was agreed to by a very small majority of the committee. I believe it was largely because we are so very fond of our distinguished friend, the gentleman from Texas. I personally could not support the amendment because I believe it is not in the interest of proper legislation. Certain of the Members have come to me, who joined in supporting the amendment, and have indicated that they would have another viewpoint at this time, and I know particularly the chairman of my committee has so authorized me to state. In addition, there is opposition on the part of the Department of State and the Department of Justice to this amendment. The matter was taken up with them last July while the committee print was still under consideration. I have letters from them under date of July 7 and 8, in which they oppose this amendment and another amendment which may be presented by the gentleman from Texas. I might read from a letter from the State Department:

> This is a matter primarily affecting the operations of the Department of Justice. It may be stated, however, that in view of the length of time already elapsed in which creditors have been denied payment of their claims, further delay of more than 1 year before consideration of payment of their claims may be taken would be undesirable.

Then, in the Department of Justice letter, similar words were used. Then they refer particularly to the words "inimical to the welfare of the United States." The Department says, "It will be very difficult to define, except in the most extreme cases, and which would operate in many cases to penalize conduct which at the time when it occurred was lawful under the laws of the United States." Then it refers to other matters.

Therefore, I would be personally in opposition to the amendment. I think the committee is about evenly divided.

Mr. BECKWORTH. Mr. Chairman, I rise in support of the amendment.

Mr. Chairman, practically every person who has been on the floor today has said he believes these claims should be adjudicated. I made the statement originally that, in my opinion, this legislation should have been passed long ago. It should have been. The trouble is that today property is being returned, and the veterans of Bataan cannot even submit their claims. I repeat, today property is being returned and the veterans of Bataan cannot even submit their claims. There is nobody to whom they can submit them.

To whom is the property being returned? According to a table which I placed in the RECORD, January 20, 1948, it is being returned in the following manner:

> Property returned to American citizens and friendly nationals that had been vested, under findings that it was owned by nationals of Germany.

Of course, people are coming before the Alien Property Custodian today and saying, "I am a friend of America." Why? Because they want their property back. That is what they did after the First World War, and the Germans got 80 percent back and many Americans do not have their World War I claims satisfied today.

I say to you it is not consistent with the policy of the legislation we have before us today to continue to give back this property, as we are doing.

One of the firms, at the conclusion of World War I, that got property back, was the General Aniline & Film Co. At the beginning of this past war it had its property taken over again, if I understand correctly. Let us see who is getting some property back, according to the tables supplied me by the Alien Property Custodian. Some examples are: 1. First National Bank of Chicago, $30,861.64; 2. Maurice Stern, 1,734 shares of common stock General Aniline & Film Co., $109,000; 3. Leopold H. P. Klotz & North American Investment Co., $457,000. We find one R. E. Stern got back 1,734 shares of that property, worth $109,000. What kind of property is this, in most cases, anyway? Let me read to you a little bit of it. The Alien Property Custodian compiled this statement:

> Continental Hendel Bank, $5,000,000 claim already filed.

Here is another one for $201,230, filed in behalf of a Swedish concern.

Here is another one for $215,000, filed in the interest of a Swedish concern.

Just as companies and people did after World War I, they are getting it back again, while we are compelling our veterans of Bataan to wait; while we are compelling our citizens to wait. We should make everybody wait—including those who were dealing with the enemy in such a way that this country of ours had to take over their property at the beginning of the war. If you want to be fair to the veterans of this country, if you want to be fair to the civilians of this country who have not yet received a penny, you will certainly keep in this legislation the committee amendment. Many veterans suffered inhuman treatment in the Philippines and in Japan and in Germany and other European countries. I have letters in my files which describe that treatment. The prisoner or the civilian has to wait while these people are getting back sums of money as I have described. How this can happen I cannot understand. I certainly hope the Members of this Congress will see fit to retain this important amendment in the legislation before us.

Mr. GEARHART. Mr. Chairman, I offer a substitute for the committee amendment.

The Clerk read as follows:

> Amendment offered by Mr. GEARHART as a substitute for the committee amendment in the bill: Insert a new section to be known as section 2, as follows:
>
> "SEC. 2. (A) No property or interest therein shall be applied to the payment of debts, under the provisions of section 34 of the Trading With the Enemy Act of October 6, 1917 (40 Stat. 411) as amended, nor shall any part or any portion of the proceeds from the sale or disposition of property or any interest therein of Germany or Japan or any national of either of such countries covered into the general fund of the Treasury as miscellaneous receipts be applied to the satisfaction or reduction of any claims of American nationals save and except pursuant to a judgment or judgments sought and obtained in the manner and in the form as in this title provided.
>
> "(B) The United States district court for the district wherein the claimant is resident, including the United States district courts for the Territories and possessions of the United States, sitting without a jury, shall have exclusive jurisdiction to hear, determine, and render judgment on claims of American nationals, their heirs and legal representatives, in respect of damage or injury inflicted upon their persons, property, rights, or interests, by measures of enemy governments, including acts of force, violence, or duress, or legislative, administrative, judicial, and other measures, undertaken or enacted after January 1, 1931, including (but not limited to) all personal injury and death claims arising out of maltreatments of former prisoners of war by the Governments of Germany or Japan, their armed forces, or their nationals, in violation of the International Convention Relating to Treatment of Prisoners of War, signed at Geneva, Switzerland, on July 27, 1929, by the plenipotentiaries of the United States, Germany, Japan, and other nations therein represented: *Provided*, That such jurisdiction shall not extend to claims for loss, damage, personal injuries, or death, with respect to which compensation is authorized under other laws of the United States.
>
> "(C) The clerk of United States district courts in each district shall certify to the Congress, at the beginning of each new session of the Congress, the judgments of the court with respect to such claims, for such action as the Congress may deem advisable.
>
> "(D) (a) The United States district courts in the several districts are authorized to make such rules and regulations as may be necessary to carry out their functions under this act.
>
> "(E) The Attorney General is authorized and directed, upon the request of any district court, to appoint a law officer to aid the court in the performance of its functions under this act and to protect the interests of the United States.
>
> "(F) Every claim cognizable under this act shall be forever barred, unless within 2 years after the date of the enactment of this act, it is presented in writing to the United States district court having jurisdiction of such claim pursuant to this act, in accordance with the rules and regulations of such court."

# APPENDIX C-6

UNITED STATES OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 80th CONGRESS

SECOND SESSION

## VOLUME 94—PART 6

JUNE 3, 1948, TO JUNE 14, 1948
(PAGES 6991 TO 8228)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1948

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## To all to whom these presents shall come, Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, [illegible]r the seal of the National Archives of the United States, that the attached reproduction(s) is a true and [illegible] copy of documents in his custody.

| | |
|---|---|
| SIGNATURE | |
| NAME<br>Richard Hunt | DATE<br>05/09/06 |
| TITLE Director<br>Center for Legislative Archives | |
| NAME AND ADDRESS OF DEPOSITORY<br>The National Archives<br>Washington, D.C. 20408 | |

*U.S. GPO: 1998-442-221/[illegible]

NA FORM 14007A (10-86)

be established by legislation now pending in the Congress (with an accompanying paper); to the Committee on Appropriations and ordered to be printed.

SUPPLEMENTAL ESTIMATE, FEDERAL WORKS AGENCY (S. Doc. No. 176)

A communication from the President of the United States, transmitting a supplemental estimate of appropriation for the Federal Works Agency, amounting to $15,000,000, fiscal year 1949, and a proposed contract authorization in the amount of $10,000,000 (with an accompanying paper); to the Committee on Appropriations and ordered to be printed.

SUPPLEMENTAL ESTIMATE, SEVERAL EXECUTIVE DEPARTMENTS AND INDEPENDENT OFFICES (S. Doc. No. 177)

A communication from the President of the United States, transmitting an estimate of appropriation for the several executive departments and independent offices to pay claims for damages, audited claims, and judgments rendered against the United States, as provided by various laws, in the amount of $2,393,458.55, together with an indefinite amount as may be necessary to pay interest and costs (with accompanying papers); to the Committee on Appropriations and ordered to be printed.

PETITIONS AND MEMORIALS

Petitions, etc., were laid before the Senate and referred as indicated:

By the PRESIDENT pro tempore:

A letter in the nature of a petition from Laura B. Prisk, of New York, N. Y., relating to Flag Day; to the Committee on the Judiciary.

A telegram in the nature of a petition from Walter I. M. Hodge, chairman, Municipal Committee, St. Croix, V. I., praying for the enactment of House bill 5904, to incorporate the Virgin Islands Corporation; ordered to lie on the table.

A resolution adopted by the forty-second annual convention of the Maryland State and District of Columbia Federation of Labor, at Washington, D. C., protesting against the enactment of the Mundt-Nixon un-American activities bill; to the Committee on the Judiciary.

A memorial of sundry citizens of the State of Washington, remonstrating against the enactment of the so-called Mundt-Nixon un-American activities bill; to the Committee on the Judiciary.

REPORTS OF COMMITTEES

The following reports of committees were submitted:

By Mr. BUTLER, from the Committee on Interior and Insular Affairs:

S. 2080. A bill to provide for the establishment of the Philadelphia National Historical Park, and for other purposes; with amendments (Rept. No. 1622); and

H. R. 6090. A bill authorizing the Secretary of the Interior to issue patents for lands held under color of title; without amendment (Rept. No. 1618).

By Mr. WILEY, from the Committee on the Judiciary:

H. R. 3190. A bill to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure;" with amendments (Rept. No. 1620); and

H. R. 6412. A bill to codify and enact into law title 3 of the United States Code, entitled "The President"; without amendment (Rept. No. 1623).

By Mr. COOPER, from the Committee on the Judiciary:

S. 2764. A bill to amend the Trading With the Enemy Act; without amendment (Rept. No. 1619).

By Mr. SALTONSTALL, from the Committee on Appropriations:

H. R. 6772. A bill making appropriations for the Department of the Navy and the naval service for the fiscal year ending June 30, 1949, and for other purposes; with amendments (Rept. No. 1621).

By Mr. BYRD, from the Committee on Armed Services:

S. 2698. A bill to authorize the transfer of horses and equipment owned by the United States Army to the New Mexico Military Institute, a State institution; with amendments (Rept. No. 1624).

PROTECTION AGAINST LYNCHING—REPORT OF A COMMITTEE

Mr. FERGUSON. Mr. President, from the Committee on the Judiciary, I ask unanimous consent to report an original bill, to provide for the better assurance of the protection of persons within the several States from lynching, and for other purposes, and I submit a report (No. 1625) thereon. The report is short, and I request that it be printed in the RECORD.

The PRESIDENT pro tempore. Without objection, the bill and the report will be received, and the bill will be placed on the calendar; and, without objection, the report will be printed in the RECORD.

The bill (S. 2860) to provide for the better assurance of the protection of persons within the several States from lynching, and for other purposes, was received, read twice by its title, and ordered to be placed on the calendar.

The report was ordered to be printed in the RECORD, as follows:

The Committee on the Judiciary, which has had under consideration various bills relating to the protection of persons within the several States from lynching, report favorably a bill to provide for the better assurance of the protection of persons within the several States from lynching, and for other purposes, with the recommendation that the bill do pass.

The purpose of the bill is self-explanatory in the title statement in that it is designed to provide for the better assurance of the protection of persons from lynching.

STATEMENT

Section 1 of the bill is self-explanatory.

Section 2 of the bill, which contains the definitions, might be considered one of the most important parts of the measure.

The bill defines lynching as an exercise or an attempt to exercise by an assembly of two or more persons, without authority of law, by action of physical force against person or property, of any power of correction or punishment over any persons in the custody of any peace officer, or suspected of, charged with, or convicted of the commission of any criminal offense with the purpose or consequence of preventing the apprehension or trial or punishment by law of such person, or of imposing a punishment. The essence of the offense is the depriving of the person accused or suspected of crime of a trial in the manner provided by law and, if such person is convicted, of punishment in the manner provided by law.

Section 3 of the bill makes it a crime punishable by imprisonment and/or a fine for Federal or State officers to conspire with members of a lynching mob in the prosecution of a lynching. The constitutionality of the imposition of Federal sanctions against Federal or State officers for their participation in a lynching will not be discussed in this section. In a later paragraph it is pointed out that such sanctions are valid. The question here involves the validity of Federal sanctions imposed against members of the lynch mob when they conspire with the Federal or State officers. It seems to be well-settled law that any Federal sanctions against the individual lynchers (aiders, abettors, etc.) are invalid.

It appears well settled that under the fourteenth amendment to the Constitution, Congress does not have the authority to enact sanctions against private individuals or individual actions. (*The Civil Rights cases* (109 U. S. 3); *U. S.* v. *Harris* (106 U. S. 629); *Slaughterhouses cases* (83 U. S. 36); *U. S.* v. *Cruikshank* (92 U. S. 542); *Strauder* v. *West Virginia* (100 U. S. 303); *Virginia* v. *Rives* (100 U. S. 313); *Hodges* v. *U. S.* (203 U. S. 1); *Corrigan* v. *Buckley* (271 U. S. 327).)

It is the opinion of this committee that those individuals who conspire with Federal or State officers for the purposes of lynching may be held guilty of the crime or conspiracy when, in effect, they could not be held guilty of lynching. It is sufficient if one of the parties to a conspiracy is legally capable of committing the offense, while the other party may not have that capacity (*Chadwick* v. *U. S.* (141 F. 225); *Ohen* v. *U. S.* (157 F. 651, 85 C. C. A. 113, certiorari denied, 207 U. S. 596)). A person may be guilty of conspiring although incapable of committing the objective offense (*Farnsworth* v. *Zerbst* (98 F. 2d 541); *U. S.* v. *Rabinowick* (238 U. S. 78, 86); *U. S.* v. *Haite* (236 U. S. 140, 144); *Jelke* v. *U. S.* (255 F. 265); *Israel* v. *U. S.* (3 F. 2d 743); *U. S.* v. *Lyman* (190 F. 414); *U. S.* v. *Socony Vacuum Oil Company* (310 U. S. 150)).

Section 4 punishes State officers and employees for their failure to prevent a lynching. The fourteenth amendment is directed toward the action of the States, including the action of State officers. Any action by the officers of the State which violates the prohibition upon State action contained in the fourteenth amendment is subject to penalty imposed by the United States (*Ex Parte Virginia* (100 U. S. 339); *Screws v. U. S.* (325 U. S. 91)). The right not to be deprived by a State (or State officers) of a trial by the State, or of the punishment prescribed by law, is inherent in due process of law (*Screws* v. *U. S.*, supra; *Crews* v. *U. S.* (160 F. 2d. 746); *U. S.* v. *Classic* (313 U. S. 299)).

Section 5 of the bill penalizes Federal officers and employees for their willful failure to prevent a lynching. Congress has, many times, created penalties upon Federal officers for a violation of their duties. The creation of the sanction in itself creates a duty on a Federal officer not to commit acts which would invoke the imposition of the penalty. (See the offenses defined and punished in U. S. Code, title 18, secs. 171 et seq.)

Section 6 defines the duty of the Attorney General of the United States under this act. It imposes a duty upon him to cause an investigation to be made to determine whether there has been a violation of the bill, whenever a lynching occurs, and information on oath is submitted to him that any officer or employee of the United States or of a State, or any governmental subdivision thereof, is guilty of a criminal offense under section 4 or section 5 of the bill. This section merely spells out a duty which normally rests with the Attorney General, the chief law enforcement officer of the United States, to enforce, and prosecute violations of, all criminal laws of the United States. It is not intended to restrict the Attorney General in the enforcement of the act but to make it mandatory upon him to cause the investigation prescribed if the information on oath is submitted to him.

Section 7 provides for civil actions for damages by an individual who is lynched (or his next of kin) against any person violating section 3, section 4, or section 5 of the act with respect to that lynching.

The validity of this section rests upon the same constitutional bases and cases cited under the foregoing sections 3, 4, or 5. Obviously, if Congress has the authority to make certain acts a crime, punishable by fines and/or imprisonment, it also has the

# APPENDIX C-7

UNITED STATES OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 80th CONGRESS

SECOND SESSION

## VOLUME 94—PART 7

JUNE 15, 1948, TO JUNE 19, 1948

(PAGES 8229 TO 9352)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1948

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## To all to whom these presents shall come. Greeting:

y virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, the seal of the National Archives of the United States, that the attached reproduction(s) is a true and co py of documents in his custody.

| SIGNATURE | |
|---|---|
| NAME: Richard Hunt | DATE: 05/09/06 |
| TITLE: Director<br>Center for Legislative Archives | |
| NAME AND ADDRESS OF DEPOSITORY:<br>The National Archives<br>Washington, D.C. 20408 | |

*U.S. GPO: 1998-442-221/8

NA FORM 14007A (10-86)

ter, east half of the northwest quarter, the east half of the east half of the west half of the northwest quarter, section 17, lots 1, 2, and 3, section 18, township 7 south, range 28 east, Montana principal meridian, containing approximately 628 acres.

The amendments were agreed to.

The bill was ordered to be engrossed for a third reading, read the third time, and passed.

IMPROVEMENT OF POST OFFICE, LOS ANGELES, CALIF.

The bill (H. R. 5750) to provide for the extension and improvement of post-office facilities at Los Angeles, Calif., and for other purposes, was considered, ordered to a third reading, read the third time, and passed.

LEASE OF LAFAYETTE BUILDING, WASHINGTON, D. C.

The bill (S. 2706) to authorize the Federal Works Administrator to lease for commercial purposes certain space in the building located at 811 Vermont Avenue NW., Washington, D. C., commonly known as the Lafayette Building, was considered, ordered to be engrossed for a third reading, read the third time, and passed, as follows:

*Be it enacted, etc.*, That the Federal Works Administrator is hereby authorized to lease for commercial purposes for periods not exceeding 10 years and upon such terms and conditions as he may deem to be in the public interest, such space in the building located at 811 Vermont Avenue NW., Washington, D. C., commonly known as the Lafayette Building, as was leased by the Reconstruction Finance Corporation for commercial purposes on July 30, 1947, the date title to such building was transferred from the Reconstruction Finance Corporation to the United States of America by section 306, title III, Public Law 268, Eightieth Congress. The rentals received pursuant to this act may be deposited into a common fund account or accounts in the Treasury, and notwithstanding the provisions of the act of June 30, 1932 (40 U. S. C. 303b), shall be available to pay the cost of maintenance, upkeep, and repair of the space so leased and for the establishment of necessary reserves therefor: *Provided*, That except for such necessary reserves, the unobligated balances of rentals so deposited into the Treasury shall be covered at the end of each fiscal year into miscellaneous receipts.

ISSUANCE OF PATENTS FOR CERTAIN LANDS

The bill (H. R. 6090) authorizing the Secretary of the Interior to issue patents for lands held under color of title was considered, ordered to a third reading, read the third time, and passed.

REVISION AND CODIFICATION OF TITLE 18, UNITED STATES CODE

The Senate proceeded to consider the bill (H. R. 3190) to revise, codify, and enact into positive law title 18 of the United States Code, entitled "Crimes and Criminal Procedure," which had been reported from the Committee on the Judiciary with amendments.

The PRESIDENT pro tempore. Is there objection to present consideration of the bill?

There being no objection, the Senate proceeded to consider the bill.

The PRESIDENT pro tempore. The bill contains a large volume of amendments. Is there objection to the consideration of the amendments en bloc?

Mr. TAFT. Mr. President, may we have an explanation of the bill? This is a long bill, containing 475 pages.

Mr. WILEY. Mr. President, I assure the distinguished Senator I shall not take much time, and that we shall not spend much time on the bill.

The House has sent to the Senate the revision of title 18. It was my privilege and duty to appoint a very distinguished subcommittee to go over the matter. The subcommittee was headed by the Senator from Missouri [Mr. DONNELL].

The purpose of the bill is to codify and revise the laws relating to Federal crimes and criminal procedure.

With the amendments proposed by the committee the bill includes all pertinent laws to January 5, 1948, and is made effective September 1, 1948.

The bill makes it easy to find the criminal statutes because of the arrangement, numbering, and classification. The original intent of Congress is preserved. A uniform style of statutory expression is adopted. The new Federal Rules of Criminal Procedure are keyed to the bill and are reflected in part II of title 18.

Obsolete and executed provisions are eliminated. Uncertainty will be ended and there will no longer be any need to examine the many volumes of the Statutes at Large as the bill, upon enactment, will itself embody the substantive law which will thus appear in full in the United States Code.

It is one of the constructive things we have been endeavoring to accomplish, and I think the bill accomplishes it. I should like to see the amendments adopted en bloc. If any further specific information is desired, I shall ask the distinguished senior Senator from Missouri to explain it, but I think, in view of the fact that the work has been gone into by some of the best experts in codification in America, in conjunction with the House committee, the committee has proposed a number of amendments, most of which are insubstantial, some of which are substantial. They will necessitate, I assume, if we pass the bill, a conference with the House. I hope the measure can be disposed of without a great deal of debate. As I said, it is along the line of bringing together the Federal criminal statutes into one place, so as to avoid the necessity of going from one volume to another in order to ascertain what the criminal law of the Nation is.

The PRESIDENT pro tempore. The Senator's time has expired. Is there objection to the consideration of the amendments en bloc?

There being no objection, the amendments were considered and agreed to en bloc.

The amendments agreed to en bloc are as follows:

Page 3, following "13. Laws of States adopted for areas within Federal jurisdiction." insert: "14. Applicability to Canal Zone."

Page 6, line 4, after "States" insert: ", except the Canal Zone."

Page 8, after line 15, insert:

"§ 14. Applicability to Canal Zone.

"In addition to the sections of this title which by their terms apply to and within the Canal Zone, the following sections of this title shall likewise apply to and within the Canal Zone: 6, 8, 11, 331, 371, 472, 474, 478, 479, 480, 481, 482, 483, 485, 488, 489, 490, 499, 502, 506, 594, 595, 598, 600, 601, 604, 605, 608, 611, 612, 703, 756, 791, 792, 793, 794, 795, 796, 797, 915, 917, 951, 953, 954, 956, 957, 958, 959, 960, 961, 962, 963, 964, 965, 966, 967, 1017, 1073, 1301, 1364, 1382, 1542, 1543, 1544, 1546, 1584, 1621, 1622, 1761, 1821, 1914, 2151, 2152, 2153, 2154, 2155, 2156, 2199, 2231, 2234, 2235, 2274, 2275, 2277, 2384, 2385, 2389, 2389, 2390, 2421, 2422, 2423, 2424, 3059, 3105, 3109."

Page 91, strike out "610. Contributions by national banks or corporations." and insert: "610. Contributions or expenditures by national banks, corporations, or labor organizations."

Page 104, strike out lines 4 to 21, inclusive, and insert:

"§ 610. Contributions by national banks, corporations, or labor organizations.

"It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization to make a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person to accept or receive any contribution prohibited by this section.

"Every corporation or labor organization which makes any contribution or expenditure in violation of this section shall be fined not more than $5,000; and every officer or director of any corporation, or officer of any labor organization, who consents to any contribution or expenditure by the corporation or labor organization, as the case may be, in violation of this section shall be fined not more than $1,000 or imprisoned not more than 1 year, or both.

"For the purposes of this section 'labor organizaiton' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

Page 117, line 8, strike out all after "receiver," down to and including "System," in line 15.

Page 118, line 18, strike out all after "care," down to and including "institution," in line 23.

Page 134, line 19, after "both" insert: "; or if he negligently suffers such person to escape, he shall be fined not more than $500 or imprisoned not more than 1 year, or both."

Page 158, after line 13, insert: "While any foreign government is a member both of the International Monetary Fund and of the International Bank for Reconstruction and Development, this section shall not apply to the sale or purchase of bonds, securities, or other obligations of such government or any political subdivision thereof or of any organization or association acting for or on behalf of such government or political subdivision, or to making of any loan to such government, political subdivision, organization, or association."

Page 367, strike out lines 15 to 18, inclusive, and insert: "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

Case 1:02-cv-00429-T Document 21-4 Filed 03/02/2007 Page 54 of 63

"Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."

Page 415, line 10, after "Zone," insert "District of Columbia."

Page 415, after line 17, insert:

"Nothing in this title, anything therein to the contrary notwithstanding, shall in any way limit, supersede, or repeal any such rules heretofore prescribed by the Supreme Court."

Page 416, after line 21, insert:

"Nothing in this title, anything therein to the contrary notwithstanding, shall in any way limit, supersede, or repeal any such rules heretofore prescribed by the Supreme Court."

Page 448, lines 24 and 25, strike out "the Revised Statutes (1 U. S. C., sec. 1)" and insert: "Title 1 of the United States Code."

Page 456, strike out lines 3 to 21, inclusive.

Page 456, line 22, strike out "19" and insert "18."

Page 457, line 3, strike out "20" and insert "19."

Page 457, strike out lines 8 to 15, inclusive, and insert:

"SEC. 20. This act shall take effect September 1, 1948."

Page 457, line 16, strike out "22" and insert "21."

Page 463, about middle of page, strike out:

| | | | | | | |
|---|---|---|---|---|---|---|
| "July 3 | 128 | 4, 5 | 40 | 755, 756 | 16 | 705, 706" |

Page 467, below middle of page, strike out:

| | | | | | | |
|---|---|---|---|---|---|---|
| "June 20 | 634 | 4 | 49 | 1556 | 16 | 705 |
| Do | 635 | 1, 2 | 49 | 1557 | 22 | 248" |

And insert:

| | | | | | | |
|---|---|---|---|---|---|---|
| "June 20 | 635 | 1, 2 | 49 | 1557 | 22 | 248" |

Page 470, after

| | | | | | | |
|---|---|---|---|---|---|---|
| "June 8 | 178 | 1, 2, 3 | 59 | 234, 235 | 12 | 241, 241a, 242" |

insert:

| | | | | | | |
|---|---|---|---|---|---|---|
| "July 31 | 339 | 9 | 59 | 51 | 6 31 | 804b" |

Page 471, at the end of the schedule of repeals on this page, insert:

| | | | | | | |
|---|---|---|---|---|---|---|
| "1947— | | | | | | |
| Apr. 16 | 39 | ------ | 61 | 62 | 18 | 411 |
| May 16 | 73 | ------ | 61 | 97 | 18 | 744b-1 |
| June 21 | 111 | ------ | 61 | 134 | 18 | 244 |
| June 23 | 120 | 304 | 61 | 159 | 2 | 251" |

The amendments were ordered to be engrossed and the bill to be read a third time.

The bill was read the third time and passed.

Mr. WILEY. Mr. President, I move that the Senate insist upon its amendments, request a conference with the House thereon, and that the Chair appoint the conferees on the part of the Senate.

The motion was agreed to.

The PRESIDENT pro tempore. The Chair will presently name the conferees.

Mr. WILEY subsequently said: Mr. President, I have been credibly informed that the House will accept our amendments. In view of that information, I ask that the action taken to rescind on my motion to appoint conferees in respect to the bill (H. R. 3190) be rescinded.

The PRESIDENT pro tempore. Without objection, it is so ordered.

### AMENDMENT OF TRADING WITH THE ENEMY ACT

The bill (S. 2764) to amend the Trading With the Enemy Act was announced as next in order.

The PRESIDENT pro tempore. Is there objection to the present consideration of the bill?

There being no objection, the Senate proceeded to consider the bill.

Mr. COOPER. Mr. President, I offer an amendment.

Mr. PEPPER. I should like an explanation of the bill.

The PRESIDENT pro tempore. The Senator from Kentucky offers an amendment which the clerk will state.

The CHIEF CLERK. On page 3, line 14, after the word "buy", it is proposed to strike out "July 31, 1949", and insert "April 30, 1949."

The PRESIDENT pro tempore. The question is on agreeing to the amendment submitted by the Senator from Kentucky.

Mr. PEPPER. Mr. President, I request an explanation of the bill.

Mr. COOPER. Mr. President, the bill proposes to amend section 32 of the Trading With the Enemy Act. That section, among other things, authorizes the Alien Property Custodian to return property to an alien if he deems that the alien was a persecutee. It has developed that some of these persons to whom property would be returned are dead, and there are no known heirs. In such case I assume the property would escheat to this country.

The bill provides that the President may designate approved organizations under certain limitations and conditions, and that such organizations may receive the property of a deceased persecutee alien and use it for the benefit of the group to which the persecutee belonged. I think it is a very humane measure. It was introduced by the Senator from Ohio [Mr. TAFT].

The PRESIDENT pro tempore. The question is on agreeing to the amendment offered by the Senator from Kentucky.

The amendment was agreed to.

The bill was ordered to be engrossed for a third reading, read the third time, and passed, as follows:

*Be it enacted, etc.*, That section 32 of the Trading With the Enemy Act of October 6, 1917 (40 Stat. 411), as amended, is hereby further amended by adding at the end thereof the following subsection:

"(h) The President may designate one or more organizations as successors in interest to deceased persons, who, if alive, would be eligible to receive returns under the provisos of subdivision (C) or (D) of subsection (a) (2) hereof. An organization so designated shall be deemed a successor in interest by operation of law for the purposes of subsection (a) (1) hereof. Return may be made to an organization so designated (a) prior to July 31, 1949, or 2 years from the vesting of the property or interest in question, whichever is later, if the President or such officer or agency as he may designate determines from all relevant facts of which he is then advised that it is probable that the former owner is dead and is survived by no person eligible under section 32 to claim as successor in interest by inheritance, devise, or bequest; and (b) after such later date, if no claim for the return of the property or interest is pending.

"No return may be made to an organization so designated unless it files a claim on or before January 1, 1952, and unless it gives assurances satisfactory to the President that (i) it will use the property or interest returned to it for the rehabilitation and resettlement of persons who suffered substantial deprivation of liberty or failed to enjoy the full rights of citizenship within the meaning of subdivisions (C) and (D) of subsection (a) (2) hereof, by reason of their membership in the political, racial, or religious group of which the former owner was a member; (ii) it will transfer, at any time within 2 years from the time that return is made, such property or interest or the equivalent value thereof to any person designated as entitled thereto pursuant to this act by the President or such officer or agency; and (iii) it will make such reports and permit such examination of its books as the President or such officer or agency may from time to time require.

"The filing of a claim by an organization so designated shall not bar the payment of debt claims under section 34 of this act."

SEC. 2. The first sentence of section 33 of the Trading With the Enemy Act of October 6, 1917 (40 Stat. 411), as amended, is hereby further amended to read as follows:

"SEC. 33. No return may be made pursuant to section 9 or 32 unless notice of claim has been filed, (a) in the case of any property or interest acquired by the United States prior to December 18, 1941, by August 9, 1948, or (b) in the case of any property or interest acquired by the United States on or after December 18, 1941, by April 30, 1949, or 2 years from the vesting of the property or interest in respect of which the claim is made, whichever is later: *Provided*, That return may be made to successor organizations designated pursuant to section 32 (h) hereof if notice of claim is filed by January 1, 1952."

### PHILADELPHIA NATIONAL HISTORICAL PARK

The bill (S. 2080) to provide for the establishment of the Philadelphia National Historical Park, and for other purposes, was announced as next in order.

The PRESIDENT pro tempore. This bill is identical with Calendar No. 1764, House bill 5053.

Mr. BUTLER. Mr. President, I ask that the House bill be substituted for Senate bill S. 2080, and that the Senate proceed to the consideration of the House bill.

The PRESIDENT pro tempore. Is there objection to the substitution of the House bill for the Senate bill and its present consideration?

There being no objection, the bill (H. R. 5053) to provide for the establishment of the Independence National Historical Park, and for other purposes, was considered, ordered to a third reading, read the third time, and passed.

The PRESIDENT pro tempore. Without objection, Senate bill 2080 is indefinitely postponed.

### CODIFICATION OF TITLE 3 OF THE UNITED STATES CODE

The bill (H. R. 6412) to codify and enact into law title 3 of the United States Code, entitled "The President," was considered, ordered to a third reading, read the third time, and passed.

### TRANSFER OF CERTAIN ARMY EQUIPMENT TO NEW MEXICO MILITARY INSTITUTE

The Senate proceeded to consider the bill (S. 2698) to authorize the transfer of horses and equipment owned by the United States Army to the New Mexico Military Institute, a State institution, which had been reported from the Committee on Armed Services, with amendments, on page 1, line 4, after the word "authorized", to insert "upon the request of the institution"; in line 7, after the word "institution", to insert "to Cornell University, Ithaca, N. Y., to Norwich University, Norwich, Vt., and to Virginia Military Institute, Lexington, Va."; on page 2, line 1, before the word

# APPENDIX C-8

UNITED STATES OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 80th CONGRESS

SECOND SESSION

## VOLUME 94—PART 7

JUNE 15, 1948, TO JUNE 19, 1948
(PAGES 8229 TO 9352)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1948

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## [illegible] all to whom these presents shall come. Greeting:

[illegible] virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, [illegible]e seal of the National Archives of the United States, that the attached reproduction(s) is a true and [illegible] [illegible]py of documents in his custody.

| | |
|---|---|
| SIGNATURE | |
| NAME<br>Richard Hunt | DATE<br>05/09/06 |
| TITLE Director<br>Center for Legislative Archives | |
| NAME AND ADDRESS OF DEPOSITORY<br>The National Archives<br>Washington, D.C. 20408 | |

*U.S. GPO: 1998 [illegible] [illegible]1/89075

NA FORM 14007A (10-86)

Case 1:02-cv-00429-T Document 21-4 Filed 03/02/2007 Page 58 of 63

BROOKS] may be excused as a conferee on the bill, S. 2655.

The SPEAKER. Is there objection to the request of the gentleman from New York?

There was no objection.

The SPEAKER. The Chair appoints the gentleman from North Carolina [Mr. DURHAM] to fill the vacancy.

The Clerk will notify the Senate of the action of the House.

## PROVIDING FOR WATER POLLUTION CONTROL ACTIVITIES

Mr. DONDERO. Mr. Speaker, I call up the conference report on the bill (S. 418) to provide for water pollution control activities in the Public Health Service of the Federal Security Agency and in the Federal Works Agency, and for other purposes, and ask unanimous consent that the statement of the managers on the part of the House be read in lieu of the report.

The Clerk read the title of the bill.

The SPEAKER. Is there objection to the request of the gentleman from Michigan?

There was no objection.

The Clerk read the statement.

The conference report and statement are as follows:

### CONFERENCE REPORT

The committee of conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (S. 418) "An Act to provide for water pollution control activities in the Public Health Service of the Federal Security Agency and in the Federal Works Agency, and for other purposes", having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the Senate recede from its disagreement to the amendment of the House, and agree to the same with amendments, as follows:

Page 2, line 12, of the amendment of the House, strike out the words "hereinafter declared to be a public nuisance".

Page 2, lines 13 and 14, of the amendment of the House, strike out the words "such interstate water and tributaries thereof", and insert the following words "surface and underground waters".

Page 9, line 11, of the amendment of the House, strike out the figure "$200,000" and insert the figure "$250,000".

Page 11, line 25, of the amendment of the House, strike out the figure "$20,000,000" and insert the figure "$22,500,000".

Page 12, line 25, of the amendment of the House, after the words "study of" insert the word "water", and strike out the word "of" after the word "pollution".

Page 13, line 1, of the amendment of the House, strike out the words "interstate waters".

Page 13, line 2, of the amendment of the House, before the word "pollution" insert the word "water", and after the word "pollution" strike out the words "of interstate waters".

Page 14, line 17 through line 23, of the amendment of the House, strike out all after the words "SEC. 9. (a)" and insert the following: "Five officers may be appointed to grades in the Regular Corps of the Public Health Service above that of senior assistant, but not to a grade above that of director, to assist in carrying out the purposes of this Act. Officers appointed pursuant to this subsection in any fiscal year shall not be counted as part of the 10 per centum of the original appointments authorized to be made in such year under section 207 (b) of the Public Health Service Act; but they shall for all other purposes be treated as though appointed pursuant to such section 207 (b)."

And the House agree to the same.

GEO. A. DONDERO,
J. HARRY MCGREGOR,
PAUL CUNNINGHAM,
JAMES C. AUCHINCLOSS,
WILL M. WHITTINGTON,
JOHN A. BLATNIK,
TOM PICKETT,
*Managers on the Part of the House.*

GEO. W. MALONE,
CHAPMAN REVERCOMB,
JOHN L. MCCLELLAN,
*Managers on the Part of the Senate.*

### STATEMENT

The managers on the part of the House at the conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (S. 418) submit the following statement in explanation of the effect of the action agreed upon and recommended in the accompanying conference report as to each of such amendments, namely:

The first two amendments apply to Sec. 2 (a), lines 4, 5, and 6, on page 18 of the bill. The language substituted more clearly defines the authority of the Surgeon General with respect to the preparation and adoption of comprehensive programs for eliminating or reducing the pollution of surface and underground waters.

The amendment to Sec. 5 (line 8, page 25), increases by $50,000 the maximum individual loan which may be made under the Act.

The amendment to Sec. 7 (line 16, page 27), increases by $2,500,000 the maximum authorized to be appropriated to the Federal Security Agency for each of the five fiscal years during the period beginning July 1, 1948, and ending June 30, 1953, for the purpose of making loans under Section 5 of the Act.

The purpose of the amendments to Sec. 8 (b) (lines 16, 17, and 18, page 28), is to expand the service of the Public Health Service station authorized to be erected at Cincinnati, Ohio, in connection with research and study of water pollution and the training of personnel in work related to control of water pollution.

The amendment with reference to Sec. 9 (a), (lines 10 to 16, page 30), substitutes a new Sec. 9 (a), which is required for the purpose set forth in the following letter:

FEDERAL SECURITY AGENCY,
*Washington, Zone 25, May 14, 1948.*

DEAR MR. CHAIRMAN: This is in reference to S. 418, which your Committee reported out, with amendments, on April 28, 1948.

Section 9 (a) of S. 418 as reported authorizes additional appointments to be made at higher grades in the Regular Corps of the Public Health Service pursuant to section 208 (b) of the Public Health Service Act to assist the Service in carrying out its new or expanded activities under S. 418. Since our letter of January 19, 1948, to you on this bill, however, the Congress has enacted Public Law 425, which amends the provisions of the Public Health Service Act in several respects, primarily in the matter of appointment and promotion of commissioned officers of the Public Health Service. As a result of Public Law 425, the authority to make additional appointments at higher grades in the Regular Corps of the Public Health Service, formerly contained in section 208 (b) of the Public Health Service Act, is now contained in section 207 (b) of that Act, in a somewhat revised form. In order, therefore, to accomplish the purposes for which section 9 (a) of S. 418 was intended, the following is suggested in lieu of such section 9 (a):

(a) Five officers may be appointed to grades in the Regular Corps of the Service above that of senior assistant, but not to a grade above that of director, to assist in carrying out the purposes of this Act. Officers appointed pursuant to this subsection in any fiscal year shall not be counted as part of the 10 per centum of the original appointments authorized to be made in such year under section 207 (b) of the Public Health Service Act; but they shall for all other purposes be treated as though appointed pursuant to such section 207 (b).

The short time available for necessary action on the amendment suggested by this letter has not permitted us to obtain advice from the Bureau of the Budget as to the relationship of this amendment to the program of the President.

Sincerely yours,

J. DONALD KINGSLEY,
*Acting Administrator.*

Hon. GEORGE A. DONDERO,
*Chairman, Committee on Public Works, House of Representatives, Washington 25, D. C.*

GEO. A. DONDERO,
J. HARRY MCGREGOR,
JAMES C. AUCHINCLOSS,
PAUL CUNNINGHAM,
WILL M. WHITTINGTON,
JOHN A. BLATNIK,
TOM PICKETT,
*Managers on the Part of the House.*

The conference report was agreed to.

A motion to reconsider was laid on the table.

## UNITED STATES CODE, TITLE 18

Mr. REED of Illinois. Mr. Speaker, I ask unanimous consent to take from the Speaker's desk the bill (H. R. 3190) to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure," with Senate amendments thereto, and concur in the Senate amendments.

The Clerk read the title of the bill.

The Clerk read the Senate amendments, as follows:

Page 3, following:

"13. Laws of States adopted for areas within Federal jurisdiction."

Insert:

"14. Applicability to Canal Zone."

Page 5, line 4, after "States" insert, ", except the Canal Zone."

Page 8, after line 15, insert:

"§ 14. Applicability to Canal Zone."

"In addition to the sections of this title which by their terms apply to and within the Canal Zone, the following sections of this title shall likewise apply to and within the Canal Zone: 6, 8, 11, 331, 371, 472, 474, 478, 479, 480, 481, 482, 483, 485, 488, 489, 490, 499, 502, 506, 594, 595, 598, 600, 601, 604, 605, 608, 611, 612, 703, 756, 791, 792, 793, 794, 795, 796, 797, 915, 917, 951, 953, 954, 956, 957, 958, 959, 960, 961, 962, 963, 964, 965, 966, 967, 1017, 1078, 1301, 1364, 1382, 1542, 1543, 1544, 1546, 1584, 1621, 1622, 1761, 1821, 1914, 2151, 2152, 2153, 2154, 2155, 2156, 2199, 2231, 2234, 2235, 2274, 2275, 2277, 2384, 2385, 2388, 2389, 2390, 2421, 2422, 2423, 2424, 3059, 3105, 3109."

Page 91, strike out

"610. Contributions by national banks or corporations."

And insert:

"610. Contributions or expenditures by national banks, corporations, or labor organizations."

Page 104, strike out lines 4 to 21, inclusive, and insert:

"§ 610. Contributions by national banks, corporations, or labor organizations

"It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political con-

vention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization to make a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person to accept or receive any contribution prohibited by this section.

"Every corporation or labor organization which makes any contribution or expenditure in violation of this section shall be fined not more than $5,000; and every officer or director of any corporation, or officer or any labor organization, who consents to any contribution or expenditure by the corporation or labor organization, as the case may be, in violation of this section shall be fined not more than $1,000 or imprisoned not more than 1 year, or both.

"For the purposes of this section 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

Page 117, line 8, strike out all after "receiver," down to and including "System," in line 15.

Page 118, line 18, strike out all after "care," down to and including "institution," in line 23.

Page 134, line 19, after "both" insert "; or if he negligently suffers such person to escape, he shall be fined not more than $500 or imprisoned not more than 1 year, or both."

Page 158, after line 12, insert "While any foreign government is a member both of the International Monetary Fund and of the International Bank for Reconstruction and Development, this section shall not apply to the sale or purchase of bonds, securities, or other obligations of such government or any political subdivision thereof or of any organization or association acting for or on behalf of such government or political subdivision, or to making of any loan to such government, political subdivision, organization, or association."

Page 367, strike out lines 15 to 18, inclusive, and insert "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

"Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."

Page 415, line 10, after "Zone," insert "District of Columbia."

Page 415, after line 17, insert:

"Nothing in this title, anything therein to the contrary notwithstanding, shall in any way limit, supersede, or repeal any such rules heretofore prescribed by the Supreme Court."

Page 416, after line 21, insert:

"Nothing in this title, anything therein to the contrary notwithstanding, shall in any way limit, supersede, or repeal any such rules heretofore prescribed by the Supreme Court."

Page 448, lines 24 and 25, strike out "the Revised Statutes (1 U. S. C., sec. 1)" and insert "Title 1 of the United States Code."

Page 456, strike out lines 3 to 21, inclusive.

Page 456, line 22, strike out "19" and insert "18."

Page 457, line 3, strike out "20" and insert "19."

Page 457, strike out lines 8 to 15, inclusive, and insert:

"SEC. 20. This act shall take effect September 1, 1948."

Page 457, line 16, strike out "22" and insert "21."

Page 463, about middle of page, strike out

| | | | | | | |
|---|---|---|---|---|---|---|
| [July 3 | 128 | 4, 5 | 40 | 755, 756 | 16 | 705, 706] |

Page 467, below middle of page, strike out

| | | | | | | |
|---|---|---|---|---|---|---|
| [June 20 | 634 | 4 | 49 | 1556 | 16 | 705 |
| Do | 635 | 1, 2 | 49 | 1557 | 22 | 248] |

and insert:

| | | | | | | |
|---|---|---|---|---|---|---|
| "June 20 | 635 | 1, 2 | 49 | 1557 | 22 | 248" |

Page 470, after

| | | | | | | |
|---|---|---|---|---|---|---|
| "June 8 | 178 | 1, 2, 3 | 59 | 234, 235 | 18 | 241, 241a, 242" |

insert:

| | | | | | | |
|---|---|---|---|---|---|---|
| "July 31 | 339 | 9 | 59 | 516 | 31 | 804b" |

Page 471, at the end of the schedule of repeals on this page, insert:

| | | | | | | |
|---|---|---|---|---|---|---|
| "1947— | | | | | | |
| Apr. 16 | 39 | ------- | 61 | 52 | 18 | 411 |
| May 16 | 73 | ------- | 61 | 97 | 18 | 744h-1 |
| June 21 | 111 | ------- | 61 | 134 | 18 | 244 |
| June 23 | 120 | 304 | 61 | 159 | 2 | 251" |

The SPEAKER. Is there objection to the request of the gentleman from Illinois?

There was no objection.

The Senate amendments were concurred in.

A motion to reconsider was laid on the table.

### NATIONAL FREEDOM DAY

Mr. REED of Illinois. Mr. Speaker, I ask unanimous consent to take from the Speaker's desk the joint resolution (S. J. Res. 37) requesting the President to proclaim February 1 as National Freedom Day, and ask for its immediate consideration. I have consulted with the leaders on both sides.

The Clerk read the title of the joint resolution.

The SPEAKER. Is there objection to the request of the gentleman from Illinois?

There was no objection.

The Clerk read, as follows:

*Resolved, etc.*, That the President of the United States is authorized to issue a proclamation designating the 1st day of February of each year as National Freedom Day for the purpose of commemorating the signing by President Abraham Lincoln, on February 1, 1865, of the joint resolution adopted by the Senate and the House of Representatives of the United States, proposing the thirteenth amendment to the Constitution of the United States of America.

The joint resolution was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

### PERMISSION TO EXTEND REMARKS AT THIS POINT

Mr. McGARVEY. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

Mr. McGARVEY. Mr. Speaker, the bill which has been reached on the Consent Calendar today will authorize and request the President to proclaim February 1 as National Freedom Day and invite the people of the United States to observe the day with appropriate ceremonies and thanksgiving. As you all know, on February 1, 1865, President Abraham Lincoln signed the joint resolution, which had previously been adopted by the Congress, proposing the thirteenth amendment to the Constitution.

I should like to repeat for you at this time the immortal words of that amendment: "Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." These words are the foundation of our form of government with its emphasis on the freedom of the individual and the human liberties which belong to every citizen of the United States. It is therefore with pride in our free Nation that I introduced this resolution at the first session of the Eightieth Congress. Since that time I have been striving to obtain approval of the legislation.

I wish to thank the members of the Judiciary Committee and, in particular, the members of the subcommittee which handled the resolution, headed by the gentleman from Illinois [Mr. REED], for the interest and cooperation they have displayed in reporting the legislation, also the gentleman from Pennsylvania [Mr. CHADWICK].

I should like to pause here to pay tribute to the founder of National Freedom Day, Maj. R. R. Wright. It is regrettable that Major Wright is not with us today to realize the fulfillment of his long years of hard work and inspiring efforts. Born in slavery, Major Wright rose to prominence as a great American and occupied an unequalled position in the hearts of his fellow Americans. The story of Major Wright is truly the story of America, for in no other country today is it possible for a citizen to achieve such outstanding success. His success, however, would not have occurred had the thirteenth amendment to the Constitution not been approved. Since its signing is one of the cornerstones in the foundation of our American traditions, I am proud that we have today passed the resolution commemorating its inception.

### PROCUREMENT AND SUPPLY OF GOVERNMENT HEADSTONES

Mr. WELCH. Mr. Speaker, I ask unanimous consent to take from the Speaker's desk the bill (H. R. 4272) to provide for the procurement and supply of Government headstones or markers for unmarked graves of members of the armed forces dying in the service or after honorable discharge therefrom, and other persons, and for other purposes, with a Senate amendment thereto, and concur in the Senate amendment.

The Clerk read the title of the bill.

The Clerk read the Senate amendment, as follows:

Page 2, line 2, strike out all after "cemeteries," down to and including "costs," in line 14 and insert "The Secretary of the Army, the Secretary of the Navy, and the Secretary of the Air Force are authorized and directed to compile a list of the names of all members of the armed forces of the United States who died while serving in such forces in the overseas theaters of operations on or after September 3, 1939, and whose bodies have not been recovered or identified or have been buried at sea. Upon the compilation of such list of names and other appropriate data, the American Battle Monuments Commission and the Secretary of the Army are authorized and directed to provide for the inscribing of each such name and pertinent

# APPENDIX C-9

UNITED STATES OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 80th CONGRESS

SECOND SESSION

## VOLUME 94—PART 7

JUNE 15, 1948, TO JUNE 19, 1948

(PAGES 8229 TO 9352)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1948

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## o all to whom these presents shall come. Greeting:

virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, seal of the National Archives of the United States, that the attached reproduction(s) is a true and co of documents in his custody.

| | |
|---|---|
| SIGNATURE | |
| NAME<br>Richard Hunt | DATE<br>05/09/06 |
| TITLE Director<br>Center for Legislative Archives | |
| NAME AND ADDRESS OF DEPOSITORY<br>The National Archives<br>Washington, D.C. 20408 | |

*U.S. GPO: 1998-442-221/8907

NA FORM 14007A (10-86)

Mr. KERSTEN of Wisconsin asked and was given permission to extend his remarks in the Appendix of the RECORD in two instances.

The SPEAKER. The gentleman from Vermont [Mr. PLUMLEY].

Mr. PLUMLEY. I just wish to call attention to the fact that this is Father's Day, and, therefore, I say: Good night, good morning, good luck.

The SPEAKER. The gentleman from Illinois [Mr. BUSBEY].

Mr. BUSBEY. Mr. Speaker, I do not know how many have ever attended a sunrise service before, but you have today.

RECESS

The SPEAKER. The Chair declares a recess subject to the call of the Chair.

Thereupon (at 6 o'clock and 23 minutes a. m.) the House stood in recess subject to the call of the Chair.

AFTER RECESS

The recess having expired, the House was called to order by the Speaker at 6 o'clock and 55 minutes a. m.

FURTHER MESSAGE FROM THE SENATE

A further message from the Senate by Mr. Latta, its enrolling clerk, announced that the Senate had passed without amendment concurrent resolutions of the House of the following titles:

H. Con. Res. 218. Concurrent resolution providing for adjournment of the two Houses of Congress until December 31, 1948; and

H. Con. Res. 219. Concurrent resolution authorizing the signing of enrolled bills following adjournment.

The message also announced that the Senate agrees to the report of the committee of conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (H. R. 6248) entitled "An act to authorize the Secretary of Agriculture to stabilize prices of agricultural commodities; to amend section 22 of the Agricultural Adjustment Act, reenacted by the Agricultural Marketing Agreement Act of 1937; and for other purposes."

The message also announced that the Senate had passed without amendment joint resolutions of the House of the following titles:

H. J. Res. 305. Joint resolution authorizing the issuance of a special series of stamps commemorative of the fiftieth anniversary of the organization of the Rough Riders (First Volunteer United States Cavalry) of the Spanish-American War; and

H. J. Res. 327. Joint resolution to authorize the issuance of a special series of stamps commemorative of Juliette Low, founder and organizer of Girl Scouting in the United States of America.

The message also announced that the Senate agrees to the amendments of the House to bills of the Senate of the following title:

S. 2767. An act to provide assistance in the recruitment and distribution of farm labor for the increased production, harvesting, and preparation for market of agricultural commodities to meet domestic needs and foreign commitments; and

S. 2790. An act to amend the Servicemen's Readjustment Act of 1944, as amended, and for other purposes.

ENROLLED BILLS AND JOINT RESOLUTIONS SIGNED

Mr. LECOMPTE, from the Committee on House Administration, reported that that committee had examined and found truly enrolled bills and joint resolutions of the House of the following titles, which were thereupon signed by the Speaker:

H. R. 371. An act for the relief of Jenness C. Thomas;

H. R. 564. An act for the relief of Sarah Lee Cregg;

H. R. 700. An act for the relief of Anthony Arancio;

H. R. 703. An act for the relief of Leon Nikolaivich Volkov;

H. R. 851. An act for the relief of Adney W. Gray;

H. R. 911. An act for the relief of Kam Fong Chun, Mr. and Mrs. Jose Dias, Joseph De Souza, Mr. and Mrs. Kenneth Ayres, and Jose Oducado;

H. R. 912. An act for the relief of Hiro Higa and Kana Higa;

H. R. 915. An act to confer jurisdiction upon the District Court of the United States for the Territory of Hawaii to hear, determine, and render judgment on the claims of the executors and trustees of the estate of L. L. McCandless, deceased, as their interests may appear, against the United States of America;

H. R. 1076. An act for the relief of Chester O. Glenn;

H. R. 1220. An act for the relief of James D. Sigler and Frederick P. Vogelsand III;

H. R. 1409. An act for the relief of Frantisek Jiri Pavlik or Georg Pavlik;

H. R. 1490. An act for the relief of the United States Radiator Corp. of Detroit, Mich.;

H. R. 1642. An act for the relief of Miss Rosella M. Kostenbader;

H. R. 1733. An act for the relief of G. C. Hedrick;

H. R. 1734. An act for the relief of Gabel Construction Co.;

H. R. 1779. An act for the relief of the Winona Machine & Foundry Co., a corporation of Winona, Minn.;

H. R. 1780. An act for the relief of the Cannon Valley Milling Co.;

H. R. 1910. An act for the relief of the legal guardian of Robert Lee Threatt, a minor;

H. R. 1930. An act for the relief of the Growers Fertilizer Co., a Florida corporation;

H. R. 2096. An act to amend section 11 of the act approved June 5, 1942 (56 Stat. 317), relating to Mammoth Cave National Park in the State of Kentucky, and for other purposes;

H. R. 2192. An act for the relief of the Massman Construction Co.;

H. R. 2193. An act for the relief of Robert E. Graham;

H. R. 2352. An act to provide for sale to the Crow Tribe of interests in the estates of deceased Crow Indian allottees;

H. R. 2372. An act for the relief of George Cleve Williams;

H. R. 2395. An act for the relief of the Cypress Creek drainage district of the State of Arkansas;

H. R. 2431. An act for the relief of the estate of David Jefferson Janow, deceased;

H. R. 2489. An act for the relief of James W. Adkins and Mary Clark Adkins;

H. R. 2551. An act for the relief of William R. Ramsey;

H. R. 2552. An act for the relief of Thomas A. Hanley;

H. R. 2696. An act for the relief of Otto Kraus, receiver of the Neafie & Levy Ship & Engine Building Co.;

H. R. 2729. An act for the relief of the legal guardian of Rose Mary Ammirato, a minor;

H. R. 2732. An act for the relief of Dennis Stanton;

H. R. 2734. An act for the relief of Joseph M. Henry;

H. R. 2878. An act to amend the act approved May 18, 1928 (45 Stat. 602), as amended, to revise the roll of the Indians of California provided therein;

H. R. 2889. An act for the relief of Aubrey F. Houston;

H. R. 2918. An act for the relief of the Sumner County Colored Fair Association;

H. R. 3052. An act for the relief of the estate of Rudolph Maximilian Goepp, Jr.;

H. R. 3218. An act to authorize an emergency fund for the Bureau of Reclamation to assure the continuous operation of its irrigation and power systems;

H. R. 3261. An act for the relief of Capt. Carroll C. Garretson;

H. R. 3427. An act for the relief of Mrs. Mary H. Overall and Thomas I. Baker;

H. R. 3499. An act for the relief of Petrol Corp.;

H. R. 3566. An act to amend subsection (c) of section 19 of the Immigration Act of 1947, as amended, and for other purposes;

H. R. 3735. An act to authorize and direct the Secretary of the Army to donate and convey to Okaloosa County, State of Florida, all the right, title, and interest of the United States in and to a portion of Santa Rosa Island, Fla., and for other purposes;

H. R. 3937. An act for the relief of William C. Reese;

H. R. 3999. An act to authorize the Attorney General to adjudicate certain claims resulting from evacuation of certain persons of Japanese ancestry under military orders;

H. R. 4047. An act for the relief of Edmund Huppler;

H. R. 4103. An act for the relief of Charles M. Davis;

H. R. 4199. An act for the relief of George Haniotis;

H. R. 4273. An act to provide for the procurement and supply of Government headstones or markers for unmarked graves of members of the armed forces dying in the service or after honorable discharge therefrom, and other persons, and for other purposes;

H. R. 4330. An act to authorize the Secretary of State to perform certain consular-type functions within the United States and its Territories and possessions;

H. R. 4367. An act authorizing the Hidalgo Bridge Co., its heirs, legal representatives, and assigns, to construct, maintain, and operate a railroad toll bridge across the Rio Grande, at or near Hidalgo, Tex.;

H. R. 4435. An act to amend the Civil Aeronautics Act of 1938 by redefining certain powers of the Administrator, by authorizing delegation of certain powers by the Civil Aeronautics Board to the Administrator, and for other purposes;

H. R. 4441. An act for the relief of the William J. Burns International Detective Agency;

H. R. 4452. An act for the relief of Douglas L. Craig;

H. R. 4462. An act authorizing the conveyance of certain lands in Park County, Wyo., to the State of Wyoming;

H. R. 4516. An act for the relief of the Moore Dry Dock Co., of Oakland, Calif.;

H. R. 4518. An act for the relief of Gerald S. Furman;

H. R. 4587. An act for the relief of Mrs. Harry A. Light (formerly Mrs. Elsie Purvey);

H. R. 4590. An act for the relief of Mrs. Loraine Thomsen;

H. R. 4635. An act to amend section 11 of an act entitled "An act to regulate barbers in the District of Columbia, and for other purposes";

H. R. 4644. An act for the relief of E. Brevard Walker, trading as E. B. Walker Lumber Co.;

H. R. 4690. An act to amend the act of July 30, 1947, permitting vessels of Canadian registry to transport certain merchandise between

# APPENDIX C-10

UNITED STATES OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 80th CONGRESS

SECOND SESSION

## VOLUME 94—PART 8

JULY 26, 1948, TO DECEMBER 31, 1948

(PAGES 9353 TO 10316)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1948

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## To all to whom these presents shall come. Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, [illegible]r the seal of the National Archives of the United States, that the attached reproduction(s) is a true and [illegible] copy of documents in his custody.

| | |
|---|---|
| SIGNATURE | |
| NAME<br>Richard Hunt | DATE<br>05/09/06 |
| TITLE Director<br>Center for Legislative Archives | |
| NAME AND ADDRESS OF DEPOSITORY<br>The National Archives<br>Washington, D.C. 20408 | |

*U.S. GPO: 1998-442-221/[illegible]

NA FORM 14007A (10-86)

Case 1:02-cv-00429-T Document 21-5 Filed 03/02/2007 Page 4 of 26

S. 2281. An act to provide for an air parcel-post service, and for other purposes;

S. 2371. An act validating certain conveyances of the Oregon Short Line Railroad Co. and the Union Pacific Railroad Co., and waiving, relinquishing, and disclaiming all title and all right of reverter and forfeiture of the United States of America to the lands described in said conveyance;

S. 2376. An act to provide a revolving fund for the purchase of agricultural commodities and raw materials to be processed in occupied areas and sold;

S. 2440. An act for the relief of Charles Duncan Montieth;

S. 2554. An act to promote the common defense by providing for the retention and maintenance of a national reserve of industrial productive capacity, and for other purposes;

S. 2621. An act authorizing the extension of the functions and duties of Federal Prison Industries, Inc., to military disciplinary barracks;

S. 2655. An act to provide for the common defense by increasing the strength of the armed forces of the United States, including the Reserve components thereof, and for other purposes;

S. 2676. An act to authorize the Secretary of the Interior to convey a certain parcel of land in St. Louis County, Minn., to the University of Minnesota;

S. 2692. An act to terminate the retirement system of the Office of the Comptroller of the Currency, and to transfer that retirement fund to the Civil Service Retirement and Disability Fund;

S. 2698. An act to authorize the transfer of horses and equipment owned by the United States Army to the New Mexico Military Institution, a State institution, and for other purposes;

S. 2705. An act to reimburse the James & Phelps Construction Co.;

S. 2709. An act for the relief of Stefan Magura and Michal Magura;

S. 2730. An act to include as allowable service under the act of July 6, 1945, service performed in the military forces and on war transfer by employees in the field service of the Post Office Department;

S. 2743. An act providing for the more expeditious determination of certain claims filed by Ute Indians;

S. 2747. An act to amend the Canal Zone Code for the purpose of incorporating the Panama Railroad Company;

S. 2767. An act to provide assistance in the recruitment and distribution of farm labor for the increased production, harvesting, and preparation for market of agricultural commodities to meet domestic needs and foreign commitment;

S. 2790. An act to amend the Servicemen's Readjustment Act of 1944, as amended, and for other purposes;

S. 2794. An act to authorize the Administrator of Veterans' Affairs to prescribe the rates of pay for certain positions at field installations;

S. 2830. An act to extend for 2 years the authority to provide for the maintenance of a domestic tin-smelting industry;

S. 2849. An act to authorize the Administrator of Veterans' Affairs to convey a certain tract of land in the State of Arkansas to Washington County, Ark.;

S. 2861. An act to assist by grants-in-aid the Republic of the Philippines in providing medical care and treatment for certain veterans;

S. 2877. An act to amend the Reconstruction Finance Corporation Act, as amended;

H. R. 333. An act for the relief of sundry residents of Alaska, the veterans of World War II;

H. R. 2009. An act for the relief of the estate of Vito Abarno;

H. R. 2269. An act for the relief of Frank A. Constable;

H. R. 2798. An act to amend section 5, Home Owners' Loan Act of 1933, and for other purposes;

H. R. 3190. An act to revise, codify, and enact into positive law title 18 of the United States Code, entitled "Crimes and Criminal Procedure";

H. R. 3416. An act to provide for the establishment of the Pensacola National Monument;

H. R. 4044. An act to amend the Trading With the Enemy Act, as amended; to create a commission to make an inquiry and report with respect to war claims; and to provide for relief for internees in certain cases;

H. R. 4917. An act to provide further benefits for certain employees of the United States who are veterans of World War II and lost opportunity for probational civil-service appointments by reason of their service in the armed forces of the United States, and who, due to service-connected disabilities, are unable to perform the duties of the positions for which examinations were taken;

H. R. 5416. An act to promote the interests of the Fort Hall Indian irrigation project, Idaho; and for other purposes;

H. R. 5832. An act to authorize the Secretary of the Army, the Secretary of the Navy, and the Secretary of the Air Force to donate excess and surplus property for educational purposes;

H. R. 5904. An act to continue the Virgin Islands Company as an agency of the United States;

H. R. 6248. An act to authorize the Secretary of Agriculture to stabilize prices of agricultural commodities; to amend section 22 of the Agricultural Adjustment Act, reenacted by the Agricultural Marketing Agreement Act of 1937; and for other purposes;

H. R. 6402. An act to provide for extension of the terms of office of the present members of the Atomic Energy Commission;

H. R. 6448. An act to authorize the Administrator of Veterans' Affairs to convey certain land in Tennessee to the city of Johnson City;

H. R. 6465. An act to amend and supplement section 2 of the act approved August 30, 1935, relating to the construction and financing of toll bridges over the Delaware River by the Delaware River Joint Toll Bridge Commission of the Commonwealth of Pennsylvania and the State of New Jersey;

H. R. 6481. An act making appropriations for Government corporations and independent executive agencies for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6527. An act to provide assistance to certain local school agencies overburdened with war-incurred or postwar national-defense-incurred enrollments;

H. R. 6641. An act to amend the Civil Service Retirement Act of May 29, 1930, to provide annuities for certain surviving spouses of annuitants retired prior to April 1, 1948;

H. R. 6771. An act making appropriations for military functions administered by the National Military Establishment for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6801. An act making appropriations for foreign aid, and for other purposes;

H. R. 6808. An act to permit refund or credit to brewers of taxes paid on beer lost in bottling operations;

H. R. 6829. An act making supplemental appropriations for the Executive Office and sundry independent executive bureaus, boards, commissions, and offices for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6916. An act to provide for permanent postal rates and to provide pay increases for Government employees;

H. R. 6935. An act making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1948, and for other purposes;

S. J. Res. 177. Joint resolution providing for participation by the Government of the United States in the Pan American Railway Congress, and authorizing an appropriation therefor;

S. J. Res. 219. Joint resolution to continue until March 1, 1919, the authority of the United States Maritime Commission to make provision for certain ocean transportation service to, from, and within Alaska;

H. J. Res. 190. Joint resolution authorizing the printing and binding of Cannon's Procedure in the House of Representatives and providing that the same shall be subject to copyright by the author;

H. J. Res. 305. Joint resolution authorizing the issuance of a special series of stamps commemorative of the fiftieth anniversary of the organization of the Rough Riders (First Volunteer U. S. Cavalry) of the Spanish-American War;

H. J. Res. 327. Joint resolution to authorize the issuance of a special series of stamps commemorative of Juliette Low, founder and organizer of Girl Scouting in the United States of America; and

H. J. Res. 433. Joint resolution permitting the free entry of certain articles imported to promote international good will, and for other purposes.

## ENROLLED BILLS AND JOINT RESOLUTIONS PRESENTED AFTER ADJOURNMENT

Subsequent to the adjournment of the Senate on June 20, 1948, the following enrolled bills and joint resolutions, heretofore duly signed by the Presiding Officers of the two Houses, were presented to the President of the United States by the Secretary of the Senate:

On June 21, 1948:

S. 83. An act authorizing the naturalization of Elizabeth Pickering Winn;

S. 1107. An act relating to the arming of American vessels;

S. 1639. An act authorizing the repair and rehabilitation of irrigation works damaged by flood and the prevention of flood damage in the Fort Sumner irrigation district, and for other purposes;

S. 1730. An act for the relief of Mrs. Anna V. Reyer, Alexander A. Reyer, and Vitaly A. Reyer;

S. 1820. An act to confer jurisdiction on the State of Iowa over offenses committed by or against Indians on the Sac and Fox Indian Reservation;

S. 2186. An act to amend section 5 of the act entitled "An act to amend the laws relating to navigation, and for other purposes";

S. 2192. An act to amend the Interstate Commerce Act so as to permit the issuance of free passes to time inspectors of carriers subject to part I of such act;

S. 2341. An act to authorize an increase in the annual appropriation for the maintenance and operation of the Gorgas Memorial Laboratory;

S. 2510. An act to provide for certain administrative expenses in the Post Office Department, including retainment of pneumatic-tube systems, and for other purposes;

S. 2706. An act to authorize the Federal Works Administrator to lease for commercial purposes certain space in the building located at 811 Vermont Avenue NW., Washington, D. C., commonly known as the Lafayette Building;

S. 2739. An act to authorize the issuance of a stamp commemorative of the two hun-

# APPENDIX C-11

UNITED STATES OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 80th CONGRESS

SECOND SESSION

## VOLUME 94—PART 8

JULY 26, 1948, TO DECEMBER 31, 1948
(PAGES 9353 TO 10316)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1948

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

**all to whom these presents shall come, Greeting:**

irtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, u eal of the National Archives of the United States, that the attached reproduction(s) is a true and co f documents in his custody.

| | |
|---|---|
| SIGNATURE | |
| NAME<br>Richard Hunt | DATE<br>05/09/06 |
| TITLE Director<br>Center for Legislative Archives | |
| NAME AND ADDRESS OF DEPOSITORY<br>The National Archives<br>Washington, D.C. 20408 | |

*U.S. GPO: 1998-442-221/89075

NA FORM 14007A (10-86)

the Department of Agriculture, and for other purposes;

H. R. 6116. An act to amend the Trading With the Enemy Act:

H. R. 6162. An act to make imported beer and other similar imported fermented liquors subject to the internal-revenue tax on fermented liquor;

H. R. 6184. An act for the relief of the East Coast Ship & Yacht Corp., of Noank, Conn.;

H. R. 6186. An act for reimbursement of the Hawaiian Dredging Co., Ltd.;

H. R. 6224. An act for the relief of John Watkins;

H. R. 6293. An act to amend the act of June 19, 1934, providing for the establishment of the National Archives, so as to provide that certain fees collected by the Archivist shall be available for disbursement in the interest of the National Archives;

H. R. 6318. An act to amend section 3 of the Standard Time Act of March 19, 1918, as amended, relating to the placing of a certain portion of the State of Idaho in the third time zone;

H. R. 6327. An act to provide for the issuance of a license to practice chiropractic in the District of Columbia to Samuel O. Burdette;

H. R. 6428. An act to reimburse the Luther Bros. Construction Co.;

H. R. 6452. An act to amend section 7 of the act entitled "An act making appropriations to provide for the government of the District of Columbia for the fiscal year ending June 30, 1903, and for other purposes," approved July 1, 1902, as amended;

H. R. 6454. An act to amend the Civil Service Retirement Act of May 29, 1930, as amended, to provide annuities for certain Federal employees who have rendered at least 20 years' service in the investigation, apprehension, or detention of persons suspected or convicted of offenses against the United States;

H. R. 6507. An act to amend subsection 602 (f) of the National Service Life Insurance Act of 1940, as amended, to authorize renewal of level premium term insurance for a second 5-year period, and for other purposes;

H. R. 6598. To amend section 2 of the act entitled "An act to provide for insanity proceedings in the District of Columbia," approved August 9, 1939;

H. R. 6633. An act to authorize an exchange of lands and interests therein between the city of San Diego, Calif., and the United States, and for other purposes;

H. R. 6634. An act to authorize the issuance of a special series of stamps in honor and commemoration of Moina Michael, originator of Flanders Field memorial poppy idea;

H. R. 6696. An act to authorize the course of instruction at the United States Naval Academy to be given to not exceeding four persons at a time from the Republic of the Philippines;

H. R. 6707. An act to amend the Office Personnel Act of 1947 (Public Law 381), 80th Cong.), and for other purposes;

H. R. 6818. An act to amend title X of the Social Security Act (relating to aid to the blind) so as to provide greater encouragement to blind recipients thereunder to become self-supporting;

H. R. 6822. An act to continue the authorization for the appointment of two additional Assistant Secretaries of State;

H. R. 6860. An act to amend the Federal Airport Act;

H. R. 6412. An act to codify and enact into law title 3 of the United States Code, entitled "The President";

H. R. 6419. An act authorizing the construction, repair, and preservation of certain public works on rivers and harbors for navigation, flood control, and for other purposes;

H. R. 6705. An act making appropriations for the Department of the Interior for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6772. An act making appropriations for the Department of the Navy and the naval service for the fiscal year ending June 30, 1949, and for other purposes;

H. J. Res. 297. Joint resolution to increase the sum authorized to be appropriated for the presentation to Eire of a statute of Commodore John Barry;

H. J. Res. 421. Joint resolution to authorize and direct the Commissioners of the District of Columbia to investigate and study certain matters relating to parking lots in the District of Columbia;

H. J. Res. 427. Joint resolution correcting act establishing the Theodore Roosevelt National Memorial Park, as amended;

H. J. Res. 428. Joint resolution providing an extension of time for claiming credit or refund with respect to war losses; and

H. J. Res. 429. Joint resolution relating to the marital deduction, for estate-tax purposes, in the case of life insurance or annuity payments.

On June 23, 1948:

H. R. 333. An act for the relief of sundry residents of Alaska, veterans of World War II;

H. R. 2009. An act for the relief of the estate of Vito Abarno;

H. R. 2269. An act for the relief of Frank A. Constable;

H. R. 2798. An act to amend section 5, Home Owners' Loan Act of 1933, and for other purposes;

H. R. 3190. An act to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure";

H. R. 3416. An act to provide for the establishment of the Pensacola National Monument;

H. R. 4044. An act to amend the Trading With the Enemy Act, as amended; to create a commission to make an inquiry and report with respect to war claims; and to provide for relief of internees in certain cases;

H. R. 4917. An act to provide further benefits for certain employees of the United States who are veterans of World War II and lost opportunity for probational civil-service appointments by reason of their service in the armed forces of the United States, and who, due to service-connected disabilities, are unable to perform the duties of the positions for which examinations were taken;

H. R. 5416. An act to promote the interests of the Fort Hall Indian irrigation project, Idaho, and for other purposes;

H. R. 5883. An act to authorize the Secretary of the Army, the Secretary of the Navy, and the Secretary of the Air Force to donate excess and surplus property for educational purposes;

H. R. 5904. An act to continue the Virgin Islands Company as an agency of the United States;

H. R. 6248. An act to authorize the Secretary of Agriculture to stabilize prices of agricultural commodities; to amend section 22 of the Agricultural Adjustment Act, reenacted by the Agricultural Marketing Agreement Act of 1937; and for other purposes;

H. R. 6402. An act to provide for extension of the terms of office of the present members of the Atomic Energy Commission;

H. R. 6443. An act to authorize the Administrator of Veterans' Affairs to convey certain land in Tennessee to the city of Johnson City;

H. R. 6465. An act to amend and supplement section 2 of the act approved August 30, 1935, relating to the construction and financing of toll bridges over the Delaware River by the Delaware River Joint Toll Bridge Commission of the Commonwealth of Pennsylvania and the State of New Jersey;

H. R. 6481. An act making appropriations for Government corporations and independent executive agencies for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6527. An act to provide assistance to certain local school agencies overburdened with war-incurred, or postwar national-defense-incurred enrollments;

H. R. 6641. An act to amend the Civil Service Retirement Act of May 29, 1930, to provide annuities for certain surviving spouses of annuitants retired prior to April 1, 1948;

H. R. 6771. An act making appropriations for military functions administered by the National Military Establishment for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6801. An act making appropriations for foreign aid, and for other purposes;

H. R. 5808. An act to permit refund or credit to brewers of taxes paid on beer lost in bottling operations;

H. R. 6829. An act making supplemental appropriations for the Executive Office and sundry independent executive bureaus, boards, commissions, and offices, for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6916. An act to provide for permanent postal rates and to provide pay increases for Government employees;

H. R. 6935. An act making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1948, and for other purposes;

H. J. Res. 190. Joint resolution authorizing the printing and binding of Cannon's Procedure in the House of Representatives and providing that the same shall be subject to copyright by the author;

H. J. Res. 305. Joint resolution authorizing the issuance of a special series of stamps commemorative of the fiftieth anniversary of the organization of the Rough Riders (First Volunteer United States Cavalry) of the Spanish-American War;

H. J. Res. 327. Joint resolution to authorize the issuance of a special series of stamps commemorative of Juliette Low, founder and organizer of Girl Scouting in the United States of America; and

H. J. Res. 433. Joint resolution permitting the free entry of certain articles imported to promote international good will, and for other purposes.

## APPROVAL OF BILLS AND JOINT RESOLUTIONS AFTER ADJOURNMENT

A message from the President of the United States, received by the Clerk of the House, reported that on the following dates the President had approved and signed bills and joint resolutions of the House of the following titles:

On June 19, 1948:

H. R. 238. An act for the extension of admiralty jurisdiction;

H. R. 636. An act for the relief of W. A. Knox, W. L. M. Knox, and Frank C. Morris, operating as Knox Lumber Sales Co., of Thomson, Ga.;

H. R. 1222. An act for the relief of Mr. and Mrs. M. C. Lewis;

H. R. 1726. An act for the relief of Elsie L. Rosenow;

H. R. 1781. An act for the relief of Annie L. Taylor, and William Benjamin Taylor;

H. R. 1855. An act for the relief of Elbert Spivey;

H. R. 2062. An act for the relief of Mrs. Carrie M. Lee;

H. R. 2273. An act to amend the act of May 29, 1944, providing for the recognition of the services of the civilian officials and employees, citizens of the United States, engaged in and about the construction of the Panama Canal;

H. R. 2479. An act for the relief of Hardy H. Bryant;

H. R. 2684. An act for the relief of sundry fruit growers of the State of Delaware who sustained losses as the result of the fumigation of apples with methyl bromide in order to comply with the requirements of the

# APPENDIX C-12

UNITED STATES OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 80th CONGRESS

SECOND SESSION

VOLUME 94—PART 8

JULY 26, 1948, TO DECEMBER 31, 1948

(PAGES 9353 TO 10316)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1948

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## To all to whom these presents shall come. Greeting:

y virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, he seal of the National Archives of the United States, that the attached reproduction(s) is a true and co py of documents in his custody.

| | |
|---|---|
| SIGNATURE [signature] | |
| NAME Richard Hunt | DATE 05/09/06 |
| TITLE Director Center for Legislative Archives | |
| NAME AND ADDRESS OF DEPOSITORY The National Archives Washington, D.C. 20408 | |

*U.S. GPO: 1998-442-221/8

NA FORM 14007A (10-86)

H. R. 4516. An act for the relief of the Moore Dry Dock Co., of Oakland, Calif.;

H. R. 4962. An act to provide pensions for certain widows of veterans of the Spanish-American War, including the Boxer Rebellion and the Philippine Insurrection;

H. R. 5036. An act to authorize the attendance of the United States Marine Corps Band at the national assembly of the Marine Corps League to be held at Milwaukee, Wis., September 22 to September 25, inclusive, 1948;

H. R. 5275. An act to amend the Tariff Act of 1930 to provide for the free importation of limestone to be used in the manufacture of fertilizer;

H. R. 5936. An act to provide for the addition of certain surplus Government lands to the Chickamauga and Chattanooga National Military Park, in the States of Georgia and Tennessee, and for other purposes;

H. R. 6318. An act to amend section 3 of the Standard Time Act of March 19, 1918, as amended, relating to the placing of a certain portion of the State of Idaho in the third time zone;

H. R. 6771. An act making appropriations for military functions administered by the National Military Establishment for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6822. An act to continue the authorization for the appointment of two additional Assistant Secretaries of State;

H. R. 6168. An act to confer jurisdiction over the Fort Des Moines Veterans' Village upon the State of Iowa;

H. R. 6698. An act to authorize the course of instruction at the United States Naval Academy to be given to not exceeding four persons at a time from the Republic of the Philippines;

H. R. 6726. An act to amend the Public Health Service Act to provide for, foster, and aid in coordinating research relating to dental diseases and conditions, and for other purposes; and

H. R. 6772. An act making appropriations for the Department of the Navy and the naval service for the fiscal year ending June 30, 1949, and for other purposes.

On June 25, 1948:

H. R. 564. An act for the relief of Sarah Lee Cregg;

H. R. 700. An act for the relief of Anthony Arancio;

H. R. 912. An act for the relief of Hiro Higa and Kana Higa;

H. R. 945. An act relating to the payment of fees, expenses, and costs of jurors;

H. R. 1409. An act for the relief of Frantisek Jiri Pavlik or Georg Pavlik;

H. R. 1642. An act for the relief of Miss Rosella M. Kostenbader;

H. R. 2009. An act for the relief of the estate of Vito Abarno;

H. R. 2193. An act for the relief of Robert E. Graham;

H. R. 2431. An act for the relief of the estate of David Jefferson Janow, deceased;

H. R. 2734. An act for the relief of Joseph M. Henry;

H. R. 2766. An act to amend section 2 of an act, entitled, "An act to provide for the establishment of a probation system in the United States courts, except in the District of Columbia," approved March 4, 1925, as amended (18 U. S. C. 725);

H. R. 3190. An act to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure";

H. R. 3214. An act to revise, codify, and enact into law title 28 of the United States Code entitled "Judicial Code and Judiciary";

H. R. 3427. An act for the relief of Mrs. Mary H. Overall and Thomas I. Baker;

H. R. 4114. An act to amend the Public Health Service Act to permit certain expenditures, and for other purposes;

H. R. 4298. An act for the relief of Henry Hill;

H. R. 4452. An act for the relief of Douglas L. Craig;

H. R. 4666. An act for the relief of William Nally;

H. R. 4587. An act for the relief of Mrs. Harry A. Light (formerly Mrs. Elsie Purvey);

H. R. 4518. An act for the relief of Gerald S. Furman;

H. R. 4659. An act to ratify and confirm amendments to certain contracts for the furnishing of petroleum products to the United States;

H. R. 4881. An act for the relief of Dimitri Petrou;

H. R. 5524. An act making appropriations for civil functions administered by the Department of the Army for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 5886. An act to amend section 332 (a) of the Nationality Act of 1940;

H. R. 6293. An act to amend the act of June 19, 1934, providing for the establishment of the National Archives, so as to provide that certain fees collected by the Archivist shall be available for disbursement in the interest of the National Archives;

H. R. 6327. An act to provide for the issuance of a license to practice chiropractic in the District of Columbia to Samuel O. Burdette;

H. R. 6412. A act to codify and enact into law title 3 of the United States Code, entitled "The President";

H. R. 6641. An act to amend the Civil Service Retirement Act of May 29, 1930, to provide annuities for certain surviving spouses of annuitants retired prior to April 1, 1948;

H. R. 6935. An act making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1948, and for other purposes;

H. J. Res. 297. Joint resolution to increase the sum authorized to be appropriated for the presentation to Eire of a statue of Commodore John Barry; and

H. J. Res. 433. Joint resolution permitting the free entry of certain articles imported to promote international good will, and for other purposes.

On June 26, 1948:

H. R. 2551. An act for the relief of William R. Ramsey;

H. R. 2732. An act for the relief of Dennis Stanton;

H. R. 3218. An act to authorize an emergency fund for the Bureau of Reclamation to assure the continuous operation of its irrigation and power systems;

H. R. 3937. An act for the relief of William C. Reese;

H. R. 6039. An act to authorize the permanent appointment in the Regular Army of one officer in the grade of general and to authorize the permanent appointment in the Regular Air Force of one officer in the grade of general, and for other purposes;

H. R. 6224. An act for the relief of John Watkins;

H. R. 6556. An act to extend the authority of the President under section 350 of the Tariff Act of 1930, as amended, and for other purposes; and

H. J. Res. 190. Joint resolution authorizing the printing and binding of Cannon's Procedure in the House of Representatives and providing that the same shall be subject to copyright by the author.

On June 28, 1948:

H. R. 371. An act for the relief of Jenness C. Thomas;

H. R. 1076. An act for the relief of Chester O. Glenn;

H. R. 1220. An act for the relief of James D. Sigler and Frederick P. Vogelsand III;

H. R. 2269. An act for the relief of Frank A. Constable;

H. R. 4330. An act to authorize the Secretary of State to perform certain consular-type functions within the United States and its Territories and possessions;

H. R. 4367. An act authorizing the Hidalgo Bridge Co., its heirs, legal representatives, and assigns, to construct, maintain, and operate a railroad toll bridge across the Rio Grande, at or near Hidalgo, Tex.;

H. R. 4635. An act to amend section 11 of an act entitled "An act to regulate barbers in the District of Columbia, and for other purposes";

H. R. 4690. An act to amend the act of July 30, 1947, permitting vessels of Canadian registry to transport certain merchandise between Hyder, Alaska, and points in the continental United States;

H. R. 4917. An act to provide further benefits for certain employees of the United States who are veterans of World War II and lost opportunity for probational civil-service appointments by reason of their service in the armed forces of the United States, and who, due to service-connected disabilities, are unable to perform the duties of the positions for which examinations were taken;

H. R. 5053. An act to provide for the establishment of the Independence National Historical Park, and for other purposes;

H. R. 5710. An act to amend the act entitled "An act to expedite the provision of housing in connection with national defense, and for other purposes," approved October 14, 1940, as amended;

H. R. 5716. An act to record the lawful admission to the United States for permanent residence of Patricia Schwartz and Beatrice Schwartz;

H. R. 6448. An act to authorize the Administrator of Veterans' Affairs to convey certain land in Tennessee to the city of Johnson City;

H. R. 6707. An act to amend the Officer Personnel Act of 1947 (Public Law 381, 80th Cong.), and for other purposes; and

H. R. 6801. An act making appropriations for foreign aid, and for other purposes.

On June 29, 1948:

H. R. 333. An act for the relief of sundry residents of Alaska, veterans of World War II;

H. R. 703. An act for the relief of Leon Nikolaivich Volkov;

H. R. 911. An act for the relief of Kam Fong Chun, Mr. and Mrs. Jose Dias, Joseph De Souza, Mr. and Mrs. Kenneth Ayres, and Jose Oducado;

H. R. 915. An act to confer jurisdiction upon the District Court of the United States for the Territory of Hawaii to hear, determine, and render judgment on the claims of the executors and trustees of the estate of L. L. McCandless, deceased, as their interests may appear, against the United States of America;

H. R. 1930. An act for the relief of the Growers Fertilizer Co., a Florida corporation;

H. R. 2239. An act to amend section 13 (a) of the Surplus Property Act of 1944, as amended;

H. R. 2372. An act for the relief of George Cleve Williams;

H. R. 2395. An act for the relief of the Cypress Creek Drainage District of the State of Arkansas;

H. R. 2744. An act to provide for the elimination of Regular Army and Regular Air Force officers and for the retirement of officers, warrant officers, and enlisted men of the Regular Army and the Regular Air Forces, and to provide retirement benefits for members of the Reserve components of the Army of the United States, the Air Force of the United States, United States Navy and Marine Corps, and Coast Guard;

H. R. 2918. An act for the relief of the Sumner County Colored Fair Association;

H. R. 4103. An act for the relief of Charles M. Davis;

H. R. 4816. An act to amend section 624 of the Public Health Service Act so as to provide a minimum allotment of $100,000 to each State for the construction of hospitals;

H. R. 5734. An act to authorize the Administrator of Veterans' Affairs to convey to the city of Cheyenne, Wyo., for public-park and

# APPENDIX C-13

UNITED STATES OF AMERICA

# Congressional Record

DAILY DIGEST OF THE 80th CONGRESS

SECOND SESSION

VOLUME 94—PART 14

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1948

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## To all to whom these presents shall come. Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, r the seal of the National Archives of the United States, that the attached reproduction(s) is a true and copy of documents in his custody.

| | |
|---|---|
| SIGNATURE | |
| NAME<br>Richard Hunt | DATE<br>05/09/06 |
| TITLE Director<br>Center for Legislative Archives | |
| NAME AND ADDRESS OF DEPOSITORY<br>The National Archives<br>Washington, D.C. 20408 | |

*U.S. GPO: 1998-442-221/

NA FORM 14007A (10-86)

Case 1:02-cv-00429-T Document 21-5 Filed 03/02/2007 Page 16 of 26

## HISTORY OF BILLS ENACTED INTO PUBLIC LAW (80TH CONG., 2D SESS.)—Continued

| Title | Bill No. | Date introduced | Committees—hearings | | Date reported | | Report No. | | Page of Congressional Record of passage | | Date of passage | | Public law | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | House | Senate | House | Senate | House | Senate | House | Senate | House | Senate | Date approved | No. |
| To amend the Railroad Retirement Act of 1937, to increase certain annuities, and the Railroad Unemployment Insurance Act with respect to taxes levied thereunder. | H. R. 6766 (S. 2782) | June 1 | IFC* | LPW | June 2 | June 9 | 2154 | 1574 | 7436 | 7933 | June 8 | June 12 | June 23 | 744 |
| Amending District of Columbia Code, relative to admissibility of testimony. | S. 1266 | May 12, 1947 | DC | DC | June 3 | May 29, 1947 | 2188 | 212 | 7455 | 7010 | June 8 | June 16, 1947 | June 24 | 745 |
| To increase salary of Coordinator of Federal Agencies in Puerto Rico. | S. 2308 | Apr. 15 | PL | IIA | June 4 | May 12 | 2208 | 1279 | 8484 | 6294 | June 16 | May 24 | June 24 | 746 |
| Permitting mining locations under United States mining laws within the game sanctuary of the Harney National Forest. | H. R. 2867 | Mar. 31, 1947 | PL | IIA | July 14, 1947 | June 11 | 912 | 1597 | 9596 | 7944 | July 21, 1947 | June 12 | June 24 | 747 |
| To amend Veterans Regulation No. 1 (a), pts. I and II, to establish a presumption of service connection for chronic and tropical diseases. | H. R. 3889 | June 18, 1947 | VA | Fin* | July 8, 1947 | June 7 | 808 | 1536 | 9609 | 7924 | July 21, 1947 | June 12 | June 24 | 748 |
| To amend the Food and Drug Act, to authorize seizure of adulterated or misbranded products. | H. R. 4071 | July 2, 1947 | IFC | IFC* | July 8, 1947 | Apr. 30 | 807 | 1221 | 134 | 8239 | Jan. 13 | June 15 | June 24 | 749 |
| To permit free entry of crude or broken limestone to be used in manufacture of fertilizer. | H. R. 5275 | Feb. 4 | WM | Fin | Feb. 23 | Apr. 15 | 1415 | 1129 | 1610 | 8238 | Feb. 24 | June 15 | June 24 | 750 |
| Conferring jurisdiction over Fort Des Moines Veterans' Village upon the State of Iowa. | H. R. 6188 | Apr. 12 | PW* | PW | Apr. 15 | June 10 | 1747 | 1585 | 5199 | 7941 | May 3 | June 12 | June 24 | 751 |
| Relative to admission of Filipinos to the U. S. Naval Academy. | H. R. 6698 | May 25 | AS* | AS | June 8 | June 17 | 2258 | 1766 | 8489 | 8755 | June 16 | June 18 | June 24 | 752 |
| Navy appropriations for 1949 | H. R. 6772 | June 2 | App* | App* | June 2 | June 14 | 2135 | 1621 | 7073 | 8301 | June 3 | June 15 | June 24 | 753 |
| To ratify contract for purchase of certain mineral land from the Choctaw and Chickasaw Indians. | S. J. Res. 203 (H. J. Res. 363) | Apr. 2 | PL | IIA | May 5 | May 10 | 1868 | 1266 | 8214 | 6290 | June 14 | May 24 | June 24 | 754 |
| Providing for a National Institute of Dental Research. | H. R. 6726 (S. 176) | May 27 | IFC* | LPW | June 2 | July 7, 1947 | 2158 | 436 | 7415 | 7934 | June 8 | June 12 | June 24 | 755 |
| To provide for the issuance of free passes on railroads to official watch inspectors. | S. 2192 | Feb. 20 | IFC | IFC | June 17 | June 8 | 2394 | 1538 | 8954 | 7924 | June 18 | June 12 | June 24 | 756 |
| To increase certain benefits payable under the Longshoremen's and Harbor Workers' Compensation Act. | S. 2237 (H. R. 6647) | Feb. 27 | EdL | LPW* | June 1 | May 17 | 2095 | 1315 | 7397 | 6302 | June 8 | May 24 | June 24 | 757 |
| To clarify the position of Air Force Secretary and to authorize Secretaries of Army, Navy, Air Force, and Secretary of Defense to establish certain positions in professional and scientific service. | S. 2505 | Apr. 15 | POCS | AS | June 11 | May 26 | 2306 | 1408 | 8494 | 6778 | June 16 | June 1 | June 24 | 758 |
| Selective Service Act of 1948 | S. 2655 (H. R. 6401) | May 12 | AS | AS* | May 7 | May 12 | 1881 | 1268 | 8828 | 7681 | June 18 | June 10 | June 24 | 759 |
| To authorize lease of certain space in Lafayette Building in the District of Columbia by FWA. | S. 2706 | May 19 | | PW | | June 12 | | 1614 | 8947 | 8721 | June 18 | June 18 | June 24 | 760 |
| Relative to consolidation of the Lighthouse Service with the Coast Guard. | H. R. 239 | Jan. 3, 1947 | MMF | IFC | Apr. 23, 1947 | June 11 | 294 | 1594 | 5055 | 7942 | May 12, 1947 | June 12 | June 24 | 761 |
| Providing pensions for certain widows of Spanish-American War veterans. | H. R. 4962 | Jan. 14 | VA | Fin | June 11 | June 17 | 2316 | 1747 | 8495 | 8754 | June 16 | June 18 | June 24 | 762 |
| To authorize Marine Band attendance at 1948 national assembly of the Marine Corps League. | H. R. 5036 (S. 2064) | Jan. 20 | AS* | AS | June 2 | June 8 | 2150 | 1541 | 7414 | 7926 | June 8 | June 12 | June 24 | 763 |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Addition of certain surplus Federal lands to the Chickamauga and Chattanooga Military Park, Ga., and Tenn. | H. R. 5936 | Mar. 22 | PL | IIA | May 5 | June 11 | 1862 | 1600 | 5995 | 7944 | May 18 | June 12 | June 24 | 764 |
| To amend the Standard Time Act relative to placing a certain portion of the State of Idaho in the third time zone. | H. R. 6318 (S. 2547) | Apr. 22 | IFC* | IFC | May 12 | May 13 | 1948 | 1287 | 6010 | 8239 | May 18 | June 15 | June 24 | 765 |
| National military appropriations for 1949 | H. R. 6771 | June 2 | App* | App* | June 2 | June 17 | 2135 | 1763 | 6957 | 8618 | June 2 | June 17 | June 24 | 766 |
| To extend for 1 year the terms of two additional Assistant Secretaries of State. | H. R. 6822 (S. 2869) | June 7 | FA | FR | June 8 | June 15 | 2257 | 1683 | 8489 | 8727 | June 16 | June 18 | June 24 | 767 |
| To provide annuities for certain surviving spouses of annuitants retired prior to Apr. 1, 1948. | H. R. 6641 (S. 2740) | May 20 | POCS | POCS | June 11 | June 15 | 2309 | 1685 | 8494 | 8728 | June 16 | June 18 | June 25 | 768 |
| To authorize free entry of certain railroad equipment under certain conditions from France. | H. J. Res. 433 | June 18 | WM | ........ | ........ | ........ | ........ | ........ | 9222 | 9098 | June 19 | June 19 | June 25 | 769 |
| Confirming certain oil contracts negotiated by Treasury. | H. R. 4659 (S. 1857) | Dec. 8, 1947 | Jud | BC | May 28 | June 9 | 2077 | 1560 | 7390 | 7930 | June 8 | June 12 | June 25 | 770 |
| To codify Title 3 of the United States Code, entitled "The President." | H. R. 6412 | Apr. 30 | Jud | Jud | May 10 | June 14 | 1898 | 1623 | 6000 | 8722 | May 18 | June 18 | June 25 | 771 |
| To codify Title 18 of the United States Code entitled "Crimes and Criminal Procedure." | H. R. 3190 | Apr. 24, 1947 | Jud | Jud | Apr. 24, 1947 | June 14 | 304 | 1620 | 5048 | 8722 | May 12, 1947 | June 18 | June 25 | 772 |
| To codify Title 28 of the United States Code, entitled "Judicial Code and Judiciary." | H. R. 3214 | Apr. 25, 1947 | Jud | Jud | Apr. 25, 1947 | June 9 | 308 | 1559 | 8392 | 7930 | July 7, 1947 | June 12 | June 25 | 773 |
| To authorize admission of displaced persons. | S. 2242 (H. R. 6396) | Mar. 2 | Jud* | Jud | May 4 | Mar. 2 | 1854 | 950 | 7888 | 6916 | June 11 | June 2 | June 25 | 774 |
| To provide for military justice within the Air Force. | S. 2401 (H. R. 5937) | Mar. 29 | AS | AS | June 8 | June 8 | 2263 | 1542 | 8492 | 7925 | June 16 | June 12 | June 25 | 775 |
| To amend the Organic Act of Puerto Rico | S. 2675 | May 17 | PL | IIA | June 4 | May 27 | 2210 | 1418 | 8484 | 6782 | June 16 | June 1 | June 25 | 776 |
| Fixing the rank of the assistant to the Chief of Engineers in charge of river and harbor and flood-control improvements. | S. 2770 (H. R. 6751) | May 28 | AS | AS | June 8 | June 2 | 2256 | 1451 | 8498 | 7696 | June 16 | June 10 | June 25 | 777 |
| Increasing the sum to $30,000 for statue of Commodore John Barry for presentation to Eire. | H. J. Res. 297 | Jan. 15 | FA | FR | May 18 | June 17 | 1972 | 1760 | 7381 | 8754 | June 8 | June 18 | June 25 | 778 |
| Relative to pay of jurors in the United States courts. | H. R. 945 (S. 19) | Jan. 14, 1947 | Jud | Jud* | June 2 | June 7 | 2162 | 1510 | 7418 | 7945 | June 8 | June 12 | June 25 | 779 |
| Relative to probation system in United States courts. | H. R. 2766 | Mar. 25, 1947 | Jud | Jud | May 11 | June 8 | 1923 | 1544 | 6007 | 7926 | May 18 | June 12 | June 25 | 780 |
| Authorizing certain expenditures from appropriations of the Public Health Service. | H. R. 4114 | July 8, 1947 | IFC | LPW | May 11 | June 9 | 1927 | 1578 | 6008 | 7933 | May 18 | June 12 | June 25 | 781 |
| Army-civil functions appropriations for 1949 | H. R. 5524 | Feb. 24 | App* | App* | Feb. 24 | Apr. 23 | 1420 | 1167 | 1772 | 6096 | Feb. 26 | May 19 | June 25 | 782 |
| To amend the Nationality Act of 1940 relative to petition for citizenship. | H. R. 5886 | Mar. 17 | Jud | Jud | Apr. 6 | June 15 | 1661 | 1641 | 6012 | 8723 | May 18 | June 18 | June 25 | 783 |
| Providing that certain fees collected by the Archivist shall be available for disbursement in the interest of the National Archives. | H. R. 6293 | Apr. 21 | POCS | POCS | May 11 | June 15 | 1938 | 1687 | 7380 | 8727 | June 8 | June 18 | June 25 | 784 |
| Second deficiency appropriations for 1948 | H. R. 6935 | June 15 | App* | App* | June 15 | June 19 | 2348 | 1769 | 8461 | 9054 | June 16 | June 19 | June 25 | 785 |
| Authorizing the Coast Guard to maintain aids to navigation. | S. 1853 | Dec. 10, 1947 | MMF | IFC* | May 7 | Mar. 31 | 1878 | 1043 | 5996 | 4288 | May 18 | Apr. 12 | June 26 | 786 |
| Relating to yachts belonging to yacht clubs | S. 2186 | Feb. 20 | MMF | IFC | June 17 | May 27 | 2397 | 1415 | 8957 | 6781 | June 18 | June 1 | June 26 | 787 |
| Acceptance of statue of Gen. Jose Gervasio Artigas from Uruguay. | S. 2591 | Apr. 30 | HA | PW | June 18 | June 2 | 2402 | 1439 | 8837 | 7693 | June 18 | June 10 | June 26 | 788 |
| Authorizing the printing and binding of Cannon's House Procedure. | H. J. Res. 190 | May 6, 1947 | HA | RAdm | May 14, 1947 | June 19 | 382 | 1770 | 5279 | 9056 | May 14, 1947 | June 19 | June 26 | 789 |
| To authorize an emergency fund for the Bureau of Reclamation to assure the continuous operation of its irrigation and power systems. | H. R. 3218 | Apr. 25, 1947 | PL | IIA | July 10, 1947 | June 4 | 860 | 1493 | 317 | 7701 | Jan. 19 | June 10 | June 26 | 790 |
| Authorizing permanent appointment in each the Regular Army and Regular Air Force of one officer in the grade of general. | H. R. 6039 | Mar. 30 | AS | AS | Apr. 14 | June 17 | 1734 | 1764 | 4644 | 8755 | Apr. 20 | June 18 | June 26 | 791 |

*Printed hearings.

# APPENDIX C-14

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

**all to whom these presents shall come. Greeting:**

irtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, al of the National Archives of the United States, that the attached reproduction(s) is a true and f documents in his custody.

| SIGNATURE | |
|---|---|
| Aloha South | |
| NAME<br>ALOHA SOUTH | DATE<br>May 18, 2006 |
| TITLE<br>ASSISTANT BRANCH CHIEF, NWCTB | |
| NAME AND ADDRESS OF DEPOSITORY<br>The National Archives<br>Washington, D.C. 20408 | |

NA FORM 14007A (10-86)

80TH CONGRESS
1ST SESSION

# H. R. 3190

---

## AN ACT

To revise, codify, and enact into positive law, Title 18 of the United States Code, entitled "Crimes and Criminal Procedure".

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That Title 18 of the United States Code, entitled "Crimes and Criminal Procedure", is hereby revised, codified, and enacted into positive law, and may be cited as "Title 18, U. S. C., §—", as follows:

| Date | Statutes at Large | | | | U. S. Code | |
|---|---|---|---|---|---|---|
| | Chapter | Section | Volume | Page | Title | Section |
| 1946—July 10 | 547 | ---------- | 60 | 524, 525 | 18 | 641 |
| July 24 | 606 | ---------- | 60 | 656 | 18 | 409–411 |
| Aug. 2 | 735 | ---------- | 60 | 789 | 18 | 408e |
| Aug. 14 | 964 | [66] 3 | 60 | 1064 | 7 | 1026 |

[66] Only the provisions amending section 52 of Act July 22, 1937, ch. 517, title IV, 50 Stat. 531, 532.

Passed the House of Representatives May 12, 1947.

Attest:

John Andrews

*Clerk.*

80TH CONGRESS
1ST SESSION

# H. R. 3190

## AN ACT

To revise, codify, and enact into positive law, Title 18 of the United States Code, entitled "Crimes and Criminal Procedure".

JUN 17 1948

(CALENDAR DAY JUN 18 1948)

House agrees to Senate amendments.

In the Senate of the United States,

JUN 18 LEG. DAY JUN 15 '48

Resolved, *That this bill pass with amendments.*

*Attest:* [signature]

*Secretary*

[PUBLIC LAW 772]
[CHAPTER 645]

H. R. 3190

DEPARTMENT OF STATE RECEIVED JUN 25 1948 LAWS BRANCH

# Eightieth Congress of the United States of America

## At the Second Session

Begun and held at the City of Washington on Tuesday, the sixth day of January, one thousand nine hundred and forty-eight

## AN ACT

To revise, codify, and enact into positive law, Title 18 of the United States Code, entitled "Crimes and Criminal Procedure".

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That Title 18 of the United States Code, entitled "Crimes and Criminal Procedure", is hereby revised, codified, and enacted into positive law, and may be cited as "Title 18, U. S. C., §——", as follows:

TITLE 18—CRIMES AND CRIMINAL PROCEDURE


| Part | | Sec. |
|---|---|---|
| I. | CRIMES | 1 |
| II. | CRIMINAL PROCEDURE | 3001 |
| III. | PRISONS AND PRISONERS | 4001 |
| IV. | CORRECTION OF YOUTHFUL OFFENDERS | 5001 |

PART I—CRIMES

| Chapter | | Sec. |
|---|---|---|
| 1. | General provisions | 1 |
| 3. | Animals, birds and fish | 41 |
| 5. | Arson | 81 |
| 7. | Assault | 111 |
| 9. | Bankruptcy | 151 |
| 11. | Bribery and graft | 201 |
| 13. | Civil rights | 241 |
| 15. | Claims and services in matters affecting government | 281 |
| 17. | Coins and currency | 331 |
| 19. | Conspiracy | 371 |
| 21. | Contempts constituting crimes | 401 |
| 23. | Contracts | 431 |
| 25. | Counterfeiting and forgery | 471 |
| 27. | Customs | 541 |
| 29. | Elections and political activities | 591 |
| 31. | Embezzlement and theft | 641 |
| 33. | Emblems, insignia, and names | 701 |
| 35. | Escape and rescue | 751 |
| 37. | Espionage and censorship | 791 |
| 39. | Explosives and combustibles | 831 |
| 41. | Extortion and threats | 871 |
| 43. | False personation | 911 |
| 45. | Foreign relations | 951 |
| 47. | Fraud and false statements | 1001 |
| 49. | Fugitives from justice | 1071 |
| 51. | Homicide | 1111 |
| 53. | Indians | 1151 |
| 55. | Kidnaping | 1201 |
| 57. | Labor | 1231 |
| 59. | Liquor traffic | 1261 |
| 61. | Lotteries | 1301 |
| 63. | Mail fraud | 1341 |
| 65. | Malicious mischief | 1361 |
| 67. | Military and Navy | 1381 |
| 69. | Nationality and citizenship | 1421 |
| 71. | Obscenity | 1461 |
| 73. | Obstruction of justice | 1501 |

[CHAPTER 645]

## AN ACT

To revise, codify, and enact into positive law, Title 18 of the United States Code, entitled "Crimes and Criminal Procedure".

June 25, 1948
[H. R. 3190]
[Public Law 772]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That Title 18 of the United States Code, entitled "Crimes and Criminal Procedure", is hereby revised, codified, and enacted into positive law, and may be cited as "Title 18, U. S. C., § ——", as follows:

Title 18, U. S. Code. Codification and enactment into positive law.

## TITLE 18—CRIMES AND CRIMINAL PROCEDURE


| Part | | Sec. | |
|---|---|---|---|
| I. | Crimes | 1 | *Infra.* |
| II. | Criminal Procedure | 3001 | *Post*, p. 813. |
| III. | Prisons and Prisoners | 4001 | *Post*, p. 847. |
| IV. | Correction of Youthful Offenders | 5001 | *Post*, p. 856. |


### Part I—Crimes


| Chapter | | Sec. |
|---|---|---|
| 1. | General provisions | 1 |
| 3. | Animals, birds and fish | 41 |
| 5. | Arson | 81 |
| 7. | Assault | 111 |
| 9. | Bankruptcy | 151 |
| 11. | Bribery and graft | 201 |
| 13. | Civil rights | 241 |
| 15. | Claims and services in matters affecting government | 281 |
| 17. | Coins and currency | 331 |
| 19. | Conspiracy | 371 |
| 21. | Contempts constituting crimes | 401 |
| 23. | Contracts | 431 |
| 25. | Counterfeiting and forgery | 471 |
| 27. | Customs | 541 |
| 29. | Elections and political activities | 591 |
| 31. | Embezzlement and theft | 641 |
| 33. | Emblems, insignia, and names | 701 |
| 35. | Escape and rescue | 751 |
| 37. | Espionage and censorship | 791 |
| 39. | Explosives and combustibles | 831 |
| 41. | Extortion and threats | 871 |
| 43. | False personation | 911 |
| 45. | Foreign relations | 951 |
| 47. | Fraud and false statements | 1001 |
| 49. | Fugitives from justice | 1071 |
| 51. | Homicide | 1111 |
| 53. | Indians | 1151 |
| 55. | Kidnaping | 1201 |
| 57. | Labor | 1231 |
| 59. | Liquor traffic | 1261 |
| 61. | Lotteries | 1301 |
| 63. | Mail fraud | 1341 |
| 65. | Malicious mischief | 1361 |
| 67. | Military and Navy | 1381 |
| 69. | Nationality and citizenship | 1421 |
| 71. | Obscenity | 1461 |
| 73. | Obstruction of justice | 1501 |
| 75. | Passports and visas | 1541 |
| 77. | Peonage and slavery | 1581 |
| 79. | Perjury | 1621 |
| 81. | Piracy and privateering | 1651 |
| 83. | Postal service | 1691 |
| 85. | Prison-made goods | 1761 |
| 87. | Prisons | 1791 |
| 89. | Professions and occupations | 1821 |
| 91. | Public lands | 1851 |
| 93. | Public officers and employees | 1901 |
| 95. | Racketeering | 1951 |

Case 1:02-cv-00429-T Document 21-5 Filed 03/02/2007 Page 25 of 26




| Chapter | | Sec. |
|---|---|---|
| 97. | Railroads | 1991 |
| 99. | Rape | 2031 |
| 101. | Records and reports | 2071 |
| 103. | Robbery and burglary | 2111 |
| 105. | Sabotage | 2151 |
| 107. | Seamen and stowaways | 2191 |
| 109. | Searches and seizures | 2231 |
| 111. | Shipping | 2271 |
| 113. | Stolen property | 2311 |
| 115. | Treason, sedition and subversive activities | 2381 |
| 117. | White slave traffic | 2421 |


## CHAPTER 1—GENERAL PROVISIONS


Sec.

1. Offenses classified.
2. Principals.
3. Accessory after the fact.
4. Misprision of felony.
5. United States defined.
6. Department and agency defined.
7. Special maritime and territorial jurisdiction of the United States defined.
8. Obligation or other security of the United States defined.
9. Vessel of the United States defined.
10. Interstate commerce and foreign commerce defined.
11. Foreign government defined.
12. Postal Service defined.
13. Laws of States adopted for areas within Federal jurisdiction.
14. Applicability to Canal Zone.


### § 1. OFFENSES CLASSIFIED

Notwithstanding any Act of Congress to the contrary:

(1) Any offense punishable by death or imprisonment for a term exceeding one year is a felony.

(2) Any other offense is a misdemeanor.

(3) Any misdemeanor, the penalty for which does not exceed imprisonment for a period of six months or a fine of not more than $500, or both, is a petty offense.

### § 2. PRINCIPALS

(a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal.

(b) Whoever causes an act to be done, which if directly performed by him would be an offense against the United States, is also a principal and punishable as such.

### § 3. ACCESSORY AFTER THE FACT

Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact.

Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by death, the accessory shall be imprisoned not more than ten years.

### § 4. MISPRISION OF FELONY

Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined not more than $500 or imprisoned not more than three years, or both.

| Date | Statutes at Large | | | | U. S. Code | |
|---|---|---|---|---|---|---|
| | Chapter | Section | Volume | Page | Title | Section |
| 1940—Continued | | | | | | |
| Mar. 28 | 73 | | 54 | 80 | 18 | 97 |
| Apr. 17 | 101 | | 54 | 110 | 28 | 421 |
| Apr. 30 | 164 | | 54 | 171 | 18 | 84 |
| Do | 176 | 1–3 | 54 | 175, 176 | 18 | 733, 733a, 733b |
| June 6 | 241 | | 54 | 234 | 18 | 408 |
| June 8 | 276 | | 54 | 249 | 28 | 217a |
| Do | 280 | | 54 | 255, 256 | 18 | 412a |
| June 11 | 323 | | 54 | 304 | 18 | 451 |
| Do | 326 | 1–3 | 54 | 306 | 18 | 469–471 |
| June 13 | 350 | | 54 | 391 | 18 | 253 |
| June 25 | 428 | | 54 | 571, 573 | 18 | 76e |
| June 28 | 439 | 1–5 | 54 | 670, 671 | 18 | 9–13 |
| June 29 | 446 | | 54 | 688 | 18 | 487 |
| Do | 449 | 1–5 | 54 | 692, 693 | 18 | 641, 718, 719, 723a, 753k |
| Do | 455 | | 54 | 695 | 12 | 588b |
| July 10 | 567 | | 54 | 747 | 18 | 587 |
| July 19 | 648 | 1, 2, 5, 6 | 54 | 707, 772 | 18 | 61a, 61l, 61m–1, 61t |
| Oct 8 | 763 | | 54 | 1021 | 18 | 283 |
| Oct. 8 | 777 | 6 | 54 | 1028 | 18 | 383–385 |
| Do | 785 | 1–5 | 54 | 1058, 1059 | 18 | 576, 576a–576d |
| Oct. 14 | 872 | | 54 | 1134 | 18 | 394a |
| Do | 876 | 346 (a–h), (l), 347 | 54 | 1163–1168 | 8 | 746 (a–h), (l), 747 |
| Oct. 17 | 897 | 1–6 | 54 | 1201–1204 | 16 | 14, 14 note 15–17 |
| Nov. 30 | 936 | | 54 | 1220, 1221 | 50 | 101, 104–106 |
| 1941—May 31 | 155 | 1 (part) | 55 | [58] 220 | 18 | 647 |
| June 14 | 204 | | 55 | 252 | 18 | 753f |
| June 21 | 212 | | 55 | 254, 255 | 18 | 746a, 746b |
| June 28 | 261 | 10 | 55 | 365 | 12 | 1731 (d) |
| July 9 | 263 | | 55 | 582 | 18 | 396a |
| July 11 | 287 | | 55 | 592 | 18 | 518a |
| Aug. 18 | 366 | 1–6 | 55 | 631, 632 | 18 | 419a, 419b, 419c, 419d |
| Aug. 21 | 366 | | 55 | 665 | 40 | 106 |
| Oct. 21 | 452 | | 55 | 743, 744 | 18 | 753f |
| Nov. 15 | 472 | 1, 3 | 55 | 763, 764 | 18 | 106, 107 |
| Nov. 21 | 492 | | 55 | 779 | 18 | 658 |
| Dec. 22 | 615 | | 55 | 853 | 18 | 321 |
| Dec. 31 | 643 | 1–3 | 55 | 876, 877 | 18 | 601, 602, note, 604 |
| 1942—Mar. 7 | 140 | | 56 | 141 | 18 | 281 |
| Mar. 18 | 178 | 1 (part) | 56 | [59] 158 | 18 | 647 |
| Mar. 21 | 191 | | 56 | 173 | 18 | 97a |
| Mar. 27 | 199 | 1106 | 56 | 184 | 50 App. | 641e |
| May 9 | 295 | 1 | 56 | 271, 272 | 18 | 683 |
| Aug. 24 | 556 | 1, 2 | 56 | 747, 748 | 18 | 580a |
| Sept. 16 | 561 | [60] 214 | | | 50 | 344 |
| Dec. 24 | 822 | 1, 2, 3 | 56 | 1087 | 18 | 420f, 420g, 420h |
| Do | 824 | | 56 | 1087, 1088 | 50 | 101 |
| 1943—June 30 | 178 | 1 (part) | 57 | [61] 268 | 18 | 647 |
| Nov. 22 | 302 | | 57 | 591 | 18 | 87 |
| 1944—Mar. 4 | 82 | 1, 2, 3, 4 | 58 | 111 | 18 | 472, 473, 474 |
| Apr. 1 | 151 | | 58 | 149, 150 | 18 | 262a |
| Apr. 4 | 162 | | 58 | 188 | 18 | 409 |
| July 1 | 358 | 19 (a), (d), (e), 19 (b) | 58 | 667, 668 | 41 | [62] 119 |
| Do | 398 | | 58 | 687 | 18 | 690a |
| Sept. 27 | 435 | | 58 | 753 | 18 | 204 |
| Oct. 3 | 479 | 20 | 58 | 781 | 18 | 496a |
| Dec. 20 | 623 | 4 | 58 | 837 | 12 | 1138c |
| Dec. 23 | 706 | 1, 2, 3 | 58 | 914, 915 | 18 | 63, 63a, 63b |
| 1945—Apr. 30 | 106 | | 59 | 104 | 15 | 97b |
| May 18 | 126 | | 59 | 168 | 18 | 518a |
| June 8 | 178 | 1, 2, 3 | 59 | 234, 235 | 18 | 241, 241a, 242 |
| July 31 | 339 | 9 | 59 | 516 | 31 | 904b |
| Sept. 24 | 383 | 1, 2, 3 | 59 | 536 | 18 | 405 |
| 1946—May 16 | 265 | | 60 | 183 | 18 | 516a |
| July 3 | 537 | | 60 | 420 | 15 | 17 note |
| | | | | | 18 | 420a–420e–1 |
| | | | | | 29 | 52 note, 101 note, 151 note |
| July 16 | 647 | | 60 | 624, 625 | 12 | 641 |
| July 24 | 608 | | 60 | 656 | 18 | 409–411 |
| Aug. 2 | 736 | | 60 | 789 | 18 | 495a |
| Aug. 14 | 964 | [63] 3 | 60 | 1,064 | 7 | 1,626 |
| 1947—Apr. 26 | 89 | | 61 | 52 | 18 | 411 |
| May 16 | 73 | | 61 | 97 | 18 | 744h–1 |
| June 21 | 111 | | 61 | 134 | 18 | 244 |
| June 23 | 120 | 204 | 61 | 159 | 2 | 251 |

[58] First proviso, only, appearing on this page.
[59] First proviso, only, appearing on this page.
[60] As added by Act, Apr. 1, 1944, ch. 150 (part), 58 Stat. 148.
[61] Second proviso, only, appearing on this page.
[62] First, second, third, and sixth paragraphs, only, of this section of title 41 of the United States Code, 1940 edition.
[63] Only the provisions amending section 32 of Act, July 22, 1937, ch. 517, title IV, 50 Stat. 531, 532.

Joseph W. Martin Jr

*Speaker of the House of Representatives.*

A. H. Vandenberg

*President of the Senate pro tempore.*

Approved
June 25 - 1948
Harry S. Truman
12:23 P.M. E.D.T.

# APPENDIX D

# APPENDIX D

## FRAUD AND UNCLEAN HANDS OF GOVERNMENT

| | |
|---|---|
| D-1 | CRS Report to Congress: The Pocket Veto Case, its Current Status (March 30, 2001) |
| D-2 | C-Span Congressional Glossary – Definition of Pocket Veto |
| D-3 | U.S. Senate – Definition of Sine Die Adjournment |
| D-4 | 107th Congress House Rules Manual re Adjournments |
| D-5 | Memorandum for Janet Reno, Attorney General |

# APPENDIX D-1

Order Code RL30909

# CRS Report for Congress

Received through the CRS Web

# The Pocket Veto: Its Current Status

March 30, 2001

Louis Fisher
Senior Specialist in Separation of Powers
Government and Finance Division

# The Pocket Veto: Its Current Status

## Summary

The Constitution provides that any bill not returned by the President "within ten Days (Sundays excepted)" shall become law, "unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law." This instrument of presidential power, known as the "pocket veto," was first used in 1812 by President James Madison. Unlike the regular veto, which is subject to a congressional override, a pocket veto is "absolute" because it is not returned to Congress.

Beginning in 1929, several judicial decisions attempted to clarify when an adjournment by Congress would "prevent" the President from returning a veto. Several cases during the Nixon administration appeared to restrict the pocket veto to a final adjournment of Congress at the end of the second session, and that understanding was accepted by the Ford and Carter administrations. Under this political accommodation, Presidents would not use the pocket veto in the middle of a session (intrasession vetoes) or between the first and the second sessions (intersession vetoes).

However, that agreement has not been followed by the Reagan, Bush, and Clinton administrations. President Ronald Reagan issued a pocket veto late in 1981 and 1983 (at the end of the first sessions), and President George Bush also used intersession pocket vetoes late in 1989 and 1991. President Bill Clinton, in 2000, used three intrasession pocket vetoes.

The pocket vetoes by Presidents Bush and Clinton were unusual in the sense that the vetoes were *returned* to Congress. Evidently the inter- and intrasession adjournments by Congress did not "prevent" the return of the vetoes. If the President returned these "pocket vetoes," could Congress attempt an override? The answer is that Congress several times has taken override votes on these types of pocket vetoes.

Efforts to legislate the meaning of "adjournment" have thus far been unsuccessful, nor has there been any definitive judicial ruling to clarify the constitutional issue, although court rulings have established important parameters for the pocket veto. As a result, the scope of the pocket veto power has been left largely to practice and to political understandings developed by the executive and legislative branches.

## Contents

Introduction . . . . . 1
Legislation in 1868 . . . . . 2
Twentieth Amendment . . . . . 2

Judicial Rulings . . . . . 3
Five-month Adjournment . . . . . 3
Brief Recess of Single House . . . . . 4
Brief Adjournment by Both Houses . . . . . 4

Legislative Proposals . . . . . 5
Defining "Adjournment" . . . . . 5

Political Accommodation:
Ford and Carter . . . . . 6
"Protective Return" . . . . . 6
Rehabilitation Bill . . . . . 7
National Security Act Amendments . . . . . 7
Bork Memo . . . . . 8

Initiatives by President Reagan . . . . . 9
Bankrupt Florida Firm . . . . . 9
El Salvador Certification . . . . . 10
Supreme Court Action . . . . . 10
Other Reagan Vetoes . . . . . 11

Legislative Proposals: 1989-90 . . . . . 11
Justice Department Position . . . . . 12
Immediate Consideration of a Veto? . . . . . 12
The Three-day Rule . . . . . 16

Pocket Vetoes from 1989 to 2000 . . . . . 17
FIRREA Legislation . . . . . 17
Chinese Immigration . . . . . 18
Udall Scholarship Fund . . . . . 19
Clinton's Actions . . . . . 19
Marriage and Death Tax Bills . . . . . 20
Intelligence Authorization . . . . . 21

Conclusions . . . . . 21

Selected References . . . . . 23

# The Pocket Veto: Its Current Status

## Introduction

The framers of the Constitution rejected proposals for an absolute executive veto recommended by James Wilson and Alexander Hamilton. The delegates at the Philadelphia convention defeated that proposal, ten states voting against it and not a single one in favor. The President received a qualified veto, subject to an override by a two-thirds majority of each House of Congress.[1]

However, an absolute veto is available in some situations. The Constitution provides that any bill not returned by the President "within ten Days (Sundays excepted)" shall become law "unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law." This language allows for a distinction between "regular vetoes" (returned to Congress for an override vote) and "pocket vetoes" (not returned). As this report later explains, there now exists a new hybrid version: pocket vetoes that are returned to Congress.

James Madison was the first President to exercise a pocket veto. Both of his pocket vetoes were done after lengthy adjournments between the first and second sessions. On July 6, 1812, Congress adjourned at the end of the first session of the 12th Congress, returning on November 2, 1812 to begin the second session. Madison's message, referring to the pocket veto, is dated November 5, 1812:

> The bill, entitled "An act supplementary to the acts heretofore passed on the subject of an uniform rule of naturalization," which passed the two Houses at the last session of Congress, having appeared to be liable to abuse by aliens having no real purpose of effectuating a naturalization, and therefore not been signed; and having been presented at an hour too near the close of the session to be returned with objections for reconsideration, the bill failed to become a law. . . .[2]

---

[1] 1 The Records of the Federal Convention of 1787, at 96-104 (Max Farrand ed., 4 vols. New Haven, Conn.: Yale University Press, 1937) (hereafter "Farrand"). George Reed of Delaware later proposed that the President be given an absolute veto. His motion was rejected, 1 to 9 (2 Farrand 200). The delegates voted on August 15 to require a three-fourths majority for an override, voting 6 to 4 (id. at 301), but reversed themselves on September 12 by an identical vote in support of the two-thirds requirement (id., at 582-83, 585-87).

[2] Annals of Cong., 12th Cong., 2nd sess. 17; Presidential Vetoes, 1789-1988, S. Pub. 102-12, at 5 (H.R. 170).

The intersession adjournment of the 12th Congress lasted almost four months. Madison's second pocket veto occurred in 1816, after Congress on April 30, 1816, adjourned to end the first session of the 14th Congress. The bill was presented to him on April 27, 1816. Congress began the second session on December 2, 1816, a little more than six months later.[3]

## Legislation in 1868

On February 17, 1868, Senator George F. Edmunds announced that the Senate Committee on the Judiciary had reported S. 366, a bill to regulate "the presentation of bills to the President and the return of the same."[4] The bill stated that "the adjournment of Congress which shall prevent the return of any such bill by the President to that house in which it originated, shall be held and construed to be the final adjournment of a session, and not an adjournment of either or both houses of Congress . . . to a particular day."[5] The apparent purpose was to prohibit pocket vetoes in the middle of a session but to allow them between the first and second sessions. The bill also provided that when a House was not in session, the President would return a veto message to the Secretary of the Senate or the Clerk of the House of Representatives. Furthermore, the bill provided that if the President failed to return a bill to Congress within the time defined by S. 363, the bill "shall be a law" and it shall be the duty of the President to deliver the bill to the Secretary of State to be promulgated as a law.

Senate debate began February 24. After some Senators objected to the use of legislation to alter a process set forth in the Constitution, action on the bill was delayed by a day.[6] Debate resumed March 18 and concluded March 24, when the bill passed by a vote of 29 to 11.[7] The bill was taken up in the House, left on the Speaker's table, and referred to the House Committee on the Judiciary.[8] There was no further action on the bill.

## Twentieth Amendment

Pocket vetoes reflect the practice of the 19th and early 20th centuries, when Congress would adjourn for substantial amounts of time between the first and second sessions. Typically the first session would be long (usually over 200 days and sometime over 300 days), followed by a short second session that lasted between 80 to 90 days.[9] That pattern changed markedly after ratification of the Twentieth Amendment on January 23, 1933. Instead of Congress assembling on the first

---

[3] Presidential Vetoes, at 5-6 (H.R. 106).

[4] Cong. Globe, 40th Cong., 2nd sess. 1204 (1868).

[5] S. 366, 40th Cong., 2nd sess. (Feb. 17, 1868).

[6] Cong. Globe, 40th Cong., 2nd sess. 1371-73, 1404-05, 1406.

[7] Id. at 1940-43, 2076-78.

[8] Id. at 2083, 2543, 4341-42.

[9] Congressional Directory, 1999-2000, at 526-30.

Monday in December (Art. I, Section 4), Congress would now meet on January 3 of each year. After 1933 the short sessions disappeared, and so did the lengthy adjournments between the first and second sessions.

## Judicial Rulings

The Supreme Court has addressed the pocket veto issue in several rulings, ranging from multi-month adjournments of Congress to short recesses by a single House. A number of important rulings have been handed down by lower courts, but judicial interpretations of the pocket veto power remain unclear because the Supreme Court in 1987 decided to sidestep a pocket veto issue on procedural grounds (mootness) rather than reach a substantive holding.

### Five-month Adjournment

The Supreme Court first decided a pocket veto dispute in 1929. In preparation for this legal controversy, the Justice Department completed a lengthy memo on bills presented to the President less than 10 days before the adjournment of Congress and not signed by him.[10] The bill that was litigated reached President Calvin Coolidge on June 24, 1926, less than 10 days before Congress adjourned on July 3, at the end of the first session of the 69th Congress. The intersession adjournment lasted until December 6, or over five months. The Supreme Court unanimously upheld the pocket veto, concluding that the adjournment prevented the President from returning the bill. The crucial issue was not whether an adjournment was final or interim but whether it "prevented" the bill's return. The Court held that a bill had to be returned to the chamber while it is in session and capable of legislative work. It was not sufficient, said the Court, for the veto message to be delivered to a legislative agent and held until the chamber resumed its sittings.[11]

This latter point, regarding legislative agents, was dicta and not the central holding of the case. At Senate hearings in 1971, William H. Rehnquist testified as the head of the Office of Legal Counsel in the Justice Department. Although *The Pocket Veto Case* said that if Congress were to appoint agents to receive presidential messages it would be without effect, because the return must be to Congress in session, Rehnquist remarked: "I think most people would concede that was what you might call dicta and that was not necessary to the decision in the case so it is not as binding as it would be had it been necessary . . . ."[12]

---

[10] Reprinted in H. Doc. No. 493, 70th Cong., 2nd sess. (1928).

[11] The Pocket Veto Case, 279 U.S. 655, 680-85 (1929).

[12] "Constitutionality of the President's 'Pocket Veto' Power," Hearing before the Subcommittee on Separation of Powers of the Senate Committee on the Judiciary, 92nd Cong., 1st sess. 18 (1971).

## Brief Recess of Single House

The next issue for the Court concerned the adjournment not of Congress as a whole but of a recess by the Senate, which had recessed for three days. The Court considered the time so short that the Senate could act with "reasonable promptitude" on the veto. Also, the Secretary of the Senate functioned during the recess and was able to receive (and did receive) the bill. The Court made this comparison between executive agents authorized to receive bills while the President is absent, and legislative agents authorized to receive veto messages while Congress is adjourned or in recess:

> There is no greater difficulty in returning a bill to one of the two Houses when it is in recess during the session of Congress than in presenting a bill to the President by sending it to the White House in his temporary absence. Such a presentation is familiar practice. The bill is sent by a messenger and is received by the President. It is returned by a messenger, and why may it not be received by the accredited agent of the legislative body? To say that the President cannot return a bill when the House in which it originated is in recess during the session of Congress, and thus afford an opportunity for the passing of the bill over the President's objections, is to ignore the plainest practical considerations and by implying a requirement of an artificial formality to erect a barrier to the exercise of a constitutional right.[13]

The Court emphasized that the veto procedure serves two fundamental purposes: (1) to give the President an opportunity to consider a bill presented to him, and (2) to give Congress an opportunity to consider his objections and override them. Both objectives required protection. To allow the pocket veto to expand without limit would create a kind of absolute veto that the framers had rejected.[14]

## Brief Adjournment by Both Houses

There were no further legal disputes until President Richard Nixon, on December 24, 1970, exercised a pocket veto over the Family Practice of Medicine Bill.[15] The bill had passed the Senate 64 to 1 and the House 346 to 2, providing what appeared to be overwhelming majorities for any veto that Nixon might exercise. Both chambers adjourned on December 22 for the Christmas holidays. The Senate returned on December 28 and the House the following day. Not counting December 27 (a Sunday), the Senate was absent for four days and the House for five.

Unlike the 1929 case, Nixon's action involved a short adjournment *during* a session rather than a lengthy adjournment at the end of a session. A district court held that the Christmas adjournment had not prevented Nixon from returning the bill to

---

[13] Wright v. United States, 302 U.S. 583, 590 (1938).

[14] Id. at 596-97. For an Attorney General opinion upholding a pocket veto after Congress had adjourned in 1943 for two months, see 40 Op. Att'y Gen. 274 (1943).

[15] Public Papers of the Presidents, 1970, at 1156.

Congress as a regular veto. The bill therefore became law on December 25, 1970, 10 days after it had been presented to the President.[16]

When an appellate court upheld this decision the following year, it appeared that pocket vetoes would be impermissible during *any* intrasession adjournment. The D.C. Circuit ruled that an intrasession adjournment of Congress "does not prevent the President from returning a bill which he disapproves so long as appropriate arrangements are made for the receipt of presidential vetoes during the adjournment."[17] The Justice Department decided not to appeal this case to the Supreme Court.[18] The bill was eventually printed as a public law (P.L. 91-696) and backdated to December 25, 1970, which marked the end of the 10-day period provided in the Constitution for executive review of bills.

Because of the brief interval between the first and second sessions (which can be shorter than an intrasession adjournment), *inter*session pocket vetoes also seemed suspect. Under this logic, pocket vetoes would be available only with final adjournment of a Congress at the end of the second session. [Litigation in the 1980s, culminating in the *Barnes* case, is discussion later in the section "Initiatives by President Reagan."]

## Legislative Proposals

In response to President Nixon's pocket veto of the Family Practice of Medicine Bill, both Houses held hearings and considered statutory language to restrict the use of pocket vetoes. The Senate Judiciary Committee held a hearing on January 26, 1971, to examine the constitutionality of Nixon's action and to evaluate legislative options. On April 7, 1971, Subcommittee No. 5 of the House Committee on the Judiciary held hearings on H.R. 6225, which was designed to spell out the pocket veto powers of the President.

### Defining "Adjournment"

H.R. 6225 defined "adjournment" as the sine die adjournment that terminates a session of Congress. Thus, the bill would have prevented *intra*session pocket vetoes but not *inter*session pocket vetoes after Congress adjourned sine die at the end of the first session. Senator Sam Ervin introduced a similar bill (S. 1642), but defined adjournment to mean an adjournment sine die by either the Senate or the House. Both bills provided for a legislative officer to receive veto messages while Congress "is not actually in session."

In the 93rd Congress, Congressman Peter Rodino introduced H.R. 7386, pursuant to the Necessary and Proper Clause, to provide that the return of a bill,

---

[16] Kennedy v. Sampson, 364 F.Supp. 1075, 1087 (D.D.C. 1973).

[17] Kennedy v. Sampson, 511 F.2d 430, 437 (D.C. Cir. 1974).

[18] Arthur John Keeffe, with John Harry Jorgenson. "Solicitor General Pocket Vetoes the Pocket Veto," 61 A.B.A.J. 755 (1975).

order, resolution, or vote under Section 7 of Article I of the Constitution "is prevented only when the adjournment of the Congress, or of either House, is sine die." That bill was reported by the House Judiciary Committee on May 1, 1974, but no further action was taken. The report explained:

> It should be understood that the President possesses no pocket veto *power* as such. A pocket veto is something the Congress causes. It is the result that occurs when Congress waives its right to reconsider legislation when its adjournment prevents the return of the bill.[19]

In other words, according to this interpretation, the presidential opportunity to exercise a pocket veto depends on circumstances that Congress can control. Through legislation, the committee argued, Congress could clarify the kind of adjournment that "prevents the return" of a bill. The committee believed that "just as Congress has the power to define those instances where there is a burden on interstate commerce or a violation of the equal protection clause, it may define those instances where an adjournment prevents the return of a bill."[20]

## Political Accommodation: Ford and Carter

In 1974, Congress adjourned from October 17 to November 18 for the elections. During that intrasession period, President Gerald Ford exercised the pocket veto five times, but in a unique manner. Although he claimed to pocket veto the bills, he also returned them to Congress, using the identical language each time: "I am advised by the Attorney General and I have determined that the absence of my signature from this bill prevents it from becoming law. Without in any way qualifying this determination, I am also returning it without my approval to those designated by Congress to receive messages at this time."[21]

### "Protective Return"

Other Presidents have used the approach, which the Justice Department calls a "protective return." That phrase means the return of a bill, along with a veto message, during the time that Congress is in recess, with the hope that it protects against the possibility that (contrary to the executive branch view) a court might hold that Congress had appointed an official to receive veto messages during the recess and that Congress had not by its adjournment prevented the return of the bill. Therefore, a pocket veto is unavailable. A "protective return" is a hybrid: the President claims the power of pocket veto but, at the same time, returns the bill to Congress for a possible override.

---

[19] H. Rept. No. 93-1021, 93rd Cong., 2nd sess. 2 (1974).

[20] Id.

[21] Public Papers of the Presidents, 1974, at 447 (October 22, 1974, veto of National Wildlife Refuge System Legislation). The same language appears in four other vetoes on October 29, 1974, covering two private bills (id. at 499-500 and 501), a farm labor bill (id. at 503), and Vocational Rehabilitation Act Amendments (id. at 504-05).

After Congress returned on November 18, President Ford told lawmakers that during the adjournment "it was necessary for me to pocket veto five bills." Yet he said that he had returned the bills to Congress, adding this comment: "If the Congress should elect to challenge these vetoes by overriding them, there could be a prolonged legal uncertainty over this legislation. However, I would welcome new legislation to replace the measures which were vetoed."[22]

## Rehabilitation Bill

Congress treated the "pocket vetoes" as return vetoes, capable of being overridden by a two-thirds vote of each chamber. In fact, both Houses overrode the veto of the Vocational Rehabilitation Act Amendments: the House on November 20 and the Senate on November 21. Nevertheless, the Administration refused to promulgate it as a law. Senator Edward Kennedy amended a pending bill—affecting a pocket veto claim dating back to the Nixon administration—to include the rehabilitation bill and also brought the matter to court. On January 19, 1976, a district court agreed with *Kennedy* v. *Sampson* that pocket vetoes could not be used except after adjournment sine die unless Congress failed to appoint individuals to receive veto messages from the President.[23]

While this litigation was underway, the Administration announced an accommodation with Congress. On December 19, 1975, with Congress about to adjourn sine die for the first session of the 94th Congress, some Members of Congress expressed concern that any bills submitted to President Ford might be pocket vetoed. Representative Bob Eckhardt, recalling the Nixon precedent with the Family Practice of Medicine bill, said that the "only way we can safely posture ourselves during a period of time like Christmas is not to adjourn for a period longer than 3 days. As long as we do not adjourn for a period longer than 3 days, a pocket veto is not possible."

The Ford administration, communicating its views through House Minority Leader John Rhodes, announced that it would not use the pocket veto during intersession adjournments. Rhodes stated that President Ford "has no plans to exercise his constitutional right of pocket veto." When Congress submitted legislation to him, "he will either sign it or veto it in the ordinary way, which would preserve the right of this House and of the other body to either sustain or override those vetoes when we come back after the sine die adjournment."[24]

## National Security Act Amendments

The second session of the 94th Congress began January 19, 1976. When the House and the Senate returned, lawmakers had an opportunity to override President Ford's December 31, 1975, veto of amendments to the National Security Act. As he had promised, Ford used a regular veto, not a pocket veto. In the Senate, during the

---

[22] Id. at 624-25.

[23] Kennedy v. Jones, 412 F.Supp. 353 (D.D.C. 1976).

[24] 121 Cong. Rec. 41884 (1975)

override debate, Senator Edward Kennedy said that Ford's action in returning the bill to Congress "is an unprecedented as it is welcome to those of us who have been endeavoring to obtain a rationale [sic] construction of the pocket veto clause."[25]

## Bork Memo

On January 26,1976, Solicitor General Robert Bork wrote a memorandum to Attorney General Edward Levi, concluding that President Ford should not exercise the pocket veto during intrasessions and intersessions, but only at sine die adjournment at the end of the second session, provided that Congress has authorized an officer or other agent to receive return vetoes.[26] Bork reached that conclusion by taking into account both historical and practical considerations. He wrote: "We do not believe that the length of the intra-session adjournment can be constitutionally significant under modern conditions, so long as an agent remains behind who is authorized and available to receive a return veto. Nor do we regard the difference between intra-session and inter-session adjournments to require a difference in constitutional practice."[27] The use of a pocket veto, he wrote, "is improper whenever a return veto is possible."[28]

In addition to calling attention to the shortness of contemporary intra- and intersession adjournments, Bork offered a more practical reason for limiting the President's pocket veto power. The constitutional text, he noted, does not prescribe a time limit for the period when Congress passes a bill and when it must present the bill to the President. He continues: "Thus, were it supposed that the President had a power to pocket veto a bill because the tenth day fell during a recess or adjournment, Congress could defeat the power by leaving a bill with an officer instructed to present it to the President nine days before the end of any recess or adjournment. This fact reduces the argument for the power to pocket veto during intra-session or inter-session recesses or adjournments to the level of constitutional triviality."[29]

On January 29, 1976, Attorney General Levi wrote to President Ford, advising him that it was "extremely unlikely" that the Justice Department would prevail in its defense of the Ford pocket vetoes being litigated. Moreover, Levi said that continued use of the pocket veto during intra- and intersession adjournments, where Congress has authorized an officer to receive return vetoes, "cannot be justified as consistent with the provisions of the Constitution."[30] The Department's chances of success in court "are remote" and "our position is not constitutionally sound."[31] Under pressure

---

[25] 122 Cong. Rec. 677 (1976).

[26] Reprinted in "H.R. 849," Hearing before the Subcommittee on the Legislative Process of the House Committee on Rules, 101st Cong., 1st sess. 125 (1989).

[27] Id. at 126.

[28] Id. at 127.

[29] Id. at 128-29.

[30] Id. at 140.

[31] Id. at 142.

from the lawsuit in *Kennedy* v. *Jones* and with the advice of Solicitor General Bork, the Justice Department announced on April 13, 1976, that it would not attempt to pocket veto any legislation during congressional recesses. Attorney General Levi released this statement:

> President Ford has determined that he will use the return veto rather than the pocket veto during intra-session and inter-session recesses and adjournments of the Congress, provided that the House of Congress to which the bill and the President's objections must be returned according to the Constitution has specifically authorized an officer or other agent to receive return vetoes during such periods.[32]

The accommodation announced by the Ford administration on the pocket veto was honored by President Jimmy Carter. All of his 18 pocket vetoes were exercised after Congress had adjourned sine die at the end of the second sessions of the 95th and 96th Congresses.

## Initiatives by President Reagan

Several actions by President Ronald Reagan reopened the pocket veto controversy. Although President Reagan initially abided by *Kennedy* v. *Sampson* to the extent that he did not exercise the pocket veto during intrasessions,[33] he experimented with pocket vetoes between the first and second sessions.

### Bankrupt Florida Firm

After Congress had adjourned on December 16, 1981, at the end of the first session of the 97th Congress, to return in about 6 weeks, President Reagan pocket vetoed a special relief bill for a bankrupt Florida firm.[34] A private corporation challenged the constitutionality of this pocket veto, but the case did not result in any reported decisions.[35]

On August 20, 1982, when the Senate debated an adjournment resolution, with the Senate scheduled to return on September 8, Senator Robert C. Byrd asked Senate Majority Leader Howard Baker whether President Reagan intended to use the pocket veto during this intrasession adjournment. Baker replied: "I do not believe the President will choose that. I cannot assure the Senator that is absolutely impossible, but having inquired into that it is my distinct impression the President will choose

---

[32] 122 Cong. Rec. 11202 (1976).

[33] Public Papers of the Presidents, 1984 (II), at 1205.

[34] Public Papers of the Presidents, 1981, at 1208.

[35] Presidential Vetoes, 1789-1988, S. Pub. 102-12, at 492. Fidelity Mortgage Investors, No. 75-B-154 (Bkrtcy. S.D. N.Y.) and Lifetime Communities, Inc. v. Administrative Office of U.S. Courts, No. 81-Civ.-0544 (KTD) (S.D.N.Y.).

either to sign or veto the measure. I do not anticipate a pocket veto . . . ."[36] In fact, the only pocket vetoes exercised by President Reagan in 1982 were those after Congress adjourned sine die after the second session of the 97th Congress.[37]

## El Salvador Certification

At the end of the first session of the 98th Congress, President Reagan again exercised his pocket veto power between sessions. On November 30, 1983, he pocket vetoed a bill to require certification of human rights practices in El Salvador as a precondition for sending military aid.[38] The House had adjourned sine die on November 18 and did not return until January 23, 1984—nine weeks later.

A bipartisan group of 33 Members of the House of Representatives filed suit to require that the bill be published as a public law. A district court upheld President Reagan's action. The judge reasoned that the case most pertinent was the Pocket Veto Case of 1929, which also involved a multi-month sine die adjournment between the first and second sessions. Although the decision in 1929 had been shaken by *Wright* in 1938 and the *Kennedy* cases, the judge felt obliged to follow the single holding of the Supreme Court that seemed to him most relevant.[39]

The district court decision was overturned by the D.C. Circuit, which pointed out that both the House and the Senate, before adjourning, had expressly arranged for an agent to receive veto messages from the President: "It is difficult to understand how Congress could be said to have prevented return of H.R. 4042 simply by adjourning. Rather, by appointing agents for receipt of veto messages, Congress affirmatively *facilitated* return of the bill in the eventuality that the President would disapprove it."[40] The appellate court also noted that "the line that divides the first session of a Congress from the second has ceased to have any practical significance."[41]

## Supreme Court Action

Just when it appeared that the pocket veto issue might be resolved judicially, in 1987 the Supreme Court held that the controversy over the El Salvador legislation was moot because the bill had expired by its own terms, regardless of whether it had been previously enacted into law or not. The dispute was therefore moot.[42] Yet the issue was a live case or controversy in the sense that the pocket veto exercised by President Reagan was "capable of repetition," and therefore proper for a court to

---

[36] 128 Cong. Rec. 22567 (1982); see also 128 Cong. Rec. 22586 (1982).

[37] Presidential Vetoes, 1789-1988, S. Pub. 102-12, at 494-95.

[38] Public Papers of the Presidents, 1983, II, at 1636.

[39] Barnes v. Carmen, 582 F.Supp. 163 (D.D.C. 1984).

[40] Barnes v. Kline, 759 F.2d 21, 30 (D.C. Cir. 1985). Emphasis in original.

[41] Id. at 38.

[42] Burke v. Barnes, 479 U.S. 361 (1987).

decide. However, the Court might have used mootness to avoid another difficult constitutional issue: whether Members of Congress have standing to sue in court.[43]

### Other Reagan Vetoes

In all other cases, President Reagan pocket vetoed bills at the end of the second session of a Congress after Members had adjourned sine die. Occasionally he would call attention to the generous scope of his pocket veto, but nevertheless opt for a regular veto. On August 29, 1984, he announced that he had full constitutional authority to pocket veto bills during any congressional adjournment, but—"consistent with" *Kennedy* v. *Sampson*—he chose on this occasion to use a regular veto and returned the bill to the Senate for possible override.[44] Similarly, on January 17, 1986, after stating that the adjournment of Congress had prevented his return of a House bill, he nevertheless returned the bill to the House, "consistent with the Court of Appeals decision in *Barnes* v. *Kline*, 759 F.2d 21 (D.C. Cir. 1985), *cert. pending sub no. Burke* v. *Barnes*, No. 85-781."[45]

## Legislative Proposals: 1989-90

With little hope of obtaining clarification from the courts, Congress turned to legislative remedies. On July 26, 1989, the Subcommittee on the Legislative Process of the House Committee on Rules held hearings on H.R. 849, a bill to clarify the law surrounding the President's use of the pocket veto. On May 9, 1990, the Subcommittee on Economic and Commercial Law of the House Committee on the Judiciary also held hearings on pocket veto legislation.

In 1990, the House Rules Committee reported legislation to restrict the pocket veto to the end of a Congress (adjournment sine die at the end of the second session).[46] The bill was referred to the House Judiciary Committee, which favorably reported the bill later that year.[47] At that point the bill was referred to the Committee of the Whole House.[48] Although the bill was referred to the House Calendar,[49] there was no further action on H.R. 849.

---

[43] Id. at 366 (Stevens, J., dissenting).

[44] Public Papers of the Presidents, 1984, II, at 1205.

[45] Public Papers of the Presidents, 1986, I, at 64.

[46] H. Rept. No. 417 (Part 1), 101st Cong., 2nd sess. (1990).

[47] H. Rept. No. 417 (Part 2), 101st Cong., 2nd sess. (1990).

[48] 136 Cong. Rec. 23476 (1990).

[49] Id. at 25523.

## Justice Department Position

At the hearings, the Justice Department expressed its opposition to the legislation and stated that it would recommend that the President veto such legislation if it were presented to him. William P. Barr, head of the Office of Legal Counsel in the Justice Department, testified that Congress "cannot change the meaning of the Constitution by passing a statute defining what the word adjournment means for purposes of pocket veto clause."[50] Moreover, he took the position that whenever either House of Congress adjourned for more than three days, the President could exercise the pocket veto:

> We think that where one House seeks the consent of another House and goes out on a recess for more than 3 days, you have bicameral action, which constitutes an adjournment of Congress. Congress is then adjourned even if one House remains in session because you have had bicameral action.
>
> Where a House goes out on a brief recess and does not obtain the consent of the other House because it is not going to be over 3 days, then Congress remains in session and is not adjourned for purposes of the pocket veto clause. Congress is not adjourned.[51]

Barr's prepared statement is clearer on this point: "the Constitution implies that any adjournment by the Congress—that is, any adjournment of either house for longer than three days—gives occasion for a pocket veto."[52]

In reaching this conclusion, Barr identified two schools of thought on the pocket veto. The first one, which he said was the basis for the pocket veto legislation (H.R. 849), is what he called "the ducking Congress school of thought." In this sense, the pocket veto clause protected the President when Congress submitted legislation to him and adjourned to "evade service of process, so to speak." Under this theory, all Congress had to do was "provide a mailbox and a registered agent to accept service of process."[53]

## Immediate Consideration of a Veto?

Barr described a second purpose of the pocket veto clause, and that was the framers' intent "to have the Legislature present with the capacity to give immediate consideration" to a President's veto:

> They wanted a process whereby the confrontation between the Executive and the Legislature, which they considered to be a momentous occasion, very important, solemn occasion, the President has a solemn duty

---

[50] "H.R. 849," Hearing before the Subcommittee on the Legislative Process of the House Committee on Rules, 101st Cong., 1st sess. 55 (1989).

[51] Id. at 58.

[52] Id. at 61.

[53] Id. at 56.

> to review the legislation. He is given 10 days to do it. When he vetoes, they wanted again this confrontation to be capable of immediate resolution, immediate consideration in Congress. . . .
>
> So we think that part of the rationale for the pocket veto clause was the ducking Congress problem, but there was another reason, which was to eliminate or to minimize periods of uncertainty, to focus the debate . . . to permit the legislative process to rapidly resolve and immediate address differences that arose between the Executive and Congress.[54]

This rationale is not supported by constitutional language or legislative practice. Article I, Section 7, provides that when a President vetoes a bill and returns it to the House in which it originated, that House "shall enter the Objections at large on their Journal, and proceed to reconsider it." Nothing in congressional proceedings over the past two centuries suggests that reconsideration must be immediate. On a regular basis, Congress exercises judgment and discretion on the timing of reconsideration and override votes. There is no urgent or compulsory legislative need to test a presidential veto.

The Constitution states that Congress shall "proceed to reconsider" a President's veto. It does not say that Congress shall immediately proceed, and there is no requirement that reconsideration produce a vote. The Constitution provides: "If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law." This language implies that if Congress, after reconsideration, does not agree to pass the bill, no action is necessary. The veto stands unchallenged. Such has been the uniform interpretation of Congress.

Over the first 50 years of reconsidering vetoes (1792-1842), Congress usually reconsidered a veto within a day or two, but the record shows that Members of the House and Senate concluded that an immediate override vote was not required by the Constitution. Depending on various factors and circumstances, to be determined by each House, the vote could be delayed.

The first veto was by President George Washington on April 5, 1792. The veto message was received by Congress, the presidential objections read and entered in the Journal, and the House of Representatives resolved that "to-morrow be assigned for the reconsideration, of the said bill, in the mode prescribed by the Constitution of the United States."[55] The last 11 words appear to suggest that the designation of tomorrow would satisfy the "mode prescribed by the Constitution." However, subsequent legislative debates make it clear that the "mode" merely referred to the requirement for a two-thirds majority, the determination of votes by yeas and nays, and the entering into the Journal of the names of the persons voting for and against the bill.

---

[54] Id. at 57.

[55] Annals of Cong., 2nd Cong., 1st-2nd sess. 539 (1792).

There were no vetoes by Presidents John Adams and Thomas Jefferson. After President Madison vetoed a bill on February 21, 1811, legislators explored the extent to which a vote to override the President could be delayed. When Representative Burwell Bassett suggested that the veto message be referred to a select committee, Speaker Joseph Varnum objected "that the article on the Constitution on this subject required that the House should proceed to a reconsideration of the bill." Bassett replied that although the Constitution called for reconsideration of a bill when returned, "the mode of reconsideration was not prescribed; and it might as well be by reference to a select committee as in any other mode."[56] In this case, the override vote occurred two days later, on February 23.

Madison's second veto occurred on February 28, 1811, and the override vote took place two days later. After his third veto on Friday, April 3, 1812, the House of Representatives ordered that reconsideration occur "to-morrow."[57] Later on Friday the House considered an issue that required secrecy and the clearing of the galleries. Secret deliberations continued on Saturday, April 4, with no action on the vetoed bill. Reconsideration did not occur until Wednesday, April 8.

On Monday, January 30, 1815, Madison vetoed a bill and returned it to the Senate. It was ordered that "to-morrow, at twelve o'clock, the Senate will proceed to consider the bill."[58] The Senate reconsidered the bill on January 31, but after the reading of the bill further consideration was postponed until February 2, at which point the veto was sustained. Madison's last veto was on March 3, 1817, and sustained by the House on that same day.[59]

President James Monroe vetoed one bill, issuing a veto message on Saturday, May 4, 1822. On Monday, May 6, Representative Bassett moved to refer the bill to the Committee of the Whole. The House rejected his motion and sustained the veto.[60] President John Quincy Adams vetoed no bills. President Andrew Jackson vetoed 12 bills, of which five were regular vetoes and seven were pocket vetoes. Although reconsideration was prompt on four of the vetoes, Senator Daniel Webster explained the need for legislative judgment depending on the nature of the bill:

> The Constitution prescribes that the House shall proceed to this decision thereupon. It was the practice of Congress to give a proper time for the transcript of the message, and for a respectful consideration of the subject. In cases of less importance, it was the custom to proceed immediately to the decision. But, in this case [involving the U.S. Bank], it was respectful to the President, to the length of the paper which had been read, to the high character of the various topics which it embraced, and to the general importance of the subject, that the Senate should assign such day and hour

---

[56] Annals of Cong., 11th Cong., 3rd sess. 983-84 (1811).

[57] Annals of Cong., 12th Cong., 1st sess. 1252 (1812).

[58] Annals of Cong., 13th Cong., 3rd sess. 191 (1815).

[59] Annals of Cong., 14th Cong., 2nd sess. 1055-63 (1817).

[60] Annals of Cong., 17th Cong., 1st sess. 1874-75 (1822).

for taking the message into consideration, as would be agreeable under the existing circumstances.[61]

Jackson's last regular veto was sent to the Senate on Friday, June 10, 1836. However, the veto message was not taken up until Wednesday, June 22. After extensive debate the question of overriding the veto was laid on the table. Finally, on Monday, June 27, the Senate voted to sustain the veto. This was the longest delay thus far in reconsidering a bill: 14 days (excluding Sundays).[62]

In 1842, the House voted to refer a veto by President John Tyler to committee. The veto message was sent to the House on Tuesday, August 9, with consideration scheduled for the following day.[63] On August 10, Representative John Quincy Adams moved that the veto message be referred to a select committee with instructions to report to the House. Representative A. Lawrence Foster objected to the motion on constitutional grounds, arguing that "it was not competent to make a motion to refer." Speaker John White "was understood to overrule the objection," pointing out that "the House alone had control of the matter, and the House could lay it on the table, or send it to either a select committee or a Committee of the Whole House." Representative Joseph Underwood agreed, noting that a veto message might refer to certain facts "of which Congress had no knowledge when a bill was passed," and the House could appoint a committee "to ascertain the truth of the statement, and to reexamine the facts." If the committee could investigate matters of fact, "they could assuredly inquire into matters of opinion, and report on reasoning as well as facts." After additional debate, Adams' motion to refer the veto message to a select committee was adopted, and on Thursday, August 11, the 13 members of the select committee were named. A motion to take up the vetoed bill for the purpose of reconsideration was rejected.[64] The select committee reported on Tuesday, August 16, and on the following day the veto was sustained.[65]

Subsequent override votes were delayed by much longer periods. Although President Franklin Pierce vetoed a bill on May 3, 1854, the override vote did not occur until more than two months later, on July 6. A Pierce veto of August 4, 1854 was not acted upon until December 6, 1854, but the delay in this case resulted from the congressional adjournment from August 7 to December 4. In 1856, Congress took more than two months to schedule an override of a Pierce veto that occurred on May 19. The Senate overrode the veto on July 7 and the House overrode the veto a day later. No recess or adjournment interrupted this period.

A lengthy delay occurred under President Ulysses S. Grant. On January 11, 1870, he vetoed a private relief bill. The Senate overrode the veto on May 31, a delay of more than four and a half months, and the House sustained the veto on June 22.

---

[61] Cong. Debates, 22nd Cong., 1st sess. 1220 (1832).

[62] Cong. Globe, 24th Cong., 1st sess. 435, 460, 469 (1836).

[63] Cong. Globe, 27th Cong., 2nd sess. 867-68 (1842).

[64] Id. at 873, 875, 877, 878.

[65] Id. at 894-901, 906.

Both Houses were in session throughout this period. In the case of a Grant veto of March 28, 1872, laid before the House, no action had been taken by the time Congress adjourned on June 10. The next session began on December 2. The House voted to override on January 18, 1873, but the Senate referred the bill to its Committee on Claims and took no further action.

If the President were to veto a bill in the early months of a Congress, nothing would require Congress to challenge the veto promptly. It could choose to override the veto at any time during that session, or even wait for some opportunity in the second session, so long as the override effort occurred during that Congress.

## The Three-day Rule

Although the Justice Department argues that the President may exercise the pocket veto whenever either House adjourns for more than three days, and bolsters that position by pointing to constitutional language that prohibits a House from adjourning for more than three days without the consent of the other, there is no necessary connection between the veto power and the three-day rule that appears in Article I, Section 5.[66] Yet Barr testified that whenever there is "any adjournment by either or both Houses of more than three days [there is] an adjournment of Congress," and therefore an opportunity for a pocket veto.[67] During the hearing, subcommittee chairman Butler Derrick asked Barr: "What makes you think that your bright line [the three-day rule] is any better than our bright line [sine die adjournment at the end of the second session]?"[68] Derrick explained that H.R. 849 required Congress to have a properly appointed agent to receive veto messages. Barr regarded the bill's bright line as defective by identifying these improbable scenarios: "[s]uppose your agent isn't around or is dead or not in the country on the 10th day?"[69]

During the pocket veto hearing in 1990 before the House Judiciary Committee, John McGinnis of the Office of Legal Counsel repeated the three-day rule: "Article I, section 5 of the Constitution states that neither House, during its session of Congress, shall without consent of the other adjourn for more than 3 days. Thus, we believe that the Constitution implicitly defines an adjournment of Congress, which takes place whenever either House goes out for more than 3 days."[70] His prepared statement notes that the Constitution "implies that any adjournment by the

---

[66] "Neither House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days, nor to any other Place than that in which the two Houses shall be sitting."

[67] "H.R. 849," Hearing before the Subcommittee on the Legislative Process of the House Committee on Rules, at 62.

[68] Id. at 84.

[69] Id.

[70] "Pocket Veto Legislation," Hearing before the Subcommittee on Economic and Commercial Law of the House Committee on the Judiciary, 101st Cong., 2nd sess. 20 (1990).

Congress—that is, any adjournment of either house for longer than three days—gives occasion for a pocket veto."[71]

Members of the House Judiciary from both parties objected to this three-day analogy. Committee Chairman Jack Brooks (D-Tex.) detailed his reasons for rejecting the three-day rule, while ranking minority member Hamilton Fish (R-N.Y.) regarded "the idea of a pocket veto in a 3- or 4-day adjournment [as] just outrageous."[72]

## Pocket Vetoes from 1989 to 2000

On several occasions, Presidents George Bush and Bill Clinton exercised a pocket veto either between sessions or in the middle of a session. Some of these actions were challenged by Congress; others were not.

### FIRREA Legislation

On August 16, 1989, President Bush issued a memorandum of disapproval of a bill waiving enrollment requirements for the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA). He had signed FIRREA (H.R. 1278) when it was presented to him, and considered the waiver legislation (H. J. Res. 390) "superfluous."[73] Although the administration considered his action a pocket veto, the compilation of presidential vetoes prepared by the Senate Library concluded that H. J. Res. 390 had "become law because of President Bush's failure to return the legislation to Congress during a recess period."[74]

On November 21, 1989, Speaker Tom Foley and Republican Leader Robert H. Michel wrote to President Bush to explain the reason for the two bills. H. J. Res. 390 authorized a "hand enrollment" of FIRREA by waiving the requirement that the bill be printed on parchment. The Treasury Department had requested the hand enrollment option "to insure that the mounting daily costs of the savings-and-loan crisis could be stemmed by the earliest practicable enactment of H.R. 1278. In the end, a hand enrollment was not necessary since the bill was printed on parchment in time to be presented to you in that form."[75]

Although the two House leaders expressed appreciation for Bush's judgment that H. J. Res. 390 was ultimately unnecessary, they believed that he should have acted by a return veto "since the intrasession pocket veto is constitutionally infirm." They cited the D.C. Circuit opinion in *Kennedy* v. *Sampson* as controlling authority and asked Bush to join them in urging the Archivist to assign a public law number to

---

[71] Id. at 25

[72] Id. at 34-35, 38.

[73] Public Papers of the Presidents, 1989, II, at 1090.

[74] Presidential Vetoes, 1989-1996, S. Pub. 105-22, at 6.

[75] 136 Cong. Rec. 3 (1990).

H. J. Res. 390. They received a response from Attorney General Dick Thornburgh, who said that the joint resolution did not become a law, the Archivist had been instructed by the administration not to treat it as a law, and that the executive branch believed that *Kennedy* v. *Sampson* "was incorrectly decided."[76]

## Chinese Immigration

On November 21, 1989, at the end of the first session of the 101st Congress, Congress adopted H. Con Res. 239 to establish rules for the adjournment. Both chambers noted that the Clerk of the House and the Secretary of the Senate were authorized to receive messages from the President during periods when Congress was not in session, and expressed an intent to preserve their constitutional prerogatives "to reconsider vetoed measures in light of the objections of the President."[77] Any measure disapproved by the President between the first and second sessions would be treated as a return bill, subject to congressional overrides, and not as a pocket veto.

On November 30, President Bush exercised what appeared to be a pocket veto of a bill providing emergency relief for Chinese immigration. He said that the adjournment of Congress had "prevented my return of H.R. 2712 within the meaning of Article I, section 7, clause 2 of the Constitution," citing *The Pocket Veto Case* as controlling law. However, because of the questions raised by *Kennedy* v. *Sampson*, he said he was sending the bill with his objections to the Clerk of the House of Representatives. Thus, although he claimed the constitutional power to exercise a pocket veto, in fact he handled the matter as a return veto.

On January 23, 1990, the House published the veto message in the *Congressional Record* but made plain that it was a regular veto subject to congressional override. Speaker Tom Foley remarked: "The bill was returned with the President's objections to the House in which it originated, his objections have been entered at large in the Journal, and the House is now in a position to proceed to reconsider the bill."[78] On the following day, the House voted 390 to 25 to override the veto. A day later, with a vote of 62 to 37, the Senate failed in its override attempt. During the debate, Senator William Armstrong said that there was reason "to believe that all of this debate may be about a statute that has already been enacted." He placed in the *Congressional Record* a legal analysis prepared by the Senate Republican Policy Committee, which concluded that because of the decisions by the D.C. Circuit in *Kennedy* v. *Sampson* and *Barnes* v. *Kline*, President Bush's action on the Chinese immigration bill marked an invalid use of the pocket veto power, and the bill therefore became law within 10 days of being submitted to him.[79]

---

[76] Id. at 4.

[77] 135 Cong. Rec. 31156 (1989).

[78] 136 Cong. Rec. 5 (1990).

[79] Id. at 528 (1990).

The Senate Library treats this veto by President Bush as a regular veto.[80] A few days after the override votes, Senator George Mitchell pointed out that the administration itself regarded the action by Bush as a regular, or return, veto:

> The President and administration officials lobbied hard and successfully for votes. They would not have had to do so if the act was already a nullity because it had been pocket vetoed last November, and if the President's decision to send it back to the Congress was only a gesture.[81]

## Udall Scholarship Fund

President Bush provoked another pocket veto dispute when he issued a memorandum of disapproval on December 20, 1991, of a bill to create a Morris K. Udall scholarship fund (S. 1176). The veto occurred after the Senate recessed from November 27, 1991 to January 3, 1992. Bush stated in his veto message: "Because the Congress is adjourned, this means that this bill will not become a law."[82]

Instead of treating the pocket veto as a regular veto and taking an override vote, the Senate tried a different strategy. On February 4, 1992, it passed similar legislation (S. 2184) that included a section repealing S. 1176, implying that the Bush pocket veto was invalid and that S. 1176 had become law.[83] After the House passed S. 2184 on March 3,[84] President Bush signed the bill into law. Section 2 of the bill contained this language: "The Morris K. Udall Scholarship and Excellence in National Environmental Policy Act, S. 1176, One Hundred Second Congress, is hereby repealed."[85] However, in signing the bill, Bush remarked: "S. 2184 purports to 'repeal' S. 1176, passed in the last session of the Congress and presented to me in December. Because the bill came to me during an adjournment of the Congress and I withheld my signature, S. 1176 never became law. Therefore, the section of S. 2184 purporting to repeal S. 1176 can have no effect."[86]

## Clinton's Actions

President Clinton vetoed no bills during the 103d Congress (1993-95). During the 104th Congress (1995-97) he vetoed 17 bills but all were regular vetoes. In the 105th Congress (1997-99), again there were no pocket vetoes. All vetoes were of the return type. Only in the 106th Congress (1999-2001) did President Clinton resort to the pocket veto, and he did this in his final year in office. In one instance, with regard to the bankruptcy reform bill (H.R. 2415), the pocket veto came at the end of the

---

[80] Presidential Vetoes, 1989-1996, at 2.

[81] 136 Cong. Rec. 913 (1990).

[82] Public Papers of the Presidents, 1991, II, at 1651.

[83] 138 Cong. Rec. 1389-93 (1992).

[84] Id. at 4078-82.

[85] 106 Stat. 78, Sec. 2 (1992).

[86] Public Papers of the Presidents, 1992-93, I, at 473.

106th Congress, after Congress had adjourned sine die. In three other instances, however, the "pocket vetoes" (placed in quotation marks here because they were returned to Congress) came in the middle of a session.

## Marriage and Death Tax Bills

On August 5, 2000, President Clinton invoked the "protective return" by vetoing the Marriage Tax Relief Reconciliation Act of 2000. He claimed that the summer break of Congress (from July 27 to September 6) "prevented my return" of the bill within the meaning of the Constitution as interpreted by *The Pocket Veto Case*. Yet he added this qualification: "In addition to withholding my signature and thereby invoking my constitutional power to "pocket veto" bills during an adjournment of the Congress, to avoid litigation, I am also sending H.R. 4810 to the House of Representatives with my objections, to leave no possible doubt that I have vetoed the measure."[87] Similarly, on August 31 he "pocket vetoed" the Death Tax Elimination Act of 2000 and appended the same qualification.[88]

On September 6, the House treated the two veto messages as return vetoes, not pocket vetoes. In placing the veto messages in the *Congressional Record*, the Speaker pro tempore remarked:

> Consistent with the action of Speaker Foley on January 23, 1990, when in response to a parliamentary inquiry the House treated the President's return of an enrolled bill with a purported pocket veto of H.R. 2712 [the Chinese immigration relief act] of the 101st Congress as a "return veto" within the meaning of Article I, Section 7, clause 2 of the Constitution, the Chair, without objection, orders the objections of the President to be spread at large upon the Journal and orders the message to be printed as House document.[89]

On September 7, Speaker Dennis Hastert and Democratic Leader Richard Gephardt wrote to President Clinton, expressing their views on the scope of the pocket veto. They pointed to President Bush's attempt during the 101st Congress to exercise a pocket veto, even though he returned the bill to Congress for a legislative override. The two leaders told Clinton: "Your allusion to the existence of a pocket-veto power during even an intrasession adjournment continues to be most troubling. We find that assertion to be inconsistent with your previous use of the return-veto under similar circumstances but without similar dictum concerning the pocket-veto."[90] They noted that on January 9, 1996, when Clinton vetoed the welfare reform bill

---

[87] 36 Weekly Comp. Pres. Doc. 1794 (August 5, 2000).

[88] Id. at 1986-87.

[89] 146 Cong. Rec. H7240 (daily ed. September 6, 2000).

[90] Id. at E1523 (daily ed. September 19, 2000).

(H.R. 4)—an action that took place between the first and second sessions of the 104th Congress—the veto message did not include dictum concerning the pocket veto.[91]

Congress treated both of the Clinton "pocket vetoes" as regular vetoes, subject to override votes. On September 7, the House voted 274 to 157 to override the veto of the death tax bill, short of the two-thirds needed for an override.[92] During the debate, no one referred to Clinton's action as a pocket veto. All legislators accepted it as a regular veto. On September 13, the House took up the veto of the marriage tax bill, and again no Member regarded Clinton's disapproval memo as a pocket veto. The vote of 270 to 158 fell short of the necessary two-thirds majority.[93]

### Intelligence Authorization

In early November 2000, both Houses adjourned for the national elections. The Senate adjourned November 2 and returned November 14; the House adjourned November 3 and returned November 13. During that intrasession adjournment, President Clinton on November 4 vetoed the intelligence authorization bill (H.R. 4392). He again added the dictum of "protective return": claiming pocket veto authority but returning the bill to the House for an override effort.[94] Instead of attempting an override, the House chose to vote on a substitute bill (H.R. 5630) that remedied an issue raised by Clinton in his veto message. The substitute bill deleted the provision that Clinton objected to and became law.[95]

## Conclusions

The scope of the pocket veto power has been in a state of tension ever since President Nixon pocket vetoed the Family Practice of Medicine Bill in 1970. As a result of court cases and executive-legislative accommodations, it appeared that an agreement had been reached during the Ford and Carter administrations, limiting the pocket veto to the end of the second session of a Congress, after Congress had adjourned sine die, provided that Congress has instructed legislative agents to receive presidential messages. That accommodation has been disrupted in the past three administrations of Presidents Reagan, Bush, and Clinton, who invoked the pocket veto between the first and second sessions and at times in the middle of a session.

The status of these "pocket vetoes" remains unclear because Presidents claim the pocket veto power while at the same time they return the bill to Congress for a possible override. In a number of cases, Congress has taken votes in an effort to override these vetoes.

---

[91] Id. For veto message, see Public Papers of the Presidents, 1996, I, at 22-23.

[92] 146 Cong. Rec. H7335 (daily ed. September 7, 2000).

[93] Id. at H7509-20 (daily ed. September 13, 2000).

[94] Id. at H11853 (daily ed. November 13, 2000).

[95] Id. at H11854, H11864 (statements by Rep. Goss); P.L. 106-567 (December 27, 2000), 114 Stat. 2831 (2000).

Congress has considered legislation to define "adjournment" to mean sine die adjournment at the end of a Congress. Such legislation is likely to be vetoed by a President. Although the constitutional analysis of the Justice Department has not been consistent in recent decades, it would probably recommend that a President veto any bill that attempted to define the meaning of "adjournment." Even if some Presidents (Ford and Carter) are willing to accept a limitation on their pocket veto powers, their successors might insist on a broader definition of presidential power.

Congress could take other actions to protect its prerogatives during a recess or adjournment. It could instruct legislative officers in the House and the Senate to present a bill to the President nine days before the end of any recess or adjournment. In a letter addressed to a Member of the House on May 17, 1990, John O. McGinnis of the Office of Legal Counsel in the Justice Department pointed out that a bill is not subject to the Pocket Veto Clause whenever Congress takes a brief adjournment, even though in this memo McGinnis reaffirms the three-day rule. He notes that the pocket veto operates "only if the *tenth day* after presentment falls during an adjournment." In that sense, the pocket veto "is not a power of the President that he exercises affirmatively. Rather, pocket vetoes happen automatically on the tenth day after presentment if the President has not signed the bill." Here McGinnis refers to the power of Congress to decide when to send bills to the President: "Thus, the Court's reading of the Adjournment Clause requires, at most, attention to the scheduling of presentments, so that the tenth day after presentment does not fall during an adjournment of either House that is longer than three days."[96]

[96] 14 Op. O.L.C. 103, 106 (1990).

## Selected References

Bellamy, Calvin. "The Growing Potential of the Pocket Veto: Another Area of Increasing Presidential Power," 61 Illinois Bar Journal 85 (1972).

Cohen, Harold. "Validity of Pocket-Veto," 10 Boston University Law Review 76 (1930).

Condo, Joseph A. "The Veto of S. 3418: More Congressional Power in the President's Pocket?," 22 Catholic University Law Review 385 (1973).

Derrick, Butler C., Jr. "Stitching the Hole in the President's Pocket: A Legislative Solution to the Pocket-Veto Controversy," 31 Harvard Journal on Legislation 371 (1994).

Dumbrell, John W. and John D. Lees. "Presidential Pocket-Veto Power: A Constitutional Anachronism?," 28 Political Studies 109 (1980).

Hoff, Samuel B. "The Presidential Pocket Veto: Its Use and Legality," 6 Journal of Policy History 188 (1994).

Jorgenson, John H. "Pocket Veto Rolls behind the Eight Ball," 60 American Bar Association Journal 347 (1974).

Kass, Benny L. "The Pocket Veto: An Elusive Bone of Contention," 57 American Bar Association Journal 1033 (1971).

Keeffe, Arthur John, with John Harry Jorgenson. "Solicitor General Pocket Vetoes the Pocket Veto," 61 American Bar Association Journal 755 (1975).

Kennedy, Edward M. "Congress, the President, and the Pocket Veto," 63 Virginia Law Review 355 (1977).

Miller, Arthur Selwyn. "Congressional Power to Define the Presidential Pocket Veto Power," 25 Vanderbilt Law Review 557 (1972).

Note. "The Presidential Veto Power: A Shallow Pocket," 70 Michigan Law Review 148 (1971).

_______. "The Veto Power and Kennedy v. Sampson: Burning a Hole in the President's Pocket," 69 Northwestern University Law Review 587 (1974).

"Pocket Veto Legislation," report by the Committee on Federal Legislation, 29 Record of the Association of the Bar of the City of New York 724 (1974).

Pope, John Houston. "The Pocket Veto Reconsidered," 72 Iowa Law Review 163 (1986).

Serven, Abram R. "The Constitution and the 'Pocket Veto,'" 7 New York University Law Quarterly Review 495 (1929).

Spitzer, Robert J. The Presidential Veto: Touchstone of the American Presidency. Albany, N.Y.: SUNY Press, 1988. See pp. 105-19, 156-57.

U.S. Congress. "Report on Pocket Veto," H. Doc. No. 493, 70th Cong., 2nd sess. (1928).

________. "The Pocket Veto Power," Hearing before Subcommittee No. 5 of the House Committee on the Judiciary, 92nd Cong., 1st sess. (1971).

________. "Constitutionality of the President's 'Pocket Veto' Power," Hearing before the Subcommittee on Separation of Powers of the Senate Committee on the Judiciary, 92nd Cong., 1st sess. (1971).

________. "H.R. 849 [A bill to clarify the law surrounding the President's use of the pocket veto]," Hearing before the Subcommittee on the Legislative Process of the House Committee on Rules, 101st Cong., 1st sess. (1989).

________. "Pocket Veto Legislation," Hearing before the Subcommittee on Economic and Commercial Law of the House Committee on the Judiciary, 101st Cong., 2nd sess. (1989).

U.S. Department of Justice. "Pocket Veto," 40 Opinions of the Attorneys General 274 (1943).

________. "Pocket Veto Clause," 14 Opinions of the Office of Legal Counsel 103 (1990).

Vose, Clement E. "The Memorandum Pocket Veto," 26 Journal of Politics 397 (1964).

# APPENDIX D-2

# C-SPAN Congressional Glossary

| Term | Definition | Used In |
|---|---|---|
| **Pocket Veto** | **A Pocket Veto** is when the President fails to sign a bill within the 10 days allowed by the Constitution.<br><br>Congress must be in adjournment in order for a pocket veto to take effect.<br><br>If Congress is in session and the president fails to sign the bill, it becomes law without his signature. | House and Senate |

Glossary | Glossary | Home Page

# APPENDIX D-3

**Adjournment Sine Die** - The end of a legislative session "without day." These adjournments are used to indicate the final adjournment of an annual or the two-year session of a Congress.

**Terms**

act
adjourn
Adjourn for more than 3 days
Adjournment Sine Die
adjournment to a day and time certain
advice and consent
amendment
amendment in the nature of a substitute
appeal
appropriation
authorization
authorizations act
balanced budget
baseline
bill
budget authority
budget resolution
calendar of business
caucus
chairman
chaplain
"christmas tree" bill
class
clean bill
cloakroom
cloture
committee
committee amendment
committee calendar
committee jurisdiction
committee membership
committee on committees
committee print
committee substitute
executive calendar
executive communication
executive session
filibuster
fiscal year
floor
floor amendment
floor leaders
floor manager
germane
hearing
hold
item veto
joint committee
joint meeting
joint resolution
joint session
journal
"lame duck" session
layover
leave to sit
legislative day
legislative session
majority leader
majority whip
mandatory spending
markup
measure
minority leader
minority whip
morning business
motion to proceed to consider
"must pass" bill
nomination
nongermane amendment
public debt
public law
question
quorum
quorum call
ranking minority member
receipts
recess
recognize
reconciliation bill
reconciliation instruction
reconciliation process
reconsider
referral
regular meeting day
relevant
report
rescission
riddick's senate procedure
rider
roll call vote
scheduling
scorekeeping
secretaries, party
secretary of the senate
select or special committee
senate manual
senator
seniority
sergeant at arms
session
simple resolution
slip law
standing committee
statutes at large

**Sessions of Cong**

The 109th Congress is i from 2005 through 2006 Congress met from 178 1790. Use this chart to all Congresses and corr years.

Congressional Sessions

**Find Bills in THOM**

You can access legislati information, by bill numb words, from the THOMA site. Information from th back to the 93rd Congre is available on THOMAS

**Virtual Reference**

If you are seeking gene information on the Sena legislative branch and p on the federal governm Virtual Reference Desk place to begin. Links are broadly by subject and you to PDF documents, sources on the Web, or Senate Web pages.

[illegible]
concurrent resolution
conditional adjournment
conferees
conference committee
conference, party
conference report
confirmation
congressional record
consideration
continuing resolution/continuing appropriations
controlled time
deficit (surplus)
discretionary spending
enacted
engrossed bill
enrolled bill
entitlement
ex officio
executive business

obligation
off-budget entities
original bill
outlays
override of a veto
oversight
parliamentarian
parliamentary inquiry
permanent appropriation
pocket veto
point of order
policy committees
president of the senate
president pro tempore
presidential signature
presiding officer
private law
pro forma session
proxy voting

statutory limit on the public debt
subcommittee
supplemental appropriation
supplemental, minority, and additional views
table, motion to
trust funds
unanimous consent
unanimous consent agreement
user fees
veto
vice president
voice vote
vote
whips
yeas and nays
yield
yield the floor
yield time

Contact | Content Responsibility | Usage Policy | PDF Help | Privacy Policy

# APPENDIX D-4

[106th Congress House Rules Manual -- House Document No. 106-320]
[From the U.S. Government Printing Office Online Database]
[DOCID:hrulest-55]

[Page 300-303]

sec. li--a session

Parliament have <> three modes of separation, to wit: by adjournment, by prorogation or dissolution by the King, or by the efflux of the term for which they were elected. Prorogation or dissolution constitutes there what is called a session; provided some act was passed. In this case all matters depending before them are discontinued, and at their next meeting are to be taken up de novo, if taken up at all. 1 Blackst., 186. Adjournment, which is by themselves, is no more than a continuance of the session from one day to another, of for a fortnight, a month, &c., ad libitum. All matters depending remain in statu quo, and when they meet again, be the term ever so distant, are resumed, without any fresh commencement, at the point at which they were left. 1 Lev., 165; Lex. Parl., c. 2; 1 Ro. Rep., 29; 4 Inst., 7, 27, 28; Hutt., 61; 1 Mod., 252; Ruffh. Jac., L. Dict. Parliament; 1 Blackst., 186. Their whole session is considered in law but as one day, and has relation to the first day thereof. Bro. Abr. Parliament, 86.

[[Page 301]]

Committees may be <> appointed to sit during a recess by adjournment, but not by prorogation. 5 Grey, 374; 9 Grey, 350; 1 Chandler, 50. Neither House can continue any portion of itself in any parliamentary function beyond the end of the session without the consent of the other two branches. When done, it is by a bill constituting them commissioners for the particular purpose.

The House may empower a committee to sit during a recess which is within the constitutional term of the House (IV, 4541-4543), but not thereafter (IV, 4545). Therefore committees are created commissions by law if their functions are to extend beyond the term of the Congress (IV, 4545). Under clause 2(m)(1)(A) of rule XI, all committees are authorized to sit and act anywhere within the United States, and to issue subpoenas, whether the House is in session or has adjourned to a date certain or adjourned sine die, even after the second regular session of a Congress until the end of the constitutional term. Under clause 1(b)(4) of rule XI, all committees are authorized to file investigative reports and annual activities reports following sine die adjournment.

Congress separate <> in two ways only, to wit, by adjournment, or dissolution by the efflux of their time. What, then, constitutes a session with them? A dissolution certainly closes one session, and the meeting of the new Congress begins another. The Constitution authorizes the President, ``on extraordinary occasions to convene both Houses, or either of them.'' I. 3. If convened by the President's proclamation, this must begin a new session, and of course determine the preceding one to have been a session. So if it meets under the clause of the Constitution which says, ``the Congress shall assemble at least once in every year, and such

[[Page 302]]

meeting shall be on the first Monday in December, unless they shall by

**law appoint a different day.'' I. 4. This must begin a new session; for even if the last adjournment was to this day the act of adjournment is merged in the higher authority of the Constitution, and the meeting will be under that, and not under their adjournment. So far we have fixed landmarks for determining sessions. * * ***

The twentieth amendment to the Constitution, clause 2, now provides that the Congress shall assemble at least once in every year, at noon on the 3d day of January, unless they shall by law appoint a different day. Section 132 of the Legislative Reorganization Act of 1946, 60 Stat. 812, as amended by section 461 of the Legislative Reorganization Act of 1970, 84 Stat. 1140, provides that except in time of war the two Houses shall adjourn sine die not later than the last day of July (Sundays excepted) unless otherwise provided by the Congress. (For form of resolution used to continue in session past July 31, see H. Con. Res. 648, 92d Cong., July 25, 1972, p. 25145.) The same section contemplates an adjournment of Congress from the thirtieth day before to the second day following Labor Day in the first session of a Congress (each odd-numbered year) in lieu of a sine die adjournment. See Sec. 1105, infra. Congress is adjourned for more than three days by a concurrent resolution (IV, 4031, footnote), and such adjournments to a day certain, within the session, do not terminate the session (V, 6676, 6677). In one instance the two Houses by concurrent resolution provided for adjournment to a day certain with the provision that if there be no quorum present on that day the session should terminate (V, 6686). Prior to the adoption of the twentieth amendment it had become established practice that a meeting of Congress once within the year did not make uncertain the constitutional mandate to meet on the first Monday of December (I, 10, 11). And where a special session continued until the time prescribed by the Constitution for the annual meeting without an appreciable intervening time (V, 6690, 6692), a question arose as to whether there had actually been a recess of Congress (V, 6687, 6693), with the conclusion that a recess was a real and not an imaginary time (V, 6687).

* * * In other <> cases it is declared by the joint vote authorizing the President of the Senate and the Speaker to close the session on a fixed day, which is usually in the following form: ``Resolved by the

[[Page 303]]

Senate and House of Representatives, that the President of the Senate and the Speaker of the House of Representatives be authorized to close the present session by adjourning their respective Houses on the ---- day of ----.''

In the modern practice the resolving clause of the concurrent resolution is in form different from that given by Jefferson. For a history and chronology of adjournment resolutions, see Sec. 84, supra.

When it was <> said above that all matters depending before Parliament were discontinued by the determination of the session, it was not meant for judiciary cases depending before the House of Lords, such as impeachments, appeals, and writs of error. These stand continued, of course, to the next session. Raym., 120, 381; Ruffh. Fac., L. D., Parliament.

Impeachments stand, in like manner, continued before the Senate of the United States.

For a discussion of continuance of impeachments, see Sec. 620, infra.

# APPENDIX D-5

# LEGAL EFFECTIVENESS OF CONGRESSIONAL SUBPOENAS ISSUED AFTER AN ADJOURNMENT SINE DIE OF CONGRESS

***A congressional subpoena issued after an adjournment sine die of Congress lacks any legal force and effect and does not impose any legal obligation to comply with the subpoena.***

**November 12, 1996**

## MEMORANDUM FOR JANET RENO ATTORNEY GENERAL

You have asked this Office to analyze the legal effectiveness of a congressional subpoena issued after a sine die adjournment of Congress. In a 1982 opinion, this Office concluded that a congressional subpoena issued during a session of Congress lacks present force and effect after the adjournment sine die of Congress. Continuing Effect of a Congressional Subpoena Following the Adjournment of Congress, 6 Op. O.L.C. 744 (1982). According to that opinion, the lapse in legal effectiveness "results from the same factors that produce, at the same time, the death of all pending legislation not enacted . . . and the termination of congressional authority to hold a contumacious witness in custody." Id. at 745 (internal citations omitted). It would necessarily follow from the analysis contained in that opinion that a subpoena issued after an adjournment sine die lacks any force and effect ab initio. After revisiting the issue, we continue to adhere the analytical framework used in this Office's 1982 opinion. Therefore, for the reasons set forth below, we conclude that a congressional subpoena issued after a sine die adjournment has no legal effect.[1]

## I. LEGAL DISCUSSION

The Constitution vests all legislative authority in Congress. U.S. Const., art. I, § 1. Although the Constitution does not expressly authorize Congress to issue subpoenas, the Supreme Court has stated that the authority to subpoena is an "indispensable ingredient" of Congress' legislative power. Eastland

v. United States Servicemen's Fund, 421 U.S. 491, 505 (1975). In McGrain v. Daugherty, 273 U.S. 135, 174 (1927), the Court declared that "the power of inquiry-with process to enforce it-is an essential and appropriate auxiliary to the legislative function." According to the Court:

> A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information-which not infrequently is true-recourse must be had to others who do possess it. Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed.

Id. at 175. Similarly, in Eastland, the Court said:

> The power to investigate and to do so through compulsory process plainly falls within [the definition of Congress' legislative function]. This Court has often noted that the power to investigate is inherent in the power to make laws.

Eastland, 421 U.S. at 504.[2]

This understanding–that Congress' subpoena power inheres in and is ancillary to its power to legislate–leads logically to the conclusion that the legal obligation to comply with a congressional subpoena lapses upon the cessation of Congress' authority to legislate. Just as an adjournment sine die results in the death of all pending legislation, see Floyd M. Riddick, The United States Congress: Organization and Procedure 56 (1949), making passage and presentment to the President impossible, see U.S. Const. art. I, §§ 1, 7; The Pocket Veto Case, 279 U.S. 655, 681 (1929) (final adjournment of Congress "terminates the legislative existence of the Congress"), so too must it result in the cessation of the auxiliary power to compel witnesses to present testimony or

information via subpoena. It follows that congressional subpoenas issued after an adjournment sine die but prior to the beginning of a new Congress have no legal effect.

The limitations the Court has placed upon Congress' use of its inherent authority to deal with contempts provide additional support for the view that congressional subpoenas issued after an adjournment sine die have no legal effect. The Court has held that Congress has implicit authority under the Constitution to deal with a contempt of its authority. See Anderson v. Dunn, 19 U.S. 204, 226-30 (1821). This power stems, according to the Court, from Congress' inherent authority to preserve its constitutionally-derived legislative power. See id.; Marshall v. Gordon, 243 U.S. 521, 541 (1917) ("[I]n virtue of the grant of legislative authority there [is] a power implied to deal with contempt in so far as that authority [is] necessary to preserve and carry out the legislative authority given.").

The Court has made clear, however, that there are limits to Congress' use of this power. First, such power "rests only upon the right of self-preservation; that is, the right to prevent acts which, in and of themselves, inherently obstruct or prevent the discharge of legislative duty or the refusal to do that which there is an inherent legislative power to compel in order that legislative functions may be performed." Id. at 542.[3] Second, even where Congress properly exercises its authority to deal with a contempt, the punishment must cease upon the adjournment of Congress:

> [T]he existence of the power that imprisons is indispensable to its continuance; and although the legislative power continues perpetual, the legislative body ceases to exist on the moment of its adjournment or periodic dissolution. It follows, that imprisonment must terminate with that adjournment."

Anderson, 19 U.S. at 231 (emphasis added); accord, Marshall, 243 U.S. at 542 (Congress' contempt power, "even when applied to subjects which justified its exercise, is limited to imprisonment, and such imprisonment may not be extended beyond the session of the body in which the contempt occurred."). These limitations,

which the Court concluded were justified in view of the nature of the authority upon which Congress' contempt power is based (i.e., self-preservation of legislative authority), see Anderson, 19 U.S. at 230-31,[(4)] provide additional support for the conclusion that Congress lacks the power of compulsory process after a sine die adjournment.

Because this conclusion rests upon the cessation of Congress' legislative existence, it applies equally to House and Senate subpoenas. However, the case of the Senate merits some separate discussion, because the Court, noting certain internal and structural differences between the House and the Senate, has occasionally referred to the Senate as a "continuing body." See Eastland, 421 U.S. at 512; McGrain, 273 U.S. at 181; cf. Gojack v. United States, 384 U.S. 702, 706 n.4 (1966). In McGrain, the Court suggested that the Senate's status as a continuing body might prevent a controversy over an attempt by the Senate to compel compliance with one of its subpoenas from becoming moot upon the adjournment of the Congress during which the Senate action was initially taken. See McGrain, 273 U.S. at 181. See also Eastland, 421 U.S. at 512. The continuing existence of a case and controversy with respect to enforcement of a subpoena might seem to imply that the subpoena had a continuing legal effect beyond a sine die adjournment.

The Court's discussion of mootness in McGrain does not alter our conclusion regarding the legal effect of a Senate subpoena issued after an adjournment sine die, for two reasons. First, in addressing the mootness issue, the Court in McGrain relied upon an interpretation of a passage in Jefferson's Manual that appears to have misunderstood that passage's actual import. The Court quoted the following passage from Jefferson's Manual:

> Neither House can continue any portion of itself in any parliamentary function beyond the end of the session without the consent of the other two branches. When done, it is by a bill constituting them commissioners for the particular purpose. . . .

McGrain, 273 U.S. at 181 (quoting Senate Rules and Manual, 1925,

**p. 303). Referring to that language, the Court concluded that "the context shows that the reference is to the two houses of Parliament when adjourned by prorogation or dissolution by the king." Id.**

**The larger passage of which this quotation is a part, and which we have set out in a footnote,[5] indicates that Jefferson is drawing upon the practices of Parliament to propound analogous principles to guide the newly established Congress. Where differences in the English and American systems of governance necessitate explication of the analogies, Jefferson does so. Where the analogy between the English and American systems applies without modification, however, there is no need for further discussion. Thus, in the quotation repeated in McGrain, Jefferson notes that upon the end of the session, all pending matters are discontinued and all parliamentary functions cease, unless special provisions, requiring the consent of the other two branches, have been made. The larger passage reveals that this assertion has been preceded by a discussion of the three modes by which Parliament "separates," only two of which amount to the end of a legislative session. So Jefferson has stated the ways in which Parliament can be separated so as to result in the termination of all parliamentary functions. He then continues on in the passage to note that Congress is unlike the Parliament, in the specific respect that it has only two modes of separation. This prompts Jefferson to ask, "[w]hat, then, constitutes a session [of Congress]?" Jefferson's Manual at 292. An answer to that question is necessary in order to apply the principle that all pending matters are discontinued and all parliamentary functions cease upon termination of the legislative session, but a repetition of the principle itself is unnecessary, because Jefferson is taking it as understood that this fundamental principle applies to the American legislature just as it applies to the British legislature.[(6)]**

**Reading this passage to suggest that Jefferson meant not to apply the principle to Congress would be most peculiar. Such a reading would need to explain why Jefferson had so carefully noted the differences with respect to what constitutes a session of Congress, as compared to Parliament, and yet kept so completely hidden his belief that entirely different consequences flowed from**

**the end of a congressional session as compared to the end of a parliamentary session.**

**Nor can this passage be read to treat the Senate differently from the House. Throughout the passage, Jefferson refers consistently to "Congress," suggesting that both houses of Congress are subject to the same analysis. Elsewhere, he shows full awareness of the fact that because the Constitution makes numerous distinctions between the two bodies, it is conceivable that different rules would apply to each of them. Where that is true, however, he explicitly distinguishes between the House and the Senate, as he does in a subsequent passage that refers back to the passage quoted in footnote 5, and that states an important qualification to the principle that the end of a session terminates all business before the legislative body:**

> **When it was said above that all matters depending before the Parliament were discontinued by the determination of the session, it was not meant for judiciary cases depending before the House of Lords, such as impeachments, appeals, and writs of error. These stand continued, of course, to the next session. . . .**
>
> **Impeachments stand, in like manner, continued before the Senate of the United States.**

**<u>Jefferson's Manual</u> at 294. This passage confirms the view that in the earlier passage Jefferson was relying upon Parliamentary rules to develop rules applicable to both houses of Congress because it shows that he did not hesitate to point out cases where a rule applied to only one house of the legislature in particular. In addition, and quite separately, by calling attention to the Senate's post-adjournment authority to exercise its constitutionally-derived <u>judicial</u> powers to try impeachments as a special exception, the passage confirms that Jefferson did not believe that the Senate could exercise its constitutionally-derived <u>legislative</u> powers after an adjournment <u>sine die</u>. Because Congress' authority to coerce by subpoena the production of information derives from its constitutionally-delegated authority to legislate, Jefferson must have intended to convey that such authority ceases upon an**

adjournment sine die.[7]

Second, even assuming with McGrain that the Senate's status as a continuing body dictates that a legal controversy relating to an action taken by the Senate of a previous Congress (i.e., before the adjournment sine die of that Congress) under a then-existing Senate subpoena cannot be mooted merely by the adjournment sine die of the previous Congress,[(8)] such fact does not compel the conclusion that the legal effectiveness of compulsory Senate process extends beyond a sine die adjournment. A case will become moot when the relief sought by the plaintiff would, if granted, confer no tangible benefit. Preiser v. Newkirk, 422 U.S. 395, 401 (1975). The Court's discussion of mootness in McGrain thus centered on whether the Senate, having initially exercised its constitutionally-based contempt authority during the session in which it had issued the subpoena, was capable of repeating such action. See McGrain, 273 U.S. at 181-82. As demonstrated by the Court's discussion in McGrain, a mootness determination entails a different analysis than that required to resolve whether a party is empowered in the first instance to bring a suit or take a specified action.

For these reasons, the Court's mootness discussion in McGrain does not, in our view, resolve the legal status of a Senate subpoena issued after a sine die adjournment, and the passage from Jefferson's Manual relied upon in McGrain to distinguish the Senate from the House actually equates the two bodies for purposes relevant to this analysis.[9] In fact, we believe that the Court's previous analyses of Congress' subpoena and contempt power support the view that a congressional subpoena issued after an adjournment sine die has no legal effect.[10]

## II. CONCLUSION

For the reasons discussed above, we conclude, consistent with our 1982 opinion, that a congressional subpoena issued after an adjournment sine die lacks any legal force and effect and does not impose any legal obligation to comply with the subpoena.

Chris Schroeder
Acting Assistant

Attorney General

Office of Legal

Counsel

[1] Several rules of the House and Senate apply to the authorization and issuance of congressional subpoenas. See, e.g., House Rule XI (2)(m)(1)(B); Senate Rule XXVI(1). See also, House Rule XI(2)(m)(2)(A); Senate Rule XXVI(7)(a)(1). For purposes of analysis, this memorandum assumes that a post-sine die adjournment congressional subpoena can be issued in a manner consistent with the relevant House and Senate rules.

[2] The Court emphasized in Eastland that "whether particular activities . . . fall within the 'legitimate legislative sphere' [depends upon] whether the activities took place 'in a session of the [house of Congress at issue] by one of its members in relation to the business before it.'" Id. at 503-04 (quoting Kilbourn v. Thompson, 103 U.S. 168, 204 (1881)).

[3] Applying this standard, the Court in Marshall invalidated an attempt by the House to respond to a contempt in the form of "irritating and ill-tempered statements made in [a] letter [addressed to the chairman of a House subcommittee]," id. at 546, where "the contempt relied upon was not intrinsic to the right of the House to preserve the means of discharging its legislative duties," id., but was, instead, "related only to the presumed operation which the letter might have upon the public mind and the indignation naturally felt by members of the committee on the subject." Id.

[4] The Court in Anderson stated:

> The present question is, what is the extent of the punishing power which the deliberative assemblies of the Union may assume and exercise on the principle of self-preservation?
>
> Analogy, and the nature of the case, furnish the answer--

> 'the least possible power adequate to the end proposed;' which is the power of imprisonment. . . . And even to the duration of imprisonment a period is imposed by the nature of things, since the existence of the power that imprisons is indispensable to its continuance; and although the legislative power continues perpetual, the legislative body ceases to exist on the moment of its adjournment or periodic dissolution. It follows, that imprisonment must terminate with that adjournment.

Id.

[5] The larger passage from Jefferson's Manual is as follows:

> Parliament have three modes of separation, to wit: by adjournment, by prorogation or dissolution by the King, or by the efflux of the term for which they were elected. Prorogation or dissolution constitutes there what is called a session; provided some act was passed. In this case all matters depending before them are discontinued, and at their next meeting are to be taken up de novo, if taken up at all. . . . Adjournment, which is by themselves, is no more than a continuance of the session from one day to another, of for a fortnight, a month, &c., ad libitum. All matters depending remain in statu quo, and when they meet again, be the term ever so distant, are resumed, without any fresh commencement, at the point at which they were left. Their whole session is considered in law but as one day, and has relation to the first day thereof.
>
> Committees may be appointed to sit during a recess by adjournment, but not by prorogation. Neither House can continue any portion of itself in any parliamentary function beyond the end of the session without the consent of the other two branches. When done, it is by a bill constituting them commissioners for the particular purpose.
>
> Congress separate in two ways only, to wit, by adjournment, or dissolution by the efflux of their time.

> What, then, constitutes a session with them? A dissolution certainly closes one session, and the meeting of the new Congress begins another. The Constitution authorizes the President, "on extraordinary occasions to convene both Houses, or either of them." If convened by the President's proclamation, this must begin a new session, and of course determine the preceding one to have been a session. So if it meets under the clause of the Constitution which says, "the Congress shall assemble at least once in every year, and such meeting shall be on the first Monday in December, unless they shall appoint a different day." This must begin a new session; for even if the last adjournment was to this day the act of adjournment is merged in the higher authority of the Constitution, and the meeting will be under that, and not under their adjournment. So far we have fixed landmarks for determining sessions.

William Holmes Brown, Constitution, Jefferson's Manual and Rules of the House of Representatives, H.R. Doc. No. 256, 101st Cong., 2d. Sess. (1991) ("Jefferson's Manual") 291-92 (citations omitted).

[6] As suggested above, Jefferson's reference to the "end of the session" is satisfied by a sine die adjournment. See The Pocket Veto Case, 279 U.S. at 681; Riddick, supra, at 56.

[7] The House Parliamentarian appears to agree with this view. In the annotation to the Parliamentarian's presentation of Jefferson's Manual, he refers to the passage cited in McGrain as "Sitting of committees in recess, and creation of commissions to sit after Congress adjourns." Jefferson's Manual § 589 (annotation) at 291 (emphasis added).

[8] In McGrain, the Senate took action to enforce its subpoena prior to its adjournment. McGrain, 273 U.S. at 153-54.

[9] As stated above, our analysis concludes, consistent with Anderson, 19 U.S. at 231, The Pocket Veto Case, 279 U.S. at 681, and Jefferson's Manual, that the legislative power of a house of Congress ends upon the end of a session and that its adjournment

sine die constitutes the end of a session. See text at note 4, and note 6, above. Therefore, we reject as untenable the apparent suggestion of the court in Harris v. Board of Governors, 938 F.2d 720, 723 (7th Cir. 1991) that Congress' ability to exert legislative power may continue beyond that point. In any event, because the court in Harris determined that the case became moot upon appeal, see id. at 720, such dicta has no binding effect. See id. at 725 (Ripple, J., concurring in the court's decision that the case became moot on appeal and noting that the court's dicta "does not constitute the law of the circuit.").

[10] Our conclusion that Congress' constitutional authority to coerce by subpoena the tendering of requested information lapses upon an adjournment sine die is not intended to call into question the Executive branch's longstanding practice of responding voluntarily to information requests from congressional committees (whether by letter or subpoena) during adjournment sine die periods. The conclusion that as a matter of law Congress lacks authority after adjournment sine die to impose obligations or sanctions outside the Legislative branch -- whether by legislation, subpoena or contempt order -- does not mean that Congress cannot make a request for information or that the Executive branch cannot, as a matter of policy (based on the comity afforded another branch of government), respond voluntarily to such a request.